BROADSTREET GLOBAL

May 22, 2026

**Re: Broadstreet Global Fund ("BSGF" or "Fund") Update – Final Phase of Redemption**

Dear Broadstreet Universe:

Previously we released multiple investor update letters (12/5/25, 1/15/26, 2/2/26, 2/25/26, 3/23/26, 4/28/26, and 5/14/26), collectively the "Investor Updates," all sent after the redemption transaction (the "Redemption") previously announced last fall. Those updates, in conjunction with the private placement memorandum, operating agreement, investor acknowledgement and data room disclosures (collectively the "Investor Documents"), comprise extensive information provided to all investors describing our relationship.

As previously announced, the results of the Redemption were that approximately 94% of the redemption value of our investors elected to be redeemed in the form of stock payment from a reverse triangular merger transaction. The remaining approximately 6% of the redemption value had elected cash consideration.

We are pleased to report that last week we signed the bill of sale transaction document with our purchasing counterparty in the stock-based transaction referenced in the Investor Updates. The remaining 6% cash redemption transaction relied upon the timely and appropriate liquidation of certain assets. As a result of our Investor Updates, and in particular after the May 14, 2026 investor update, we received a response from investors who had previously elected cash redemption and who now inquired about instead seeking a stock redemption. We had not responded to such requests as we awaited more visibility on our cash liquidation transactions.

**Cash Sales-Process Hits Impasse**

Now, we can further report that we have reached a stalemate with our purchasers of the assets involving the cash liquidation. Even taking into account those investors who indicated a desire to receive stock instead of cash, that still does not alleviate the amount of sales necessary to fully satisfy the remaining investors who desire to receive cash by next week. By way of example, we have a project for which we received an appraisal for nearly $24 million, but our purchasers have offered a maximum of $12 million. That is simply unacceptable and has resulted in an impasse preventing a larger transaction. Further, even since our last Investor Update communication, there

has been continued interest rate volatility and geo-political uncertainty. These are not merely unfortunate market headwinds; they are the specific conditions the Operating Agreement anticipates. As discussed below, Section 6.07(b)(ii) expressly addresses the situation in which market disruptions make the pricing or liquidation of assets difficult or would force losses on the Fund — the precise circumstance confronting us now.

In fact, as discussed in our prior Investor Updates, a number of private equity firms have gated redemptions, and private equity exits and returns of distributed paid-in capital to investors appear to be at historic lows, meaning that many private equity investors are not receiving returns of even their principal investments/initial capital. This has all been detailed in our Investor Updates. Fortunately, that is not our situation, as we do have an arranged exit — and it is an arranged exit that was previously authorized as per our Investor Documents signed by each and every investor.

**Our Authority To Complete The Redemption In Kind**

We have taken our right to make these decisions extremely thoughtfully, with professional assistance and oversight, to ensure that all of our decisions are made with full authority, pursuant to the Investor Documents, and rationally. We want to be transparent with you about the basis for our decision.

First, the choice of redemption method belongs to the Manager. The Operating Agreement that every investor executed as a condition of investment provides, in Section 6.05(a), that *the Manager may, in its sole discretion, make distributions in cash or **in kind**, or in a combination thereof*, in connection with a withdrawal or required withdrawal. The Manager likewise may choose, in its sole discretion, which assets to distribute in kind. Section 6.03 further authorizes the Manager, in its sole discretion, to terminate all or any part of a Member's Capital Account, subject to commercially reasonable notice. Section 6.07(b) goes further still, permitting the Manager to *at any time suspend or restrict the right of any Member to withdraw capital or receive a distribution* where, in the Manager's judgment, doing so *would be in the best interests of the Company or such Series*. Section 6.07(b) does not leave that judgment at large; it expressly identifies the very circumstances present here. Among the situations in which the Manager may suspend or restrict withdrawals, the Operating Agreement specifies the case in which *disruptions in investment markets make pricing and/or liquidation of some or all Company or Series assets difficult or would result in losses if the Company or a Series attempted such liquidations* (Section 6.07(b)(ii)). That is precisely our situation: with interest-rate volatility and heightened geopolitical uncertainty narrowing the field of buyers, the only offers available would have required liquidating assets at roughly half of their value — a result the Operating Agreement contemplates the Manager need not, and should not, accept. The Private Placement Memorandum is to the same effect, and indeed states the point in its strongest form: notwithstanding any supplement, side letter, or other document, "all withdrawals may be modified or paid back in kind if the Manager so determines it

to be in the best interest of the Fund," a determination committed to "the sole and absolute discretion of the Manager."[1]

Second, that discretion is exercised consistent with our obligations and judgment as to the best interests of the Fund. That is the very standard Section 6.07(b) sets, and it is the determination we have made here: faced with offers at roughly half of value, a forced sale of assets at distressed prices is something we cannot and will not accept, because it would not be in the best interests of the Fund. A large transaction simply cannot be done under such circumstances. This is not a matter of preference but of the framework the Operating Agreement establishes. The market disruptions described above are exactly the conditions Section 6.07(b)(ii) addresses, and the Operating Agreement separately provides, in Section 5.08, that the values assigned to a Series' assets by the Manager in accordance with the Fund's Valuation Policy are "final and conclusive as to all of the Members." Selling at a price the Manager has determined to be roughly half of fair value would disregard that valuation and impose precisely the losses Section 6.07(b)(ii) is designed to avoid. More than that, such pricing has put us at an impasse on a larger transaction.

**Monitor Does Not Have Approval Rights**

Third, this is a business decision that remains ours to make. As we have kept you apprised, the Fund has voluntarily operated with an agreed to corporate monitorship. The Court has made clear — on the record — that the monitorship is advisory: the Monitor reports to the Court and may give recommendations, but the governing order does not require the Monitor's approval for business decisions, and there is no approval required. We are obligated to make the Monitor aware of material business decisions before they are implemented, and we have done exactly that with respect to the in-kind redemption described here. But awareness is not approval, and the decision of how to complete the Redemption rests with the Manager, as both the Investor Documents and the Court confirm.

We share this detail because the role of the Monitor has been a recurring subject in this matter, and we want you to understand it accurately. Throughout this process the Monitor has at times sought a more active role in business and redemption decisions, and we have frequently accommodated those requests in a spirit of cooperation and to avoid unnecessary conflict and bad reporting. The Court itself recognized at the December 8, 2025 hearing that there may have been "a blurring of the lines" as to what the Monitor was and was not to do, and it was careful to confirm that no approval from the Monitor is required for our business decisions. Our cooperation along the way has never been, and is not, a transfer of the Manager's authority to the Monitor.

---

[1] This is the bargained-for framework every investor agreed to, and the courts enforce it: as the courts have repeatedly found, parties are bound by the clear terms of the documents they sign and cannot rewrite them after the fact. *See Mergens v. Dreyfoos*, 166 F.3d 1114 (11th Cir. 1999); *Kaufman v. Guest Capital, L.L.C.*, 386 F. Supp. 2d 256, 273 (S.D.N.Y. 2005)(Court "cannot **rewrite** the [PPM] and add words that the parties themselves did not include in their agreement.").

It is worth recalling how the cash option came to exist in the first place. Our original plan was to redeem investors in kind. The cash alternative was added in the course of the monitorship as a recommendation, and we accepted it at the time under the pressure of disagreement with the Monitor and worked cooperatively to offer investors a choice between cash and stock. A recommendation, however, is by its nature advice that the recipient remains free to accept, decline, or revisit as circumstances change. Our agreement to offer a cash option last fall, made in a spirit of cooperation, was not a permanent surrender of the discretion the Investor Documents reserve to the Manager. When the asset sales necessary to fund that option failed to materialize on acceptable terms, the Manager retained — and retains — the discretion to determine how best to complete the Redemption. The Court made abundantly clear that it is BSGF that is to make the business decisions. Extensive and detailed documents were drafted by some of the largest law firms specializing in private equity which included terms signed by all participants, represented in writing to be highly sophisticated investors, for situations that might arise such as this.

We also want you to understand the good faith with which we pursued the cash option before reaching this point. Of the total redemption value, approximately **94% of investors elected stock** and only approximately 6% elected cash. Satisfying that cash component depended on selling certain assets at a reasonable price, and we devoted substantial effort to closing those sales. As described above, that process reached an impasse. We followed the orderly process our governing documents and the Court contemplate: we kept the investors, the Monitor and the Court fully apprised of each material development in advance, and we are now completing the Redemption in the manner the Investor Documents commit to the Manager. In short, we are honoring our documents that everyone signed and doing exactly what our documents allow us to do.

Yes, some investors (a small minority of the total redemption) may not be pleased with our decisions, and that is an unfortunate by-product of dealing with such a large number of investors. But in the end, the bottom line is that all decisions have been made in direct compliance with all of our Investor Documents. There is a reason why those documents exist and that is, to define our relationship and clarify our rights.

**What This Means For You**

In light of the above, management has elected to complete the Redemption of the small minority of investors remaining who had elected a cash redemption by instead redeeming them in the form of an "in-kind" redemption, with payment being made in stock. The stock payment will be the same class of stock, from the same reverse triangular merger transaction, as that being issued to all other investors. That means you are being paid a 3x multiple of your investment, calculated as previously described in the redemption notice. Again, although this encompasses a small minority of remaining investors, and we are cognizant that some investors may have preferred receiving cash, we are simply doing that which all investors lawfully signed and approved through the Investor Documents.

Case 1:26-cv-20398-DPG Document 16-1 Entered on FLSD Docket 05/22/2026 Page 5 of 5

Our next step is to collect the brokerage account information from each investor in order to make the arrangements for the delivery of stock for the Redemption. **Please provide your brokerage delivery information by email (info@broadstreetglobalfund.com) at your earliest convenience so that we can arrange transfer of your stock.**

As always, we have greatly appreciated our journey together. We have accomplished a great deal together, and in our hearts we believe that this result is the best result.

Sincerely,

**Broad Street Global Management LLC**
Manager of Broad Street Global Fund LLC