**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:26-cv-23998-GAYLES**

**BROAD STREET GLOBAL MANAGEMENT LLC,**

Plaintiff,

v.

**STEVEN SCHULMAN, ANKUR ANAND, GREGORY LOVALLO, NIMISH PATEL, AND ROBERT HARPER,**

Defendants.

_____________________________________/

**STEVEN SCHULMAN, ANKUR ANAND, GREGORY LOVALLO, NIMISH PATEL, AND ROBERT HARPER,**

Defendants/Counter-Plaintiff,

v.

**BROAD STREET GLOBAL MANAGEMENT LLC,**

Plaintiff/Counter-Defendant.

_____________________________________/

**STEVEN SCHULMAN, ANKUR ANAND, GREGORY LOVALLO, NIMISH PATEL, ROBERT HARPER, NIKHIL PATEL, NIPUNA PATEL, JYOTI PATEL, DINESH THAKKER, SHASHIKALA THAKKER, JIT PATEL, KARISHMA GUPTA, KHUSBU HARSHAD PATEL, MANDAKINI SUBHASH PATEL, JAMES ANDREW HO, HOWIE MANN, WILLIAM JOSEPH MORONEY, THEODORE CHESNER, STEVEN STILES, KINJALKUMAR PATEL, BHUMIKA PATEL, YATIN KHANNA, ALYA CAPITAL, LLC, SANJAY GUPTA and ANITA GUPTA,**

Defendants/Third-Party Plaintiffs,

v.

**BROADSTREET, INC., DAVID FEINGOLD, STEVEN BALDASSARRA, JOSEPH BALDASSARRA and AKHIL MORADA,**

Third-Party Defendants.

# TABLE OF CONTENTS

**Page**


TABLE OF CONTENTS ....................................................................................i

ANSWER ....................................................................................................2

COUNTER CLAIM AND THIRD PARTIES ..........................................................6

INTRODUCTION ..........................................................................................7

PARTIES ...................................................................................................12

COUNTER PLAINTIFFS ................................................................................12

COUNTER DEFENDANTS ..............................................................................19

JURISDICTION AND VENUE .........................................................................21

FACTUAL ALLEGATIONS ...............................................................................22

I. BSG FUND'S FORMATION, OPERATION, AND REALTION TO THE BROADSTREET ENTERPRISE ..........22

II. BSG Management and BSI Offered and Sold More Than $1 Billion of Securities…………...23

III. THE OFFERING DOCUMENTS ..........................................................25

IV. THE BSG FUND SERIES ..................................................................27

V. BROADSTEET KNOWINGLY RAISED MONEY FROM NON-ACCREDITED INVESTORS ..........33

VI. FEINGOLD AND THE BALDASSARRAS HAVE TAKEN MORE THAN $170 MILLION FROM THE BSG FUND ..........34

VII. BSG MANAGEMENT AND THE BALDASSARRAS ARE INVESTMENT ADVISORS ..........37

VIII. FEINGOLD AND THE BALDASSARRAS CONTROL BSI AND BSG MANAGEMENT ....................38

IX. THE JULY 2023 COMPLIANCE ACKNOWLEDGEMENT ....................41

X. IN 2025 BROADSTREET RAN OUT OF MONEY TO CONTINUE PAYING THE GUARANTEED DISTRIBUTION ....................45

XI. FEINGOLD'S ROLE IN THE SCHEME ....................46

XII. THE BALDASSARRAS ROLE IN THE SCHEME ....................48

XIII. BEGINNING IN MARCH 2025 BROADSTREET INITIATED ITS SCHEME TO GET RID OF THE INVESTORS IN THE ALTCOIN SERIES ....................50

XIV. BEGINNING IN MAY 2025 INVESTORS START RECEIVING REPORTS FROM THE COURT APPOINTED MONITIR IN THE SEC ENFORCEMENT ACTION ....................55

XV. MONITOR'S FIRST STATUS REPORT ....................55

XVI. MONITOR'S THIRD STATUS REPORT ....................57

XVII. MONITOR'S FOURTH STATUS ....................59

XVII. BROADSTREET INITIATED ITS SCHEME TO GET RID OF INVESTORS IN NOVEMBER 2025 BY ISSUING A REDEMPTION NOTICE. ....................63

a. Cover letter to Redemption Notice ....................64

b. The Redemption Notice ....................66

c. Item 1 the Additional Q&A Information Schedule ....................68

d. Item 2 the Operating Agreement ....................70

e. Item 4 entitled Contender Development, Inc. Calculated Value of Business Enterprise of NewCo. ....................73

XIX. ISSUES WITH SOULPOWER ACQUISITION CRP. AND SPAC'S IN GENERAL ........ 77

XIX. THE DECEMBER 3, 2025 HEARING IN THE SEC ENFORCEMENT ACTION ........ 79

XX. BROADSTREET MISREPRESENTS THE AMOUNTS OF INVESTORS THE CHOSE STOCK VS. CASH OPTION ........ 79

XXI. BROADSTREET'S FEBRUARY 2, 2026 INVESTOR UPDATE ........ 79

XXII. BROADSTREET FEBRUARY 25, 2026 INVESTOR UPDATE ........ 83

XXIII. BROADSTREET'S MARCH 23,2026 INVESTOR UPDATEJURY TRIAL DEMAND ........ 84

XXIV. BROADSTREET'S APRIL 28, 2026 INVESTOR UPDATE ........ 84

XXV. MONITOR'S SIXTH STATUS REPORT ........ 85

XXVI. BROADSTREET'S MAY 14, 2026 INVESTOR UPDATE ........ 86

XXVII. BROADSTREET'S MAY 22, 2026 INVESTOR UPDATE ........ 87

XXVIII. BROADSTREET'S MAY 28, 2026 INVESTOR UPDATE ........ 90

XXIX. MONITOR'S SEVENTH STATUS REPORT ........ 90

XXX. MONITOR'S EIGHTH STATUS REPORT ........ 91

XXXI. BROADSTREET'S JULY 27, 2026 INVESTOR UPDATE ........ 92

XXXII. THE COUNTER PLAINTIFF'S AND REPRESENTATIONS BROADSTREET EMPLOYEES MADE DIRECTLY TO THEM ........ 93

CLAIMS FOR RELIEF ........ 107

COUNT I – DECLARATORY JUDGEMENT ........ 107

COUNT II – BREACH OF CONTRACT (THE REDEMPTION NOTICE) ….108

COUNT III – BREACH OF CONTRACT (THE "IN-KIND" REDEMPTION..112

COUNT IV – CONVERSION……………………………………………..…114

COUNT V – CIVIL THEFT……………………………………………….117

COUNT VI – BREACH OF CONTRACT…………………………………...119

COUNT VII – FRAUD (ALTCOIN) ……………………………………...122

COUNT VIII – FRAUD……………………………………………..…...127

COUNT IX – BREACH OF FIDUCIARY DUTY……………………...……130

COUNT X – DISGORGEMENT…………………………………...……133

COUNT XI – ACCOUNTING…………………………………………….…134

COUNT XII – CONTROL PERSON LIABILITY…………………………...135

COUNT XIII – CONSTRUCTIVE TRUST, EQUITABLE LIEN, AND/OR
SEGREGATION OF SALE PROCEEDS…………………………………..…137

PRAYER FOR RELIEF……………………………………………..…..138

JURY TRIAL DEMAND………………………………………………….…140

CERTIFICATE OF SERVICE……………………………………………..141

**ANSWER TO THE COMPLAINT, AFFIRMATIVE DEFENSES,**
**COUNTERCLAIM, AND THIRD-PARTY COMPLAINT**

Defendants/Counter-Plaintiffs/Third-Party Plaintiffs, by and through undersigned counsel, hereby file this Answer, Affirmative Defenses and Counterclaim to the Complaint filed by Broad Street Global Management LLC ("BSGM"), and adds claims for third parties Nikhil Patel, Nipuna Patel, Jyoti Patel, Dinesh Thakker, Shashikala Thakker, Jit Patel, Karishma Gupta, Khusbu Harshad Patel, Mandakini Subhash Patel, James Andrew Ho, Howie Mann, William Joseph Moroney, Theodore Chesner, Steven Stiles, Kinjalkumar Patel, Bhumika Patel, Yatin Khanna, Alya Capital, LLC, Sanjay Gupta and Anita Gupta and claims against third parties Broadstreet, Inc., David Feingold, Steven Baldassarra, Joseph Baldassarra and Akhil Morada, and state as follows:

**ANSWER**

1. Admitted to the extent that the controversy between the Parties can be resolved in part by a declaratory judgment. Defendants otherwise deny the remainder of paragraph 1.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Admitted.

14. Admitted to the extent that each of the Defendants signed subscription agreements. Defendants otherwise deny the remainder of paragraph 14.

15. Defendants admit that the Operating Agreement and PPM speak for themselves. Defendants otherwise deny the remainder of paragraph 15.

16. Admitted.

17. Defendants admit that Redemption Notice speaks for itself. Defendants otherwise deny the remainder of paragraph 17.

18. Admitted.

19. Defendants admit that the February 2, 2026 letter speaks for itself. Defendants otherwise deny the remainder of paragraph 19.

20. Defendants admit that the February 25, 2026 letter speaks for itself. Defendants otherwise deny the remainder of paragraph 20.

21. Defendants admit that the March 23, 2026 letter speaks for itself. Defendants otherwise deny the remainder of paragraph 21.

22. Defendants admit that the April 28, 2026 letter speaks for itself. Defendants otherwise deny the remainder of paragraph 22.

23. Defendants admit that the May 14, 2026 letter speaks for itself. Defendants otherwise deny the remainder of paragraph 23.

24. Denied.

25. Defendants admit that the May 22, 2026 letter speaks for itself. Defendants otherwise deny the remainder of paragraph 25.

26. Defendants admit that their Demand letters speak for themselves. Defendants otherwise deny the remainder of paragraph 26.

27. Admitted.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

28. Admitted.

29. Admitted.

30. Admitted.

31. Admitted.

32. Denied.

**GENERAL DENIAL**

Defendants deny all allegations and inferences in Plaintiff's Complaint not expressly admitted, including the Prayer for Relief.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**
**(Estoppel)**

Plaintiff is barred from asserting its claim for a declaratory judgment because Plaintiff and its agents represented to Defendants that they will be allowed to redeem their interest in the Broad

Street Global Fund, LLC in cash in the **binding** Redemption Notice Plaintiff sent to Defendants on November 14, 2025.

**SECOND AFFIRMATIVE DEFENSE**
**(Fraud)**

Plaintiff's claim is based on the fraudulent misrepresentation that what Plaintiff has offered Defendants is an "in-kind" redemption. The speculative, illiquid and restricted shares that Plaintiff is attempting to force on Defendants cannot be sold and thus are worthless. Plaintiff has fraudulently represented that these shares are worth three-times Defendants' capital account in the Redemption Notice with absolutely no basis to support that valuation. Plaintiff knowingly made these fraudulent representations with the intent to deceive Defendants and this Court into believing the stock redemption is an "in-kind" redemption. The truth is that these shares have no known value and thus cannot represent the required fair value of Defendants' capital account for it to be an "in-kind" redemption. Accordingly, Plaintiff should be barred from asserting its claim for declaratory judgment since the relief sought is based on the fraudulent misrepresentation that what Plaintiff wants to redeem Defendants with is an "in-kind" redemption.

**THIRD AFFIRMATIVE DEFENSE**
**(Illegality)**

Plaintiff is barred from asserting its claim for declaratory judgment because it is based on an illegal act or transaction. Plaintiff seeks a declaratory judgment from this Court so that it can force all of its investors, including Defendants, to accept speculative, illiquid and restricted shares of stock with no known value as an "in-kind" redemption so that Plaintiff can steal the remaining assets (not part of the "in-kind" redemption transaction) that were acquired with over $500 million of its investors' funds. Plaintiff has misrepresented the redemption at issue as an "in-kind" redemption as part of its illegal scheme to steal from its own investors, including Defendants.

Accordingly, Plaintiff should be barred from asserting its claim for declaratory judgment since its seeking this relief in order to facilitate a massive theft from its own investors.

**FOURTH AFFIRMATIVE DEFENSE**
**(Unclean Hands)**

Plaintiff is barred from asserting its claim for declaratory judgment under the doctrine of unclean hands.

**FIFTH AFFIRMATIVE DEFENSE**
**(Accord and Satisfaction)**

Plaintiff is barred from asserting its claim for declaratory judgment under the doctrine of accord and satisfaction.

**SIXTH AFFIRMATIVE DEFENSE**
**(Prior Breach)**

Plaintiff is barred from asserting its claim for declaratory judgment due to a prior breach of contract.

**RESERVATION OF RIGHTS**

Defendants reserve the right to amend these defenses as there may be additional facts and/or defenses that cannot be articulated at this time because of the lack of certain information and/or documents bearing on Plaintiff's claim, and thereby all rights are fully reserved to assert additional defenses upon further investigation and discovery.

**COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

Defendants and Counter-Plaintiffs Steven Schulman, Ankur Anand, Gregory Lovallo, Nimish Patel, Robert Harper, and Third-Party Plaintiffs Nikhil Patel, Nipuna Patel, Jyoti Patel, Dinesh Thakker, Shashikala Thakker, Jit Patel, Karishma Gupta, Khusbu Harshad Patel, Mandakini Subhash Patel, James Andrew Ho, Howie Mann, William Joseph Moroney, Theodore Chesner, Steven Stiles, Kinjalkumar Patel, Bhumika Patel, Sanjay Gupta and Anita Gupta

(collectively, "Counter-Plaintiffs") by and through the undersigned counsel hereby file this counterclaim against Plaintiff and Counter Defendants Broad Street Global Management LLC and against Third-Party Defendants Broadstreet, Inc., David Feingold, Steven Baldassarra, Joseph Baldassarra[1] and Akhil Morada (collectively "Counter-Defendants" or "Broadstreet"), and in support thereof state as follows:

**INTRODUCTION**

1) Counter-Plaintiffs bring this counterclaim because Counter-Defendants, as agents of the Broad Street Global Fund, LLC ("BSG Fund"), are trying to steal **over half a billion dollars** from their own investors, including Counter-Plaintiffs' over $16 million of investments in the BSG Fund. They are attempting to do this while there is a pending SEC Enforcement Action against these same individuals and entities related to their involvement with the BSG Fund, *SEC v. Feingold et al.*, Case No. 1:25-cv-20436-GAYLES/SHAW (S.D. Fla.), and while there is a pending class action and derivative lawsuit against David Feingold, Steven Baldassarra, Joseph Baldassarra, Broad Street Global Management LLC, Broadstreet, Inc. and others for stealing over $150 million in funds and assets from three private equity funds[2] and their investors, *Siriani et al. v. Feingold et al.*, Case No. 9:26-cv-80119-RKA (S.D. Fla.).

2) Broadstreet is trying to pull off this heist of investor assets by fraudulently misrepresenting the value of speculative, illiquid and restricted share of stock in two publicly traded companies (Z Squared Inc. ticker "ZSQR" and Soulpower Acquisition Corporation ticker "SOUL") that it is forcing its investors to accept as an "in-kind' redemption, while Broadstreet

---

[1] The "**Baldassarras**" or the "**Baldassarras Brothers**" refer collectively to Steven Baldassarra and Joseph Baldassarra.

[2] The three private equity funds are the L3 Capital Income Fund, LLC, the L3 Capital Hotel Fund, LLC and the L3 Capital Special Opportunity Fund, LLC (collectively the "**L3 Funds**").

keeps the remaining assets (not involved in the "in-kind" transactions for ZSQR and SOUL) that were acquired with over $500 million of investor assets for itself. Broadstreet is keeping hotels, auto dealerships, self-storage facilities, 70% of the infrastructure projects, pre-IPOs, a custom home building company and a man-made beach/water park called Crystal Lagoons. Meanwhile its investors get stock that may be restricted for the next 3 ½ years in companies that have no track record that Broadstreet claims are worth $3.6 billion with absolutely nothing that supports that valuation. Broadstreet is doing all this after it has already paid itself over $300 million (or 30%) of the over $1 billion it raised from its investors in upfront fees for 5 years of services that it never provided. This is theft in broad daylight.

3) Broadstreet ran the BSG Fund in Ponzi-like fashion. Broadstreet raised money for the BSG Fund by guaranteeing investors interest payments, sometimes as high as 28% annually, that far exceed income being generated from any of the BSG Fund's investments. Broadstreet was able to maintain the distribution payments to its investors with a combination of paying old investors with new investor money and using money from the Merchant Cash Advance (MCA) Series investment to pay distributions to all BSG Fund's investors regardless of the investment Series that the investor chose.

4) Broadstreet provided its investors with monthly investor reports that made it appear that the distributions they received came from the investment that the investor selected when that was not the case. These monthly investor reports were also misleading in that Broadstreet made it appear as if all the money the investor allocated to a particular investment Series made it to that investment, when in fact 30% of the funds the investor provided for their selected investment was immediately stripped out as fees.

5) Broadstreet's house of cards came crashing down in 2025 when the Court in the SEC Enforcement Action issued its January 31, 2025 Order (and later Orders) preventing Broadstreet from raising new investor funds (DE 18 at 2, DE 88 at 1-2, DE 95 at 9 in *SEC v. Feingold et al.*, Case No. 1:25-cv-20436-GAYLES/SHAW (S.D. Fla.)) and the MCA Series was forced into a liquidation due to a money-in versus money-out loss of over $40 million from the excess withdrawals from that investment.

6) Realizing that it could no longer keep up the pretense that its investments were generating money, Broadstreet came up with a two-step plan to get rid of all the BSG Fund investors. First, Broadstreet convinced all its investors in its Altcoin Series to allow Broadstreet to transfer their interest in the Altcoin Series to a publicly traded company called Z Squared Inc. (ZSQR). Broadstreet did this in March 2025 by fraudulently representing to the Altcoin investors that if they agreed to move their investments to a publicly traded company, they would receive their investment back plus 100% or 50% of their investment (depending on when they invested) and by fraudulently representing to the Altcoin investors that Broadstreet and/or its affiliates would only be paid after the investors received their entire remuneration. Broadstreet had already paid itself and its affiliates 30% of the money raised for the Altcoin Series and the Z Squared stock that Broadstreet provided to the Altcoin investors was not worth anything close to what Broadstreet represented, and thus Broadstreet fraudulently induced its Altcoin investors to agree to transfer their ownership interest in the Altcoin Series.

7) Next, to get rid of its remaining investors, in November 2025 Broadstreet notified its investors that the BSG Fund is going private and will no longer have any investors. On November 14, 2025, Broadstreet sent each of its investors a **binding** Redemption Notice giving each investor the right to choose how they wanted to exit the BSG Fund. Redemption Choice – A

promised to pay investors the cash value of their capital account within 180 days. Redemption Choice – B promised to pay investors three times the amount of their capital account in the form of common stock in a Cayman Island special purpose acquisition company ("SPAC") called Soulpower Acquisition Corp. (SOUL) that may be restricted for the next 3 ½ years. In exchange for taking the BSG Fund investors SOUL would receive approximately 30% of the BSG Fund's infrastructure projects, and Broadstreet would keep all the remaining assets of the BSG Fund. The November 14, 2025 BSG Fund Redemption Notice ("Redemption Notice") is attached hereto as **Exhibit A**.

8) All the Counter-Plaintiffs selected Redemption Choice – A for cash in the Redemption Notice. However, on May 22, 2026, five days before the cash payment was due, Broadstreet informed its investor that it was no longer going to honor the cash redemption selection and instead it is going to redeem those investors with shares of SOUL as an "in-kind" redemption. Effectively taking away the right to control their own investment decisions that Broadstreet claims each investor has pursuant to the Compliance Acknowledgement Update each investor signed. A compilation of Compliance Acknowledgement Updates that Broadstreet provided its investors is attached hereto as **Composite Exhibit B**.

9) Most of the Counter-Plaintiffs invested in the BSG Fund with the goal of receiving a steady income stream to fund their retirement. Having their retirement savings locked up for 3 ½ years is not what the Counter-Plaintiffs signed up for, nor is it what they were told they were investing in. Broadstreet is forcing the Counter-Plaintiffs, and presumably other BSG Fund investors, into an unsuitable investment that is expressly contrary to their investment objectives and risk tolerance.

10) In an effort to stop Broadstreet from taking away their rights, Counter-Plaintiffs retained the undersigned counsel to send BSG Fund a civil theft demand letters objecting to the "in-kind" redemption. Counter-Plaintiffs' Civil Theft Demand Letters are attached hereto as **Composite Exhibit C**.

11) In response, Plaintiff filed this Complaint to obtain a declaratory judgment that would force Defendants and presumably all BSG Fund investors who elected to receive a cash redemption to accept as an "in-kind' redemption restricted shares in Soulpower Acquisition Corp. If granted, it would not only prevent approximately **$148 million** in cash redemptions from flowing back to BSG Fund investors, but it would allow Broadstreet to steal over **$500 million** in assets acquired with its investors' funds while its investors get a potentially worthless piece of paper. Broadstreet must be stopped.

12) For these reasons and others, Defendants/Counter-Plaintiffs hereby file this Counterclaim seeking, *inter alia*: (i) a declaration that Broadstreet is required to honor the cash redemptions that Broadstreet agreed to provide to any of its investors who opted for a cash redemption in the November 14, 2025 Redemption Notice; (ii) a declaration that Broadstreet does not have the right to force an "in-kind" redemption on BSG Fund investors who selected Redemption Choice – A to be redeemed in cash in the November 2025 BSG Fund Redemption Notice; (iii) a declaration that the restricted SOUL shares do not qualify as an "in-kind" redemption; (iv) the return of misappropriated funds and assets; (v) the return of unpaid distributions that Defendants/Counter-Plaintiffs are entitled to; (vi) injunctive relief preventing Plaintiff/Counter-Defendants from selling or transferring away assets of an investment Series that Defendants/Counter-Plaintiffs have an ownership interest in; (vii) dissolution of the BSG Fund; (viii) removal of the manager of the BSG Fund and appointment of a Receiver to oversee the

liquidation of the BSG Fund; (ix) attorneys' fees where provided for by contract and statute; and (x) when they are granted leave to do so, punitive damages against Plaintiff/Counter-Defendants based on their outrageous conduct arising from their theft and diversion of hundreds of millions of dollars from innocent investors.

## PARTIES

### COUNTER-PLAINTIFFS

13) Steven Schulman is a resident and citizen of the State of New York. Steven Schulman invested money in BSG Fund.

14) Ankur Anand is a resident and citizen of the State of New York. Ankur Anand invested money in BSG Fund through his companies Beach Hotel Fund LLC and Broad Street SC Homes LLC. Beach Hotel Fund LLC is a New York limited liability company and Ankur Anand is its sole member. Broad Street SC Homes LLC is also a New York limited liability company, and all its members reside in and are citizens of the State of New York.

15) Gregory Lovallo is a resident and citizen of the State of New Jersey. Gregory Lovallo invested money in BSG Fund.

16) Nimish Patel is a resident and citizen of the State of North Carolina. Nimish Patel invested money in BSG Fund.

17) Robert Harper is a resident and citizen of the State of Texas. Robert Harper invested money in BSG Fund.

18) Nikhil Patel is a resident and citizen of the State of Tennessee. Nikhil Patel invested money in BSG Fund.

19) Nipuna Patel is a resident and citizen of the State of Tennessee. Nipuna Patel invested money in BSG Fund.

20) Jyoti Patel is a resident and citizen of the State of Alabama. Jyoti Patel invested money in BSG Fund.

21) Dinesh Thakker is a resident and citizen of the State of Ohio. Dinesh Thakker invested money in BSG Fund.

22) Shashikala Thakker is a resident and citizen of the State of Ohio. Shashikala Thakker invested money in BSG Fund.

23) Jit Patel is a resident and citizen of the State of Alabama. Jit Patel invested money in BSG Fund.

24) Karishma Gupta is a resident and citizen of the State of Alabama. Karishma Gupta invested money in BSG Fund.

25) Khusbu Harshad Patel is a resident and citizen of the State of Alabama. Khusbu Harshad Patel invested money in BSG Fund.

26) Mandakini Subhash Patel is a resident and citizen of the State of Georgia. Mandakini Subhash Patel invested money in BSG Fund.

27) James Andrew Ho is a resident and citizen of the State of Nevada. James Andrew Ho invested money in BSG Fund.

28) Howard Mann is a resident and citizen of the State of New York. Howard Mann invested money in BSG Fund.

29) William Joseph Moroney is a resident and citizen of the State of Arizona. William Joseph Moroney invested money in BSG Fund.

30) Theodore Chesner is a resident and citizen of the State of New Jersey. Theodore Chesner invested money in BSG Fund.

31) Steven Stiles is a resident and citizen of the State of California. Steven Stiles invested money in BSG Fund.

32) Kinjalkumar Patel is a resident and citizen of the State of Texas. Kinjalkumar Patel invested money in BSG Fund.

33) Bhumika Patel is a resident and citizen of the State of Texas. Bhumika Patel invested money in BSG Fund.

34) Sanjay Gupta is a resident and citizen of the State of Ohio. Sanjay Gupta invested money in the BSG Fund.

35) Anita Gupta is a resident and citizen of the State of Ohio. Anita Gupta invested money in the BSG Fund.

36) Yatin Khanna is a resident and citizen of the State of New York. Yatin Khanna invested money in the BSG Fund.

37) Alya Capital LLC is a LLC incorporated in the State of New Jersey. Alya Capital LLC sole member is Yatin Khanna who is a resident and citizen of the State of New York. Alya Capital LLC invested money in the BSG Fund.

38) Counter-Plaintiffs' investments in the BSG Fund are as follows:

| Investor Name | Investment | Equity Balance | Initial Contribution |
|---|---|---|---|
| **Steven Schulman** | BSG15 | [redacted] | 4/15/2023 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 3/7/2024 |
| | DR Horton/Infrastructure #5 | [redacted] | 9/29/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Beach Hotel Fund, LLC (Ankur Anand)** | Daytona Beach AC Retreats | [redacted] | 5/14/2022 |

| | | | |
|---|---|---|---|
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Broad Street SC Homes LLC (Ankur Anand)** | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 11/14/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Gregory Lovallo** | North Charleston Element | [redacted] | 2/2/2022 |
| | Triller | [redacted] | 2/26/2021 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Nimish Rameshbhai Patel** | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 2/29/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| | | [redacted] | |
| **Nimish R Patel (IRA)** | BSG15 | [redacted] | 2/15/2023 |
| | Broadstreet Tennessee | [redacted] | 8/1/2024 |
| | DR Horton/Infrastructure #5 | [redacted] | 1/23/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Robert T. Harper** | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 3/21/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Nikhil R. & Nipuna Patel** | BSG15 | [redacted] | 6/1/2023 |
| | Broadstreet Tennessee | [redacted] | 6/21/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 5/31/2023 |
| | Land Banking | [redacted] | 3/30/2023 |
| | Self-Storage - 10% Annual Return/ Profit | [redacted] | 2/27/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/14/2023 |
| | DR Horton/Infrastructure #5 | [redacted] | 4/14/2022 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 2/24/2023 |
| | **Investor Total:** | [redacted] | |

| | | | |
|---|---|---|---|
| | | [redacted] | |
| **Jyoti H. Patel (Roth IRA)** | BSG15 | [redacted] | 3/15/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 1/2/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Jyoti H. Patel** | BSG15 | [redacted] | 10/15/2023 |
| | Broadstreet Tennessee | [redacted] | 6/21/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/12/2023 |
| | Crystal Lagoons - 10% Annual Return/ Profit | [redacted] | 10/7/2022 |
| | Data#2 - 19% Annual Return | [redacted] | 11/15/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 11/15/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 5/31/2023 |
| | Self-Storage - 10% Annual Return/ Profit | [redacted] | 7/17/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Dinesh & Shashikala Thakker** | DR Horton/Infrastructure #5 | [redacted] | 4/14/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Jit H. Patel** | BSG PTT | [redacted] | 7/1/2025 |
| | BSG15 | [redacted] | 3/15/2024 |
| | Broadstreet Tennessee | [redacted] | 6/21/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 10/19/2023 |
| | Data#2 - 19% Annual Return | [redacted] | 11/14/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 12/14/2023 |
| | Self-Storage - Soft Costs 50% Deduction | [redacted] | 12/27/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Karishma Gupta (Roth IRA)** | BSG15 | [redacted] | 6/1/2024 |

| | | | |
|---|---|---|---|
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 3/1/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Khusbu Harshad Patel** | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 10/18/2023 |
| | Data#2 - 19% Annual Return | [redacted] | 11/13/2024 |
| | IF9 Infrastructure - 16% Annual Return | [redacted] | 7/19/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Mandakini Subhash Patel** | IF9 Infrastructure - 16% Annual Return | [redacted] | 5/31/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **James Andrew Ho** | BSG15 | [redacted] | 5/15/2024 |
| | Broadstreet Tennessee | [redacted] | 6/11/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 11/15/2023 |
| | Data#1 - 19% Annual Return | [redacted] | 10/22/2024 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 2/20/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Howie Mann** | DR Horton/Infrastructure #5 | [redacted] | 12/21/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **WJM Trust (Willima J Moroney)** | Weatherstone | [redacted] | 5/24/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Theodore Chesner** | Daytona Beach AC Retreats | [redacted] | 4/29/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Steven Harry Stiles** | BSG PTT | [redacted] | 7/2/2025 |
| | BSG15 | [redacted] | 10/15/2024 |
| | Broadstreet Tennessee | [redacted] | 6/14/2024 |

| | | | |
|---|---|---|---|
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/1/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Steven & Estelle Stiles** | BSG15 | [redacted] | 5/14/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Kinjalkumar Patel and Bhumika Patel** | BSG PTT | [redacted] | 7/14/2025 |
| | BSG15 | [redacted] | 11/15/2023 |
| | IF8 Infrastructure - 14.63% Annual Return | [redacted] | 11/15/2024 |
| | Broadstreet Tennessee | [redacted] | 7/1/2024 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 5/15/2023 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Sanjay & Anita Gupta** | IF9 Infrastructure - 16% Annual Return | [redacted] | 12/12/2023 |
| | BSG PTT | [redacted] | 6/30/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 4/5/2024 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Yatin Khanna** | BSG15 | [redacted] | 8/13/2019 |
| | Ripple | [redacted] | 10/19/2018 |
| | Virgin Hyperloop | [redacted] | 8/15/2019 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| **Alya Capital LLC** | Broadstreet Tennessee | [redacted] | 1/14/2025 |
| | Crystal Lagoons - 10% Annual Return/ Profit | [redacted] | 8/30/2022 |
| | Data#1 - 19% Annual Return | [redacted] | 1/31/2025 |
| | Crypto/Altcoin Mining - 28% Annual Return | [redacted] | 3/31/2022 |
| | **Investor Total:** | [redacted] | |
| | | [redacted] | |
| | | [redacted] | |

| | |
|---|---|
| **COMBINED TOTALS** | **$16,083,328.00** |

**COUNTER-DEFENDANTS**

39) David J. Feingold, Esq. ("Feingold") is a citizen of the State of Florida who resides in the Southern District of Florida. For purposes of this Counterclaim based on diversity of citizenship, Feingold is a citizen and resident of Florida. Feingold is also the Chief Executive Officer ("CEO") of BSI and a control person over BSI and BSG Management. The Baldassarras have delegated the management of many, including the largest, business lines funded by BSG Fund, including real estate infrastructure projects and merchant cash advance ("MCA portfolios"), to Feingold. Feingold is an attorney licensed in the state of Florida. In 1999, the Commission entered an order against Feingold to cease and desist from committing or causing any violations of Section 5 of the Securities Act and Rule 10b-13 of the Exchange Act.

40) Joseph Baldassarra is a citizen of the State of South Carolina. For purposes of this Counterclaim based on diversity of citizenship, Joseph Baldassarra is a citizen and resident of South Carolina. He is also a managing member of BSG Management, the President of BSI, and a control person over BSI and BSG Management. His responsibilities include: acting as investment adviser to the BSG Fund, along with Counter-Defendants BSG Management and Steven Baldassarra; soliciting investors for BSG Fund; and supervising BSI's internal sales staff who, among other things, solicit investors for BSG Fund. Joseph Baldassarra was associated with several registered broker-dealers between 1998 and 2016.

41) Steven Baldassarra is a citizen of the State of South Carolina. For purposes of this Counterclaim based on diversity of citizenship, Steven Baldassarra is a citizen and resident of South Carolina. He is also a managing member of BSG Management, the chief operating officer

("COO") of BSI, and a control person over BSI and BSG Management. His responsibilities include: acting as investment adviser to the BSG Fund, along with Counter-Defendants BSG Management and Joseph Baldassarra; and performing back-office functions for BSG Fund, including overseeing BSG Fund's and BSG Management's bank accounts and its accounting staff. Steven Baldassarra was associated with several registered broker-dealers between 1998 and 2016.

42) Broad Street Global Management LLC ("BSG Management") is a South Carolina LLC that was formed on or about October 2018. BSG Management is the designated manager of BSG Fund. BSG Management is owned and managed by the Baldassarras and is controlled by the Baldassarras and Feingold. BSG Management (through the Baldassarras) acts as an investment adviser with respect to BSG Fund. BSG Management has received approximately $9 million directly from investors and more than $871 million from the bank accounts of BSG Fund and BSG Series CM, LLC's ("BSG CM Series").

43) Broad Street Inc. ("BSI") is a Delaware corporation that was formed on or about June 2022. BSI's voting shares are owned in equal parts by the Baldassarras and Feingold and unanimity by all three is required for shareholder decisions. Since approximately June 2022 through the present, Feingold has been the CEO, Joseph Baldassarra has been the President, and Steven Baldassarra has been the COO of BSI. Feingold and the Baldassarras control BSI. BSI has received more than $200,000, an interest in a registered broker-dealer, and ownership over certain real estate assets.

44) Upon information and belief, Akhil Morada ("Morada") resides Puerto Rico. For purposes of this Counterclaim based on diversity of citizenship, Morada is a citizen and resident of Puerto Rico. Morada is also a Senior Managing Director of Broadstreet, Inc. He was involved in the solicitation and sale of investments in the BSG Fund to several of the Counter-Plaintiffs and

has been their main point of contact regarding their investments in the BSG Fund. Akhil Morada was associated with several registered broker-dealers between 2004 and 2016 and has eight customer disputes and one regulatory event listed on his FINRA BrokerCheck report attached hereto as **Exhibit D**. On August 21, 2018, Mr. Morada was suspended from being a FINRA registered broker for 12 months for allegedly engaging in quantitively unsuitable trading in the accounts of customers, and at times exercising discretion without prior written authorization in those customers' accounts.

**JURISDICTION AND VENUE**

45) This Court has subject matter jurisdiction over this declaratory judgment action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., which allows federal courts to issue declaratory judgments in cases that present a valid basis for diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

46) Diversity jurisdiction over this matter is proper because complete diversity exists between Counter-Plaintiffs and Counter-Defendants, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

47) This Court has personal jurisdiction over Counter-Defendants through Counter-Defendants transacting, doing, and soliciting business in this District, and because a substantial part of the events occurred in this District.

48) Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. BSG Fund's Formation, Operation, and Relation to the Broadstreet Enterprise.

49) BSG Fund was formed in September 2020 to operate as a private equity fund. In the fourth quarter of 2020, BSG Fund purchased substantially all the investment assets of Broad Street Global Fund SCSp, a Luxembourg entity, which was a predecessor fund to the BSG Fund.

50) BSG Fund's offering materials claim that it is divided into a number of Series, each of which focuses on a separate and distinct investment opportunity.

51) BSG Fund is managed by BSG Management, which has authority to manage BSG Fund's activities. Joseph Baldassarra and Steven Baldassarra (collectively the "Baldassarras") are the managing members of BSG Management, and BSG Management acts through the Baldassarras. Since September 2020, BSG Management has been controlled by the Baldassarras and since June 2022, as alleged further below, Feingold has also controlled BSG Management.

52) BSG Management is not registered as an investment adviser with the SEC, although as alleged below it acts as an investment adviser with respect to BSG Fund.

53) In or around June 2022, Feingold formed and became the CEO of BSI. Joseph Baldassarra is the President of BSI and Steven Baldassarra is the Chief Operating Officer of BSI. The sales staff that solicits investors for BSG Fund are BSI personnel. BSI personnel included Counter-Defendant Akhil Morada. BSI is listed as the owner on some of the real estate assets acquired with BSG Fund's funds. BSI oversees assets in which BSG Fund has invested.

54) From at least July 2022 until the present, BSI's publicly-available website contains information about certain of the Broad Street Entities, and illustrates the related nature of the Broad Street Entities and the BSG Fund Series. For example, from approximately July 2022 through approximately March 2024, the following diagram was included on BSI's website:




## II. BSG Management and BSI Offered and Sold More Than $1 Billion of Securities.

55) From October 1, 2020 through the present (the "Relevant Period"), investors have deposited more than $1 billion in the bank accounts of BSG Fund, BSG Series CM, and BSG Management. Of this amount, investors deposited approximately $868 million in the BSG Fund's bank accounts, approximately $199 million in BSG CM Series' bank accounts, and approximately $9 million in BSG Management's bank accounts.

56) From the more than $1 billion that investors deposited in the above-mentioned bank accounts, approximately $880 million has been transferred to (or directly deposited) in BSG Management's bank accounts and extensively commingled. The chart below demonstrates the flow of investor funds to BSG Management:




57) During the Relevant Period, BSG Management has continuously solicited money from, and offered and sold BSG Fund LLC units in a variety of Series to investors.

58) From approximately October 1, 2020 until approximately May 2022, BSG Management used an internal sales staff to offer and sell BSG Fund LLC units. The internal sales staff was used to, among other things: (a) solicit investors; (b) send out offering materials; (c) prepare closing resolutions; and (d) assist with the preparation of account statements.

59) From approximately June 2022, until at least October 31, 2024, BSG Management and BSI have used an internal sales staff comprised of BSI personnel to offer and sell BSG Fund LLC units. BSI's staff is used to, among other things: (a) solicit investors; (b) send out offering materials; (c) prepare closing resolutions; and (d) assist with the preparation of account statements.

60) In addition, since at least August 2022, BSG Management has utilized registered broker-dealers to sell the offering pursuant to placement agreements.

61) As a result of the solicitation efforts undertaken by BSG Management, BSI, and associated broker-dealers, BSG Management has raised more than $1 billion on behalf of the BSG Fund from over a thousand passive investors. These investors are located across the United States, including in this district, and abroad.

62) Investors in BSG Fund committed funds in cash or via wire transfer to participate in an investment opportunity. They were promised significant returns, which were to be generated from passive business opportunities described in each of the Series' pitch decks.

63) BSG Fund's numerous investors have no ability to influence the management of BSG Fund under its operating agreement and are wholly dependent on the efforts of the Baldassarras and Feingold to select and oversee investments to generate their expected returns.

64) BSG Fund has no way to act independently from BSG Management.

**III. The Offering Documents.**

65) BSG Management typically provides prospective investors with materials that detail the terms of the potential investment, including a subscription agreement, operating agreement, private placement memorandum, and supplemental materials pertaining to specific BSG Fund Series, including Supplemental Series Schedules and pitch decks (the "Offering Documents").

66) BSG Fund's Subscription Agreement reflects that each investor received BSG Fund's operating agreement and private placement memorandum prior to investing.

67) BSG Fund has had at least three operating agreements: a Limited Liability Company Agreement dated as of September 14, 2020 ("Original Operating Agreement"); an Amended and Restated Limited Liability Company Agreement dated as of May 26, 2022 ("First Amended Operating Agreement"); and an Amended and Restated Limited Liability Company

Agreement dated as of September 2023 ("Second Amended Operating Agreement") (collectively the "Operating Agreement").

68) These operating agreements set forth certain terms concerning the operation of the BSG Fund.

69) One version of the BSG Fund Confidential Private Placement Memorandum that has been provided to investors is dated October 2020 ("October 2020 PPM").

70) The private placement memoranda set forth the "terms and conditions of the private offering by [BSG Management] of the membership interests" to investors in the BSG Fund.

71) Both the operating agreements and the private placement memoranda state that supplemental materials about each Series will be made available to investors and to the BSG Fund. For example, the First Amended Operating Agreement states that there are "Series Schedule[s]" that "cover terms specific to a particular Series." Similarly, the October 2020 PPM states that "[a] supplement to the [private placement memorandum] … in respect of each Series will be created and distributed to prospective investors in such Series."

72) BSG Management also gave prospective investors access to materials in its internet data room, which, among other things, and at different times, has contained Supplemental Series Schedules with additional terms and conditions of the offering and pitch decks explaining the various investment opportunities.

73) Specifically, pitch decks exist for numerous of BSG Fund's Series described below. Certain Series have multiple pitch decks or pitch decks that were updated over time.

74) Feingold reviewed the Offering Documents, including the PPM and the Operating Agreements, before they were made available to potential and actual investors.

75) The BSG Fund Offering Documents were reviewed and approved by the Baldassarras before they were made available to potential and actual investors.

76) Further, BSG Fund, as a legal entity, acts through its designated manager, BSG Management, and BSG Management, as a legal entity, acts through its co-managers, Joseph Baldassarra and Steven Baldassarra. As such, BSG Management and the Baldassarras each have the ultimate authority with respect to the content of any written statements in the BSG Fund Offering Documents that were provided to investors.

77) In addition to the Offering Documents, BSG Management communicates with investors in other ways, including through BSI's website and periodic investor updates, which were issued monthly or quarterly.

78) Periodic investor updates and BSI's website were reviewed and approved by the Baldassarras before they were made available to investors.

**IV. The BSG Fund Series.**

79) As alleged above, BSG Fund's Offering Documents claim that it is divided into separate Series, each of which focuses on a different investment opportunity and has different risks. For example, the October 2020 PPM states that BSG Fund "has been established to pursue multiple investment objectives and investment strategies in different Series so investors can select the investment objectives and investment strategies to which the investor wishes to have exposure." It further states that "[a] Series may vary from other Series due to, among other things, investment strategy and objectives, risk and return profile, use of leverage, exposure to particular strategies and other factors."

80) BSG Fund investors must, at the time of purchase, select their LLC units within a particular Series.

81) During the Relevant Period, BSG Fund investors have been offered the opportunity to invest in numerous Series, including the ones listed below. BSG Fund has sometimes used the term Series and sub-Series interchangeably, with sub-Series generally being a further differentiation of a particular Series (for example, as discussed below, where there are different returns offered in MCA investments or there are investments in different pre-IPO companies, those are referred to as sub-Series).

**a. Merchant Cash Advance ("MCA"):**

82) The MCA Series contains at least three sub-Series that claim to use investor funds to invest in portfolios of MCAs, which are transactions in which a small business can receive quick funding by selling its future receivables at a steep discount. The advance is repaid by debiting a percentage of the business's daily sales.

83) The Offering Materials describe risks related to MCA investments. For example, an August 2022 MCA pitch deck explains that there is "industry risk, such as defaults and potential future regulation," and that "merchants are considered higher risk." The pitch deck claims that the high rates charged to the merchants offset these risks.

84) BSG Fund has promised to pay investors in the MCA Series a fixed annual return of 14%, 15%, or 18%, depending on the sub-Series, and a 17% return for at least one investor via a side-letter. BSG Management sent funds for these sub-Series to, among other places, Samson Horus, which has offices in New York, New York, and Boca Raton, Florida.

85) As of November 2023, BSG Management had raised approximately $87 million for BSG Fund's MCA Series.

**b. Real Estate Infrastructure Development ("Infrastructure"):**

86) The Infrastructure Series, BSG Fund's largest, contains at least nine sub-Series that claim to invest investor funds, as a pool, in the development of raw land into build-ready lots that can be sold to residential home builders.

87) The Offering Materials tout the relative safety of Infrastructure investments. For example, an undated Real Estate Infrastructure Development pitch deck notes existing contracts with numerous national homebuilders, which are "backed by the full faith and credit of the Fortune 500 top publicly traded homebuilders," and further notes that lots are presold to national homebuilders before "Broad Street and its affiliates" close on the land in order to "minimize risk."

88) BSG Fund has promised to pay investors in these sub-Series a preferred annual return of 14.6% or, for one investor, a 16% annual return pursuant to a side letter. BSG Management has sent funds for these sub-Series to, among other places, two real estate development companies, Blackstream Development, LLC and Contender Development, Inc.

89) As of November 2023, BSG Management had raised more than $168 million for BSG Fund's Infrastructure Series.

**c. Pre-IPO securities ("Pre-IPO"):**

90) The Pre-IPO Series contains a number of sub-Series, each of which is focused on acquiring stock of a specific company via forward purchase contracts before that company's stock can be publicly traded on a securities exchange.

91) BSG Management has promised to either deliver the specific shares acquired with the investor's funds or the proceeds from the sale of those shares after the company goes public or another liquidity event occurs.

92) As of November 2023, BSG Management had raised approximately $53.5 million for BSG Fund's Pre-IPO Series.

**d. Fixed income securities: ("Fixed Income"):**

93) The Fixed Income Series seeks to provide positive returns by investing in a wide variety of income generating investments in publicly-traded securities that primarily reflect debt, equity, or closed-end funds that have exposure to government agency and/or similar income generating investments.

94) BSG Fund has promised to pay investors in this Series a fixed annual return of 7%.

95) As of November 2023, BSG Management had raised approximately $2 million for BSG Fund's Fixed Income Series.

**e. Hotel Projects ("Hotel"):**

96) The Hotel Series contains at least three sub-Series that claim to invest in the purchase or construction and operation of specific hotel properties, including one Hotel project located in Daytona Beach, Florida.

97) BSG Fund has promised to pay investors in these sub-Series a return based on an ownership share of the hotel's operating income or proceeds from the sale of the property.

98) As of November 2023, BSG Management had raised approximately $19.4 million for the BSG Fund Hotel Series.

99) The BSG Fund's Quarterly Report for Q1 - 2024 lists a Raleigh, NC-TownePlace Suites as one of its hotel projects. However, the BSG Fund never acquired this hotel, and thus to the extent that Broadstreet raised any money for this hotel it did so as part of a true Ponzi scheme. See Page 17 of the BSG Fund's Q1 2024 Quarterly Report attached hereto as **Exhibit E**.

**f. Custom Home Building ("Home Building"):**

100) The Home Building Series contains at least four sub-Series that claim to invest in the construction of residential housing communities. BSG Fund has promised to pay investors in these sub-Series a return based on a profit split with the home builder.

101) On June 20, 2024, BSG Fund's partner in the Home Building Series filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida, where the partner's "nerve center" is located.

102) As of November 2023, BSG Management had raised approximately $31.2 million for BSG Fund's Home Building Series.

**g. Crystal Lagoons ("Crystal Lagoons"):**

103) The Crystal Lagoons Series claims to invest in the construction and operation of a resort project in Columbia, South Carolina, featuring a clearwater recreational lagoon with beach-like areas.

104) BSG Fund has promised investors in this Series "Perpetual Income at Rates of Return Never Seen Before" in the form of a fixed annual return of 10% during the first two years of the project, and a fixed annual return of 20% thereafter with additional payments based on a 25% share of the resort's operating profits or 50% of the proceeds from the sale of the property.

105) As of September 2023, BSG Management had raised approximately $24.2 million for BSG Fund's Crystal Lagoons Series.

**h. Bitcoin Mining ("Bitcoin Mining"):**

106) The Bitcoin Mining Series claims to invest in a "wholly owned [sic] bitcoin mining facility."

107) BSG Fund has promised to pay investors in this Series a targeted annual return of 25%.

108) As of November 2023, BSG Management had raised approximately $1.9 million for BSG Fund's Bitcoin Mining Series.

**i. Altcoin Mining ("Altcoin Mining"):**

109) The Altcoin Mining Series claims to "make investments into crypto coin mining machines" that will be used to generate alternative forms of crypto assets other than Bitcoins.

110) BSG Fund has promised to pay investors in this Series a targeted annual return of 28%.

111) As of November 2023, BSG Management had raised approximately $41.8 million for BSG Fund's Altcoin Mining Series.

**j. Self-Storage Facilities ("Self-Storage"):**

112) The Self-Storage Series claims to invest in a collection of self-storage facilities.

113) BSG Fund has promised to pay investors in this Series a fixed annual return of 10% paid quarterly until projects are profitable and can sustain the 10% return based on positive cash flows generated from the self-storage facilities. Thereafter, profit distributions will be based on investor percentage ownership in the sub-Series. BSG Management has told investors that it estimates it will pay 27% annualized returns for this BSG Fund Series.

114) As of November 2023, BSG Management had raised approximately $16.6 million for BSG Fund's Self-Storage Series.

**V. Broadstreet Knowingly Raised Money from Non-Accredited Investors.**

115) Broadstreet aggressively raised money for the BSG Fund in 2024. As a result, from the beginning of 2024 through October 31, 2024, approximately an additional $500 million was raised from investors.

116) In total Broadstreet raised somewhere between $1 billion and $1.2 billion from investors for the BSG Fund.

117) But not all the investors were accredited investors, and Broadstreet knew it.

118) As discussed below and in more details in the attached declarations, Akhil Morada, a senior managing director, repeatedly told several of the Counter-Plaintiffs that they did not have to worry about being an accredited investor and he would get them into the BSG Fund even though he knew they did not meet the financial requirements to be an accredited investor.

119) Mr. Morada had a practice of soliciting investors for the BSG Fund, having them wire their money to the BSG Fund, and only after he took their money did, he present them with forms to sign for their investment.

120) These forms often had investors' financial information prepopulated to reflect that they were accredited investors. However, when some of the Counter-Plaintiffs informed Mr. Morada that the information about their finances was incorrect, we would tell them to ignore that part just fill out the rest of your personal information and sign the document.

121) But Mr. Morada was not the only one at Broadstreet bringing non-accredited investors into the BSG Fund.

122) Upon information and belief, Joseph Baldassarra also told potential investors that he would get them into the BSG Fund even though they did not meet the definition of an accredited investor.

123) Thus, the practice of accepting investors into the BSG Fund who were not accredited came from the top, and presumably employees of Broadstreet were instructed by upper management on how to bring investors into the BSG Fund who were not accredited.

124) As a result, many investors who could not afford to lose their life savings or were dependent on the income generated from it now have no access to their money.

## VI. Feingold and the Baldassarras Have Taken More than $170 Million From the BSG Fund.

125) From the investor monies that have become assets of the BSG Fund, Feingold and the Baldassarras have, directly or indirectly, received more than $170 million from BSG Fund.

126) Feingold and the Baldassarras have used the money they siphoned away from the BSG Fund to live a lavish lifestyle including purchasing multiple homes, yachts, an aviation company and maintaining a private jet.

<u>Steven Baldassarra</u>

127) Just a Nice Day, Inc. ("Just A Nice Day") is a South Carolina corporation owned and controlled by Steven Baldassarra.

128) Through Just a Nice Day, Steven Baldassarra received more than $50 million of illicit proceeds.

129) In addition, more than $1.9 million of BSG Fund's assets have been transferred to Steven Baldassarra directly.

130) Collectively, from these payments and his proportionate interest in related entities and payments of personal expenses, Steven Baldassarra has received more than <u>**$56.7 million**</u> of BSG Fund's assets.

Joseph Baldassarra

131) Josephbenjamin, Inc. ("Joseph Benjamin") is a South Carolina corporation owned and controlled by Joseph Baldassarra.

132) Through Joseph Benjamin, Joseph Baldassarra received more than $65 million of illicit proceeds.

133) In addition, more than $300,000 of BSG Fund's assets have been transferred to Joseph Baldassarra directly.

134) Collectively, from these payments and his proportionate interest other related entities and personal expenses, Joseph Baldassarra has received more than **$68.2 million** of BSG Fund's assets.

David Feingold

135) More than $36 million of BSG Fund's assets have been transferred to Feingold through related entities controlled by Feingold that he uses to direct payments he claims are owed to him from the Broad Street Entities.

136) More than $7 million of BSG Fund's assets have been transferred to Feingold through another related entity owned by him and one of his sons and controlled by Feingold that he uses to direct payments he claims are owed to him from the Broad Street Entities.

137) Collectively, from these payments and his proportionate interest in Feingold's related entities and personal expenses, Feingold has received more than **$46 million** of BSG Fund's assets.

Other Ways Feingold and the Baldassarras Receive BSG Fund's Assets

138) Feingold and the Baldassarras also have arrangements to obtain money from BSG Fund's assets.

139) For example, in September 2023, BSI acquired a 24.9% ownership stake in one of the broker-dealers that sells BSG Fund LLC units through private placements (the "Broker Dealer"). The Baldassarras and Feingold, through their ownership in BSI, share in the placement fees that the Broker Dealer earns for selling BSG Fund LLC units to investors. In total, approximately $12.3 million of BSG Fund's assets have been paid to the Broker Dealer.

140) As alleged above, BSG Management sent funds for the MCA Series to Samson Horus a MCA Company. Samson Horus charged the Broad Street Entities substantial management fees (typically, between 3% to 5% of the amount advanced to the merchant) and commissions (typically, between 10% to 15% of the amount advanced) to participate in the MCA transaction. These management fees and commissions significantly reduced the returns that the Broad Street Entities received from Samson Horus. Feingold receives half of all the management fees and 20% of the commission Samson Horus charged the Broad Street Entities.

141) As alleged above, BSG Management sends funds for the Infrastructure Series to, among others, Contender Development, Inc., of which Feingold or his family members own 35% and he is co-chairman of its board of directors. Contender Development, Inc. has paid, among other things, land acquisition fees and a share of development fees to Feingold or entities under his control.

142) As alleged above, BSG Management sends funds for the Home Building Series to, among others, Durham Homes, of which Feingold or his family members own 33%. Durham Homes pays substantial commissions and management fees from Broad Street Entities' Home Building investments to Feingold or entities under his control.

<u>Broadstreet Global Holdings, LLC</u>

143) Broadstreet Global Holdings, LLC ("BSG Holdings") is a South Carolina LLC. BSG Holdings is owned and managed by the Baldassarras. BSG Holdings receives funds to pay the expenses for BSG Fund, BSG Management, and BSI. BSG Holdings has received more than $134.5 million from BSG Management.

144) Collectively, the money Feingold, the Baldassarras Brothers and BSG Holdings received from the BSG Fund, add up to at least **<u>$305.4 million</u>** or approximately 30% of the over $1 billion raised by the BSG Fund.

**VII. BSG Management and the Baldassarras Are Investment Advisers.**

145) BSG Management, Joseph Baldassarra, and Steven Baldassarra are each investment advisers within the meaning of Section 202(a)(11) of the Advisers Act. 15 U.S.C. § 80b-2(a)(11).

146) Section 202(a)(11) of the Advisers Act defines an "investment adviser" as a "person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."

147) BSG Management advises BSG Fund with respect to investments in securities. According to the October 2020 PPM, BSG Management may be paid a management fee by the BSG Fund's Series "for managing the investment and reinvestment of such Series' assets," which include investments that are securities as defined by the federal securities laws. Specifically, at least some of the investments in the Pre-IPO securities Series and Fixed Income Series are investments in securities as defined by the federal securities laws.

148) Most recently, the BSG Fund's two exit transactions involve securities traded on the NASDAQ and NYSE.

149) BSG Fund's October 2020 PPM also holds BSG Management out as an investment adviser, stating that "[f]ees charged by [BSG Management] may be greater or lower than fees charged by other investment advisers for similar services."

150) As the sole managers and owners of BSG Management, the Baldassarras are also investment advisers to BSG Fund. In their roles at BSG Management, the Baldassarras provide advice about securities for compensation to the BSG Fund and, accordingly, also meet the definition of "investment adviser."

151) As investment advisers to BSG Fund, Defendants BSG Management, Joseph Baldassarra, and Steven Baldassarra owe a fiduciary duty to BSG Fund. An investment adviser's fiduciary duty comprises a duty of care and a duty of loyalty. The duty of care requires an investment adviser to provide investment advice in the best interest of its client. The duty of care also requires BSG Management to operate the BSG Fund in accordance with its Operating Agreements. Under its duty of loyalty, an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.

## VIII. Feingold and the Baldassarras Control BSI and BSG Management.

152) Feingold and the Baldassarras Brothers control BSI.

153) Feingold and the Baldassarras are senior executives at BSI. Since approximately June 2022 through the present, Feingold has been the CEO, Joseph Baldassarra has been the President, and Steven Baldassarra has been the COO of BSI.

154) In addition, BSI's voting shares are owned in equal parts by the Baldassarras and Feingold and unanimity by all three is required for shareholder decisions.

155) Feingold and the Baldassarras also control BSG Management.

156) As alleged above, BSG Fund is managed by BSG Management, which has sole authority to manage BSG Fund's activities. Joseph Baldassarra and Steven Baldassarra are the managing members of BSG Management, and BSG Management acts through the unanimous agreement of the Baldassarras.

157) In or around June 2022, when he formed and became the CEO of BSI, Feingold began to control BSG Management and its management of BSG Fund, along with the Baldassarras. Although Feingold is not formally listed as a manager of BSG Management in BSG Fund's PPM or Operating Agreements, he is involved with the management of BSG Management and uses his control over BSI to direct the management of BSG Fund's operations by BSG Management. As CEO of BSI, Feingold is the most senior executive officer of BSI.

158) As alleged above, BSI's website shows the interrelated connected relationships between the Broad Street Entities. In addition, BSG Management, the BSG Fund, BSG Holdings, BSG Series CM and BSI, operate as a single organization.

159) BSG Management, BSG Fund, and BSI, as well as the additional related entities BSG Holdings, and CJS Technology Select Management, LLC ("CJS") prepared unaudited financial statements in which their financial results are consolidated as of December 31, 2022.

160) BSG Management, BSG Fund, and BSI, as well as the additional related entities BSG Holdings, CJS, and BSG CM Series prepared unaudited financial statements in which their financial results are consolidated as of December 31, 2023.

161) For almost two years, from in or around August 2022 to in or around April 2024, BSI did not have its own bank account, but instead paid its operating expenses (including its staff's

compensation) through BSG Holdings' bank account, which was funded by a share of the money taken from BSG Fund by BSG Management.

162) As alleged further below, BSG Fund's Offering Documents generically use the terms "Broadstreet," "Broadstreet Global," or "affiliates" without clearly identifying to which entity the materials refer.

163) All of the staff performing back-office roles for BSG Management (on behalf of BSG Fund) are personnel of BSI, some of whom are also shareholders of BSI, including the staff performing the compliance, operations management, and accounting functions. Likewise, the internal sales staff soliciting potential investors for BSG Fund are personnel of BSI. There is no formal separation of duties established between BSI and BSG Management.

164) Certain of BSI and BSG Management staff share the same office space.

165) Feingold is the individual with the most knowledge of and has primary oversight over the most substantial investments managed by BSG Management, including the MCA portfolios held at Samson Horus and the Infrastructure projects being developed by Blackstream Development, LLC and Contender Development, Inc.

166) Feingold receives weekly, monthly, and quarterly financial reports regarding BSG Fund from BSI staff performing BSG Management's back-office functions (on behalf of BSG Fund). These reports are typically shared with Feingold by Steven Baldassarra.

167) Feingold participates in weekly meetings with BSG Management and BSI staff, in which all matters pertaining to BSG Fund and its business lines are discussed.

168) Feingold and the Baldassarras Brothers have daily meetings via phone or video conference. No other persons typically attend these meetings, and all aspects of the Broad Street Entities are discussed.

169) Feingold and the Baldassarras Brothers jointly make decisions regarding the investment of certain of BSG Fund's assets, which occurs through BSG Management.

170) Feingold shared in the money taken from the BSG Fund by BSG Management.

171) Feingold has also involved himself in BSG Management's capital-raising activities for BSG Fund by making regular presentations to BSG Fund's potential investors concerning BSG Fund's investments via dinner meetings and on video conference calls, directly answering questions from potential investors, and preparing side letters with BSG Fund investors documenting special investment terms.

## IX. The July 2023 Compliance Acknowledgement Update.

172) In July 2023, while the SEC was investigating Broadstreet for fraud and misrepresentations to investors, Broadstreet decided to issue a Compliance Acknowledgement Update to its investors to get its investors to ratify what it had already been doing but never disclosed to the investors.

173) Broadstreet acknowledged that prior to initiating the enforcement action on January 29, 2025, the SEC investigated Broadstreet for more than two years, during which it issued more than ninety document subpoenas to third parties and Broadstreet-related entities and individuals, including Broadstreet's bank and financial institutions. DE 301 page 1 in Case 1:25-cv-20436-DPG (SD Fla.). Thus, the SEC investigation had already begun by the time Broadstreet first sent out the Compliance Acknowledgement Update.

174) On July 15, 2023, Broadstreet sent an email to its investors with the subject "URGENT BROADSTREET ACCOUNT UPDATE" that contained the following message:

> Dear Broadstreet Investor, In the next few days you will receive a very important email from "signNow" regarding updating your Broadstreet account. The email will be a simple one page document to e-sign. **The acknowledgement contains certain information which you have already seen or certified to in documents such as**

> **our ppm, data room and subscription documents. Therefore, your review and signature should be very quick. This is a very short process** but important for our regular compliance updates **and necessary to keep your account active.** Thank you in advance for your prompt attention when you receive the email from "signNow" regarding Broadstreet and your account update. As always, we are happy to have you as part of the Broadstreet family.

(Emphasis added). A copy of the July 15, 2023 Email is attached hereto as **Exhibit F**.

175) This email attempts to downplay the significance of what the investors would be agreeing to in this Compliance Acknowledgement Update. It encourages its investors to sign it without reading it by claiming they have already seen or certified the information that they would be acknowledging, which was not true. And it contains a threat that distributions will be withheld and the investor will be kicked out the fund if they do not sign. Thus, arguably, Broadstreet coerced, or at the very least misled, its investors into signing the Compliance Acknowledgment Update. A compilation of Compliance Acknowledgement Updates that Broadstreet provided its investors is attached hereto as **Composite Exhibit B**.

**a. Broadstreet Collected 30% in Upfront Fees It Was Not Entitled To.**

176) One of the things Broadstreet asked its investors to acknowledge in the Compliance Acknowledgement Updates was that Broadstreet could immediately keep 30% of the funds each investor provided as fees.

177) However, Broadstreet didn't simply ask its investors to agree to allow it to keep 30% of their money, presumably because most investors, including Counter-Plaintiffs, would not have agreed to that.

178) Instead, Broadstreet buried this request among 15 different items and asked its investors to agree to a 30% fee in an indirect way so that it wouldn't appear that they are asking the investors to keep 30% of their money.

179) Specifically, Broadstreet framed the acknowledgement in Paragraph 6 as follows:

> "I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to fees of up to six percent per year for five years and all fees can be taken up front or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks."

180) This acknowledgement lists several ways Broadstreet could collect fees, including paying itself 30% of the money raised as an immediate upfront fee for the promise of services that will be rendered over the next five years.

181) Even though this disclosure states that Broadstreet can take 30% as upfront fee, Broadstreet never disclosed to Counter-Plaintiffs that it did in fact take 30% of their money as a fees.

182) The monthly investor reports sent to Counter-Plaintiffs never reflected any fees being deducted from their accounts, and Broadstreet never provided Counter-Plaintiffs with any financial statements showing that Broadstreet collected 30% of the money raised from them as fees.

183) Instead, every month Broadstreet provided Counter-Plaintiffs with misleading investor reports that made it appear that Counter-Plaintiffs' entire capital was invested in the investment that Counter-Plaintiffs selected, meanwhile 30%, at a minimum, of Counter-Plaintiffs capital never made it to Counter-Plaintiffs' selected investment.

184) Through the SEC enforcement action Counter-Plaintiffs learned that Broadstreet collected approximately 30% or at least $305.4 million in fees upfront and funneled that money to Feingold, the Baldassarras Brothers and BSG Holdings to support their lavish lifestyles.

185) In addition, less than three years after Broadstreet started having Counter-Plaintiffs and its other investors sign the Compliance Acknowledgement Update, Broadstreet is now attempting to get rid of all its investors.

186) Thus, despite collecting five years of fees upfront, Broadstreet is refusing to provide five years of service to many of its investors, including most of the Counter-Plaintiffs.

187) Accordingly, to the extent that Broadstreet collected fees from Counter-Plaintiffs for services it did not provide, those fees need to be returned.

**b. Broadstreet Acted As Counter-Plaintiffs' Investment Advisor.**

188) Broadstreet also had Counter-Plaintiffs acknowledge Paragraph 12, which states: "*I make my own investment decisions, neither Broadstreet nor any of its affiliates act as an investment advisor.*" Yet, at the same time it had Counter-Plaintiffs acknowledge Paragraph 7 and 8, which states:

> "7) I understand that the real estate development projects are not designed to immediately generate cash flow and often take years to be developed, completed and generate cash flow. I am aware that funds raised for projects may be deployed to generate additional returns not associated with the real estate project while capital is waiting to be deployed in real estate projects."
>
> "8) I am aware that until the infrastructure and other real estate investments generate significant cash flow, my investment may be used to generate profits elsewhere while awaiting deployment in real estate projects or to make or pay distributions, interest, returns, or towards any payments, fees and/or reserves."

189) The acknowledgment in Paragraph 12 conflicts with the acknowledgements in Paragraphs 7 and 8. Counter-Plaintiffs cannot both make their own investment decisions and give Broadstreet the right to invest Counter-Plaintiffs' money however it sees fit.

190) Although Counter-Plaintiffs were under the impression that they were making their own investment decision by selecting which of the Broadstreet Series they wanted to invest in, in actuality, Broadstreet decided in its sole discretion how Counter-Plaintiffs funds were used.

191) In fact, in Broadstreet's motion to dismiss the SEC complaint it points to numerous provisions in the Compliance Update and Amendments to the PPM and Operating Agreement

which it claims gives it broad powers and discretion to manage, own, and control fund assets. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 301 at ¶¶ 35-38, 48-51.

192) Thus, taking the investment decisions away from Counter-Plaintiffs and allowing Broadstreet to have discretionary control over their investment, which also means that Broadstreet was acting as Counter-Plaintiffs investment advisor and thus owed Counter-Plaintiffs the highest fiduciary duty to act in Counter-Plaintiffs' best interest.

193) Moreover, Paragraph 8 is even more problematic because it requires Counter-Plaintiffs to agree to a Ponzi scheme. Specifically, it requires Counter-Plaintiffs to agree that instead of investing their money Broadstreet can give the Counter-Plaintiffs back their own money as distributions or interest payments or use the Counter-Plaintiffs' money to pay distributions to other investors.

194) Since a Ponzi scheme is illegal under both federal and state laws, no investor, including Counter-Plaintiffs, can legally agree to participate in one.

### X. In 2025 Broadstreet Ran Out of Money to Continue Paying the Guaranteed Distributions.

195) In 2025 the scheme that Broadstreet had devised to falsely present distributions as profits began to fall apart.

196) Broadstreet and its sales team promised investors guaranteed returns in amounts that varied by investment that were typically around 14% but ranged from 7% to 28% annual returns.

197) However, most of the distributions paid to the Broadstreet investors was money pulled out of the Samson Horus/MCA Series investment.

198) Broadstreet withdrew money from the Samson Horus/MCA Series to pay its investor these guaranteed returns regardless of whether the investors selected the Samson Horus/MCA Series as one of its investments.

199) Broadstreet provided its investors with monthly investor reports representing distributions coming from their particular investment, when in fact as much as 80% of those distributions were being funded by the Broadstreet investors who invested in Samson Horus/MCA Series.

200) The constant depletion of the funds from the Samson Horus/MCA Series forced Broadstreet to liquidate the MCA portfolios in 2025. Broadstreet's mismanagement of the MCA portfolios resulted in a money-in versus money-out loss of approximately $40 million.

201) Indeed, the court appointed Monitor overseeing Broadstreet in the SEC's enforcement action wrote in his Third Status Report issued on July 30, 2025 that unless Broadstreet sold some of its assets, it would not be able to continue making distributions to its investors.

202) Ultimately, with the Samson Horus/MCA Series depleted and 30% of the money raised already siphoned out of the fund, Broadstreet could no longer continue its ruse that its investments were generating money.

203) Thus, Broadstreet devised a new scheme to get rid of all its investors in 2025.

## XI. Feingold's Role in the Scheme.

204) Feingold knew that BSG Fund investors were being paid inflated returns that did not actually represent profits.

205) As alleged above, BSG Management sent funds for the MCA Series to Samson Horus. Feingold had primary responsibility for the management of the MCA portfolios funded by BSG Fund at Samson Horus. Feingold, through BSI, also oversaw the BSG Fund's Infrastructure

projects under development by Blackstream Development, LLC and Contender Development, Inc. Feingold knew that the shortfall needed to pay the promised returns to Infrastructure Series investors was to be paid from purported profits on MCA investments.

206) Despite the fact that the MCA portfolio generated little to no profits, Feingold frequently requested cash withdrawals from Samson Horus, which were paid to the Broad Street Entities' bank accounts.

207) Feingold received periodic reports showing the profitability (or lack thereof) of the MCA portfolios that he requested from Samson Horus. Samson Horus prepared a weekly performance report titled "Dave's ROI," meaning David Feingold's return on investment. These weekly reports accumulated factor rates – the percentage return a merchant would have to repay (i.e., a 1.36 factor rate meant that a merchant would have to repay 136% of the amount advanced) – as well as costs, such as origination and management fees, which reduce the amount that the BSG Fund could receive from its MCA investments. Samson Horus used this transaction data to calculate a profit percentage for each MCA portfolio. While certain of the "Dave's ROI" reports state, on their face, a "Year to Date" return on investment, the listed returns are cumulative, which is readily apparent from the reports.

208) Feingold requested, obtained, and reviewed these weekly reports, and extracted information from them to make his own calculation of the average annual return of the MCA portfolios.

209) The data in the "Dave's ROI" reports shows the profitability of the MCA portfolios. Projected profits on open MCA deals were less than 14% annually, and the open MCA deals included accounts in collections and default.

210) Further, the deterioration in the collectability of the MCA portfolios alleged above would have been apparent to Feingold by dividing the cumulative returns shown on the Dave's ROI reports by the age of the portfolios.

211) In addition, Feingold reviewed a BSG Fund internal stress test analysis performed in late 2022 that showed the anticipated returns from the MCA portfolios would not be sufficient to satisfy all of BSG Fund's investor obligations.

212) Despite knowing the actual performance of the MCA investments, Feingold provided materially overstated MCA performance information to BSG Management and to BSI. This information was incorporated into MCA Series pitch decks and BSG Fund periodic investor updates. These materials were distributed by BSI's staff to certain of BSG Fund's actual and prospective investors.

213) In addition, Feingold was the source of materially overstated MCA performance information that was incorporated into BSG Fund's unaudited consolidated financial statements for fiscal year 2023 and made available to investors upon request.

214) After its formation in June 2022, Feingold acted in his role as chief executive officer of BSI. After that time, the conduct of Feingold is imputed to BSI.

## XII. The Baldassarras' Role in the Scheme.

215) The Baldassarras should have known that BSG Fund investors were being paid inflated returns that did not actually represent profits.

216) BSG Fund's draft unaudited financial statement and income tax returns in 2020 and 2021, all of which were available to Joseph Baldassarra and Steven Baldassarra (which were signed by Steven Baldassarra), reported multi-million-dollar losses to BSG Fund and identified no income attributed to MCA investments. Despite these documents showing losses, substantial sums

were paid from the Broad Street Entities' bank accounts (or were rolled over) to BSG Fund investors during at least 2021.

217) In addition, Steven Baldassarra reviewed a BSG Fund internal stress test analysis performed in late 2022 that showed the anticipated returns from the MCA portfolios would not be sufficient to satisfy all of BSG Fund's investor obligations.

218) Further, the Baldassarras should have known that BSG Management did not create and maintain Series-level financial statements for BSG Fund reflecting the actual profits of each Series, as required by BSG Fund's Offering Materials. The Baldassarras made no effort to determine how the purported profits from MCA investments had been apportioned to the various BSG Fund Series. The Baldassarras authorized, and BSG Management and BSI provided, periodic account statements to investors, including MCA and Infrastructure Series investors, that reported consistent, fixed returns. Specifically, the account statements reflected the principal amount invested less any withdrawals, and earnings based on the investor's promised return (e.g., 14%) multiplied by the account balance. These account statements were not based on actual profits.

219) Despite the above allegations, the Baldassarras authorized, or had the power to authorize, payments to BSG Fund investors. The Baldassarras also authorized, or had the power to authorize, investors rolling over monies that were represented as profits (that the BSG Fund would have otherwise had to pay in cash) into new BSG Fund investments.

220) Further, as managers of the BSG Fund and by reviewing information that went to investors before it was sent out, the Baldassarras should have known that the information being provided by Feingold into the pitch decks, periodic updates, and unaudited financial statements regarding MCA performance, as well as the performance of the BSG Fund overall, was false and misleading.

221) The Baldassarras acted in their role as managers of BSG Management. The conduct of the Baldassarras is imputed to BSG Management.

## XIII. Beginning in March 2025 Broadstreet Initiated Its Scheme to Get Rid of the Investors in the Altcoin Series.

222) Broadstreet raised approximately $416,000,000 from its investors for the Altcoin Series. See Page 16 of the Monitor's Third Status Report in Case 1:25-cv-20436-DPG (S.D. Fla.) at DE 135.

223) Broadstreet investors, including some of the Counter-Plaintiffs, executed an Altcoin subscription agreement that promised a 28% annual return through quarterly distributions.

224) However, most of the Counter-Plaintiffs who were invested in the Altcoin Series received distributions for less than a year before the distributions stopped. And none of the Counter-Plaintiffs have received any distributions from their Altcoin investment since March 2025.

225) Upon information and belief, Broadstreet stopped paying distributions to the Counter-Plaintiffs and all the other Altcoin investors because the Altcoin Series was not generating enough income to support the 28% returns that were promised.

226) Indeed, this is not surprising since Broadstreet immediately pocketed 30% of the money raised as fees and paid 28% of the money raised back to the Altcoin investors in Ponzi like fashion. Thus, only about 40% of the money raised ever made it to the Altcoin investment.

227) The assets purchased for the Altcoin Series would have had to generate annual profits of at least 70% just to continue paying the Altcoin investors the 28% annual interest that was promised – and it did not do that.

228) To pay the Altcoin investors 28% annual dividends, the Altcoin Series would have had to generate **$116,480,000** of income annually. However, from January 1, 2025 through May

31, 2025, the BSG Fund had only received a total of **$8,714,034** from crypto mining activity, thus the Altcoin Series could not possibly generate the income needed to pay the Altcoin investors 28% (or $116,480,000) annual dividends.

229) Aware of this problem Feingold and the Baldassarras Brothers concocted a plan to hide the losses from the Altcoin Series (BSG Series CM) by converting it into restricted stock of Z Squared, Inc. through a merger with Coeptis Therapeutics Holdings.

230) Sometime around March 22, 2025, Broadstreet presented the Altcoin investors with a document entitled Altcoin Mining Participant Vote. A copy of the March 22, 2025 Altcoin Mining Participant Vote is attached hereto as **Exhibit G**. This document didn't give the investors an option to vote yes or no. It only had a place for the investors to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

231) Regarding the Z Squared stock conversion, items four through eight in this document states:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already

> provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.

(Emphasis added).

232) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

233) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including the Counter-Plaintiffs who were invested in this series, to agree to the sale to the public company.

234) Also, Broadstreet's claim that all the Altcoin investors would receive their investment back plus an additional 100% or 50% of their investment back meant that the approximate $174,720,000 (or 42% of the $416 million raised after deducting the 30% fee and a year of 28% distributions) that made it to the Altcoin investment would have to be currently worth somewhere between $624,000,000 and $832,000,000. That is a 360% to 470% return on the Altcoin investment that in 2025 was on pace to generate a 5% annual return.

235) Sometime in April 2026, Broadstreet began the process of transferring all its Altcoin investors, including some of the Counter-Plaintiffs, into Z Squared restricted stock.

Indeed, as of June 1, 2026, the Investor Reports reflect that any investor in the Altcoin Series was redeemed on April 27, 2026 via stock in ZSQR.

236) Of the Altcoin investors, Counter-Defendant Akhil Morada, a senior managing director at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares the Altcoin investors received in the transaction. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

237) Broadstreet has issued several investor updates, including one on July 27, 2026, claiming that the shares that the Altcoin investors received are worth $600 million.

238) However, this was a false statement because on July 27, 2026, Z Squared Inc. (ZSQR) closed at $4.81 per share, which means the 41,521,276 shares that Broadstreet received as part of the Altcoin conversion would only be worth around $200 million, if they could be traded.

239) But the Z Squared shares aren't even worth that much. As a result of the restrictions on the stock the Altcoin investors will not know what their shares are worth until the restriction is lifted which may not be until sometime in October 2027.

240) Broadstreet has been misrepresenting the value of the Z Squared shares to the Altcoin investors to get them to agree to receiving the stock and to hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the 28% distributions paid to the Altcoin Series investors was their own money being paid back to them in Ponzi-like fashion.

241) The Monitor in the SEC Enforcement Action identified $416,000,000 in investor capital raised for the Altcoin Series.

242) As of March 2025, Broadstreet had approximately 16,000 altcoin machines. Each of these machines cost anywhere between $10,000 and $20,000. Based on this information one

can extrapolate how much Broadstreet spent on the Altcoin machines. On the low end $160,000,000 (16,000 machines at $10K) to as much as $320,000,000 (16,000 machines at 20K).

243) Broadstreet paid itself 30% of the capital raised for the Altcoin Series and funded the 28% interest payments for the first year from that capital. That would leave approximately $174,720,000 for Broadstreet to invest in the altcoin machines (possibly a little more if the machines actually generated revenue). This means that Broadstreet's representation that the Altcoin Series/Z Squared shares are now worth $600 million is a gross misrepresentation, since the value of the machines would have had to triple, which is highly unlikely.

244) Thus, Broadstreet made fraudulent misrepresentations in the March 22, 2025 Altcoin Mining Participant Vote regarding Broadstreet and/or its affiliates being paid after the investors receive their entire remuneration and in that document and other documents since then have made continuous and ongoing misrepresentation regarding the value of the Z Squared shares the investors would receive in order to induce Counter-Plaintiffs and the other Altcoin investors to agree to accepting the Z Squared shares.

245) Counter-Plaintiffs relied on these misrepresentations when signing the March 22, 2025 Altcoin Mining Participant Vote.

246) These misrepresentations warrant rescission of this transaction and Counter-Plaintiffs should be put back in the same position that they were in before these misrepresentations were made.

247) Accordingly, Counter-Plaintiffs should have their capital accounts restored, or receive the monetary value thereof as damages including all distributions payments they were entitled to receive since March 2025.

## XIV. Beginning in May 2025 Investors Start Receiving Reports from the Court Appointed Monitor in the SEC Enforcement Action.

248) On January 29, 2025, the Securities and Exchange Commission ("SEC") commenced an action against David J. Feingold, Joseph B. Baldassarra, Steven S. Baldassarra, Broad Street Global Management, LLC, Broad Street, Inc. and others (the "SEC Enforcement Action") Case 1:25-cv-20436-DPG (S.D. Fla.).

249) On April 21, 2025, the court in the SEC Enforcement Action granted the parties' motion for appointment of a monitor (the "Monitorship Order") and appointed Jeffrey C. Schneider (the "Monitor") as Monitor for Broad Street Global Management, LLC, Broad Street, Inc., Broadstreet Global Fund, LLC, Broadstreet Global Holdings, LLC, BSG Series CM, LLC, Just A Nice Day, Inc., and Josephbenjamin, Inc. (collectively, the "Monitorship Entities").

250) The Monitorship Order, *inter alia*, obligates the Monitor to make recommendations and issue reports regarding the Monitor's assessment of the ongoing operations of the Monitorship Entities.

251) These reports contained valuable information that Broadstreet was hiding from its investors.

## XV. Monitor's First Status Report.

252) The Monitor issued his First Status Report on May 5, 2025. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 99. In it the Monitor reported, *inter alia*, that:

> In response to a specific request by the Monitor, the Monitorship Entities also produced 22 spreadsheets of "investor ledgers." Id. at ¶ 17. These ledgers memorialized "dividends" and "return on capital contributions" accrued for the benefit of investors, and whether those "dividends" and "return on capital contributions" were distributed or re-invested at the direction of the investor. Id. The "investor ledgers" did not memorialize management fees deducted from the investors' "equity balances." Id.

As stated above, the Monitor has learned that there are two Internet-based, password protected "data rooms"—one for institutional investors and one for non-institutional investors—through which the Monitorship Entities primarily communicate with their investors. Id. at ¶ 48. The data room for institutional investors includes access to the data room for non-institutional investors.

The Monitorship Entities post informational updates about their projects, including, but not limited to, pitch decks and quarterly updates, to the data rooms. Id. at ¶ 49. The data room for institutional investors includes detailed financial information. Id.

In addition to informational updates, financial information, and quarterly and other reports, the Monitorship Entities post legal documents—including supplements to the private placement memoranda—in the data rooms. Id. at ¶ 50. According to the Monitorship Entities and the private placement memoranda, the posting to the data rooms of these legal documents (including supplements to the private placement memoranda) is sufficient to alter the legal obligations of the parties; unilaterally impose legally binding obligations on the parties; and/or create new benefits for the parties, including as it relates to the amount of fees the Monitorship Entities can collect and when those fees may be collected. Id.

While the investors are able to read and review the documents and materials posted in the data rooms, a representative for Monitorship Entities confirmed that the default setting is that the investors are *not* able to download or save a copy of the documents and materials posted in the data room. Id. at ¶ 51.

The Monitorship Entities have access to and have produced audit trails for the data rooms. Id. at ¶ 52. Those audit trails show the date and time a document is uploaded into the data room, as well as the dates and times that users accessed documents in the data rooms. Id.

Importantly, the Monitorship Entities also produced approximately 4,035 Compliance Acknowledgment forms, executed by investors across various Series on dates varying throughout 2023, 2024, and 2025. Id. at ¶ 55.

The Monitor has reviewed the "investor ledgers" provided by the Monitorship Entities. Id. at ¶ 56. The "investor ledgers" do not contain a record or accounting of any management fees being deducted from the investors' "equity balances." Id. Further, a Monitorship Entities' representative confirmed that the individual investor ledgers do not reflect "a management fee removal." Id.

## XVI. Monitor's Third Status Report.[3]

253) The Monitor issued his Third Status Report on July 30, 2025. See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 135. In it the Monitor reported, *inter alia*, that:

> As of the end of the second quarter of 2025, according to the Monitorship Entities' records, **the balance of the investors' capital accounts across all Series is approximately $633,000,000**. Id. at ¶ 31. **The infrastructure-based Series** comprise more than half of investor funds, **with approximately $239,000,000** invested in the Infrastructure Series **and another $144,000,000** invested into an infrastructure series called BSG15. Id. This balance **does not include** investors in the former MCA, QSBS, **Altcoin** (BSG CM), or TCVI Series. Id. (Emphasis added).
>
> Contender Development, Inc. advised that, through December 31, 2024, only approximately $300,000 in *profits* ever had been realized on any of the infrastructure development projects and that only one project was realizing profits as of June 4, 2025. Id. at ¶ 39.
>
> Defendant Feingold is a partner and owner of Contender Development. Id. at footnote 1.
>
> In late 2024, BSG Fund wound down/rolled over and discontinued the MCA Series. Id. at ¶ 44. The MCA Series investors were given the option to fully redeem or to roll over into a new infrastructure Series, called BSG15. Id. at ¶ 45. To effectuate the roll over from the MCA Series into BSF15, BSG Fund "credited over" the MCA Series investors' capital accounts to the BSG15 Series. Id. In other words, no actual funds changed hands (or Series) when the discontinuation occurred. Id.
>
> The incoming funds from the historic MCA portfolios to BSG Fund are being used to pay investor dividends across all Series. Id. at ¶ 46.
>
> BSG Fund does not reduce a fund investor's principal balance when management fees are received by BSG Management. Investors are able to redeem the entire amount of their original investment if and when they redeem their investments. *See* S. Baldassarra Feb. 14, 2025 Decl. ¶ 16, ECF No. 54-2. Id. at ¶ 52.
>
> Juniper does not track or report to BSG Fund or the investors the amount of management fees deducted from their investment. Id. at ¶ 53. As a result, both BSG Fund's internal records and the investor-facing records all reflect that all

[3] The Monitor issued his Second Status Report on May 30, 2025, however the only unredacted portions of that report relate to a dispute over the ownership of assets with another private equity fund, and since those assets are not at issue in this lawsuit the Second Status Report does not need to be addressed here.

investors' capital accounts contain the amount invested without any reduction for the up to 30% in up front management fees. Id. Moreover, the investors' dividends, which typically are a set percentage of the capital account, are not reduced proportionately to the management fees collected. Id.

BSG Fund does, however, collect--and distribute to its manager/partners--management fees, despite such fees not being reflected on the investor ledgers. Id. at ¶ 54.

When BSG Fund solicited and received investor funds, BSG Fund held "closings" twice a month, on the 1st and 15th, when it would receive and then deploy investor funds. Id. at ¶ 55

From the interview with Steven Baldassarra, the Monitor learned that BSG Fund maintains what it refers to as a "management fee worksheet." Id. at ¶ 56. In essence, with each "closing" (*i.e.*, when investor funds were received historically on the 1st and 15th of each month), Steven Baldassarra calculated how much BSG Fund *could* collect in management fees on a Series-by-Series basis. Id.

At present, according to records provided by the Monitorship Entities, **the investor capital account balances across all Series is approximately $633,000,000**. Id. at ¶ 60. From January 1, 2025 through May 31, 2025, according to Juniper records, BSG Fund paid approximately $75,073,250 in investor dividends. Id.

Based on internal accounting records and bank statements provided by the Monitorship Entitites and reviewed by the Monitor's forensic accountant team, from January 1, 2025, through May 31, 2025, BSG Management, as manager of BSG Fund, received a total of approximately $73,955,551 in incoming transfers. Id. at ¶ 61. Of that, approximately $5,012,503, or 6.8% was from Contender Development. Id. Another $8,714,034, or 11.78%, was from crypto mining activity. Id. **The remaining approximately $58,958,667, or 79.7% was from Samson, representing liquidated profits the historic MCA portfolios**. Id.

***Ultimately, for BSG Fund to be able to meet its dividend obligations going forward, and particularly into 2026, it appears that BSG Fund must begin to receive significantly more revenue from non-MCA sources (such as infrastructure), liquidate certain assets, or sell all or part of its equity in the infrastructure portfolio.*** " Id. at ¶ 71

(Emphasis added).

254) Notably, on February 24, 2026, in another legal proceeding the President of Contender Development, Inc. acknowledged that the Highland Colony Estates infrastructure project (which is listed as a Broadstreet asset in Broadstreet's quarterly reports) has been

completed. See Case 9:26-cv-80119-RKA (S.D. Fla.) DE 35-2 at page 2. The Highland Colony Estates infrastructure project was held in the Anderson Ridge Development LLC special purpose vehicle ("SPV"). The land for this project was purchased with $2,616,600.00. The Greenville, South Carolina county records show that a $740,880.00 mortgage was taken out on this land and all the lots associated with this infrastructure project were sold by June 10, 2024 for $6,615,000. Thus, the gross revenue for this project is approximately 2.5 times the initial investment, and that is before expenses are paid. After the mortgage was repaid and this project was closed there was presumably $5,874,120.00 remaining.

255) Also, on October 7, 2025, the Monitor issued a supplement to the Third Status Report to clarify that on a money in and money out basis the Samson/MCA portfolios were not profitable and in fact "from 2019 through mid-2025, [Broadstreet] sent at least $40 million more to Samson than [Broadstreet] have received from Samson." See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 140. Thus, the Samson/MCA Series resulted in a $40 million loss.

## XVII. Monitor's Fourth Status Report.

256) The Monitor issued his Fourth Status Report on October 30, 2025. Case 1:25-cv-20436-DPG (S.D. Fla.) DE 165. In it the Monitor reported, *inter alia*, that:

> The Monitorship Entities owns a number of assets including 20,000 acres of infrastructure developments, hotels, car dealerships, and vacant land, among other assets. Id. at ¶ 7. The infrastructure assets are the most valuable, and comprise over 50 communities, over 120 projects, and over 40,000 eventual homesites. Id.
>
> As previously reported, the infrastructure assets are currently held through special purpose vehicles ("SPVs"), typically with 30% of the SPV being held by a "developer partner" (such as Contender Development, Inc.) and 70% of the SPV being held by the "equity partner." Id. at ¶ 8. For many of the infrastructure assets represented to be in the Broadstreet portfolio, the SPV's operating agreement identifies BSI (Broad Street, Inc.) as the 70% "equity partner." Id.

[P]ursuant to the Tri-Pary Agreement … any proceeds from the sale of the lots owned by an SPV with BSI as the "equity partner" will flow to BSGM and then to the BSG Fund. Id. at ¶ 9.

As of the filing of the Third Status Report, the Monitor was operating under incorrect impression that the incoming funds from Samson represented "profits" on a money in/money out basis. Id. at ¶ 27. In other words, the Monitor was led to believe that, from the beginning of time, the Monitorship Entities had sent more money to Samson to be invested in the MCA portfolio than it had received from Samson, and thus the current funds being received from Samson represented "profits." Id.

The Monitor later learned that the Monitorship Entities did not provide the Monitor with the actual funds "received" from Samson, as the Monitor had requested. Id. at ¶ 28. Rather, the Monitorship Entities provided the Monitor with "right to receive" or "RTR" figures – which are projected, best-case scenario figures that assume all accounts receivable are collected. Id. The Monitor thus filed a Supplement to the Third Status Report retracting his statement about the profitability of the MCA portfolio. Id.

Therein, the Monitor reported that, as of October 3, 2025, when the Monitor finally received a draft accounting from the Monitorship Entities of the money in and money out for the years 2019 through 2022, the updated accounting reveals that, from 2019 through mid-2025, the Monitorship Entities sent at least $40 million *more* to Samson than the Monitorship Entities have received from Samson. Id. at ¶ 29.

In the time leading up to and following the publishing of the Supplement, the Monitor has continued his efforts to evaluate what exactly the incoming funds from Samson represent – both from an accounting standpoint and from a factual standpoint. The issue remains highly significant to the Monitor given (i) the amount of funds BSG Fund has received (and continues to receive) from Samson relative to the total amount of other funds BSG Fund receives; and (ii) BSG Fund's current monthly dividend obligations to investors. Id. at ¶ 30.

As such, the Monitor stands by his position, as reported in the Supplement to the Third Status Report. … The Monitor is merely saying that, on a macro-level, money in/money out basis, there remains a $40 million deficiency over the life of the MCA portfolio. Id. at ¶ 34.

Based on internal accounting records and bank statements provided by the Monitorship Entities and reviewed by the Monitor's forensic accountant team, from June 1, 2025 through September 30, 2025, BSGM, as manager of BSG Fund, received a total of approximately $93,419,429 in incoming transfers. Id. at ¶ 38. Of that, approximately $38,690,884 or 41.4%, was received from Samson (on account of the current liquidation of the MCA portfolio). Id. Another $13,053,650,

or 14%, was received on account of infrastructure income. Id. $2,784770, or 3.0% was received on account of mining equipment rental income. Id. Approximately $509,180, or .5% represented interest. And $37,515,520.36, or 38.1%, represented deposits that have not been identifies. Id.

From January 1 to May 31, 2025, the vast majority of funds being used to pay investor dividends came from the BSG Fund's liquidation of the MCA portfolio, and the Monitor was aware that the stream of funds would taper off in the first quarter of 2026 … (reporting that the MCA portfolios "will be fully liquidated by the beginning of 2026." Id. at ¶ 41.

The Monitorship Entities have represented to the Monitor that … monthly expenses to investors comprised approximately $7 million per month. Id. at ¶ 44.

The Monitorship Entities have also represented that they recently signed an Indication of Interest with a large, national homebuilder to sell fifteen subdivisions in an all-cash transaction for $185 million. Id. at ¶ 45. This transaction was expected to close before the end of 2025 and, after factoring in pre-paid earnest money deposits, payments to lender, and other escrows, BSG Fund expects to receive approximately $155 million.[4] Id.

Needless to say, if this transaction closes, and the timing (end of year) and estimates $155 million hold, given current bank balances and other potential transactions … the Monitor believed that the Monitorship Entities will have sufficient funds to cover monthly obligations for the foreseeable future. Id. at ¶ 46.

In August 2025, after a series of possible asset sales and proposed redemptions that were not consummated, the Monitorship Entities advised the Monitor of another possible sale and proposed redemption of investors. Id. at ¶ 48. The current transaction that the Monitorship Entities wish to pursue is on that the Monitorship Entities have characterized in various Court filings as a "$3.7 billion" transaction. Id. This is the most significant and material transaction that the Monitorship Entities have pursued since the Monitor's appointment. Id. The contemplated transaction would eliminate all investors in BSG Fund – thereby eliminating *all* investors in the Monitorship Entities—thereby eliminating *all* investors' interest in the Fund and *all* investors' right to receive future distributions from the BSG Fund. Id.

The Monitor has had questions and concerns about the transaction, including that the proposed transaction did not seek to redeem investors for cash – instead, the investors are to receive stock in a SPAC (special purpose acquisition company) incorporated outside of the United States that could potentially be "locked up" for

[4] Although this number is redacted, Broadstreet later disclosed this number in its February 2, 2026 Investor Update.

up to 42 months and that is receiving only 30% of the BSG Fund's infrastructure assets. Id. at ¶ 49.

The plan, generally, is for the SPAC to develop homes on the projects being purchased and sell them to end users, thereby capturing the upside that was typically obtained by the homebuilders that purchased BSG Fund's infrastructure lots after the infrastructure work had been completed. Id. at ¶ 50.

The SPAC will also be purchasing other properties from other entities and already has obtained $252 million, per SEC filings. Id. at ¶ 50.

The Monitorship Entities first wanted to conduct the redemption of all investors "in kind," which means by providing something other than cash in exchange for the investors' interest in BSG Fund. The "in kind" stock amount has evolved over time, because the transaction is fluid, but the current iteration of the transaction involves an investor receiving ***three time*** their current capital account in SPAC stock. Id. at ¶ 51. Nevertheless, because the investors have the current right to redeem their investment in the BSG Fund for cash, the Monitor thought it would be appropriate to give investors that option as well. Id.

The Monitorship Entities agreed with that recommendation, so the Monitorship Entities and the Monitor are currently working together to compose a redemption notice to be sent to all investors that gives them the choice of either being redeemed in cash (in accordance with the documents governing their investment, which typically required payment within 180 days) or, instead, accepting three times their current capital account in restricted SPAC stock for which they would be foregoing all dividend distributions. Id. at ¶ 52.

The Monitor also asked the Monitorship Entities if they had the wherewithal, or a plan in place, to fund redemptions *in the event* they exceeded current bank balances, which the Monitor though was at least a possibility given (i) the involvement of a foreign-incorporated entity with no operating history; (ii) the more limited universe of assets that are being purchased by the entity (30% of the BSG Fund's infrastructure assets); and (iii) the potentially long-term restrictions that are being placed on the SPAC stock they would be receiving. Id. at ¶ 54.

In other words, while receiving stock valued at three times one's capital account is obviously attractive, the Monitor thought it possible that at least some investors, who had been accustom to receiving regular ~14% dividends with an unrestricted right to redeem their investment as they please, might be disinclined to, instead, accept stock that could be locked up for 42 months while no longer receiving dividends or having access to the funds they invested. Id. at ¶ 55.

The Monitorship Entities, in response, shared the Indication of Interest for the $155 million transaction discussed above. Id. at ¶ 56. The Monitorship Entities also confirmed that, if necessary, other assets could be sold to satisfy redemptions

(which, again, the Monitorship Entities would have 180 days to fund). Id. The Monitorship Entities also shared details of other potential nine-figure transactions—to sell some or all of the remaining infrastructure projects—that are currently being discussed. Id. As of the filing of this report, the other transactions have not yet been memorialized in a writing. Id.

## XVIII. Broadstreet Initiated Its Scheme to Get Rid of its Remaining Investors in November 2025 by Issuing a Redemption Notice.

257) On November 13, 2025, a Zoom meeting was held for Broadstreet investors, where David Feingold discussed the redemption process and the proposed public company or SPAC transaction.

258) Mr. Feingold explained that the decision was driven by business reasons and would be beneficial for all investors.

259) Mr. Feingold repeatedly stated that investors selecting Choice A would receive cash. He stated that investors selecting Choice B would receive restricted stock valued at approximately three times their balances.

260) Mr. Feingold claimed that the restrictions on selling the stock after receiving it were meant to keep funds in the new company and prevent the share price from dropping.

261) He emphasized that investors should consult with their attorneys and certified public accountants before making their elections.

262) During the presentation, Mr. Feingold also discussed the allocation of Broadstreet assets in connection with the proposed transaction. He represented that approximately 30% of Broadstreet's infrastructure assets reportedly valued about approximately $250 million, would be contributed to the new SPAC or public company. He further stated that Broadstreet's remaining assets would remain with Broadstreet or under the control of Broadstreet and its principals.

263) Mr. Feingold also stated that he expected to become the largest shareholder of the new public company.

264) No questions were allowed during this Zoom meeting.

265) The next day, November 14, 2025, Broadstreet sent its investors the Redemption Notice via Docusign.[5]

266) Contained in the Redemption Notice packet was a cover letter from David Feingold; the Redemption Notice agreement for the investors to Docusign; Item 1 - a document entitled Additional Q&A Information Schedule; Item 2 - the Amended and Restated LLC Agreement of Broad Street Global Fund LLC dated September 2023; Item 3 – Summary of Lock-Up Agreement; and Item 4 – Contender Development, Inc. Calculated Value of Business Enterprise of NewCo. See the November 14, 2025 Redemption Notice Packet attached hereto as **Exhibit A**.

**a. Cover Letter to Redemption Notice.**

267) The cover letter from David Feingold states in pertinent part:

> We will be pursuing our business on a private basis. As a result, **we will be providing you two options to determine how you would like to exit from your investment**. The first option, known as Option A, will be to simply have you redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.
>
> The second option, which was completely voluntary on our part, and is being given to those who desire to participate in a new real estate enterprise with a new company, is known as Option B. Option B will be a public entity that is purchasing 21 of our infrastructure projects and will involve me personally. That option will allow you to receive stock valued at three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. That stock will have restrictions on trading or liquidating, which can be as long as 42 months (or possibly less, depending on the trading volume and pricing for the public entity). Option B will not entitle you to any quarterly, monthly, or annual distributions. Your Broadstreet investment will be traded for the stock in the public entity. That stock can increase over time or decrease. **That option is different from anything previously provided in your original documents that you signed. It is an entirely new venture.**

---

[5] Initially, Broadstreet sent its investors a Redemption Notice via Docusign on or about October 24, 2025. However, at the behest of the Monitor, Broadstreet resent the redemption notice on November 14, 2025 with more information.

> In addition, I want each and every one of you to know that I personally will be taking the overwhelming majority of my compensation in the form of stock in the public enterprise and I will be the largest individual shareholder in that entity. ***I will be responsible for the operation of the real estate division of that enterprise***. I will also have restrictions on my ability to sell my stock. I will not be permitted to sell even a single share of stock for two years, regardless of the stock price or stock volume. Although I will not be the CEO of the public company, at nearly 60 years of age, I have other goals, primarily to increase my net worth and not caring much about my actual job title. Rest assured, ***I will be intimately involved in this new venture***. ***The new company will be run by a group of much younger and highly educated persons from Wharton, Harvard and Cornell*** who have a new economy view of real estate and financial services. They have a skill set that I simply do not possess to lead into this new world of decentralized finance, payments, stable coins and business transactions. ***My focus will be the real estate operations*** and I hope that the company, having a new economy aspect mixed with old economy assets, will allow for the type of investment valuation that an old world real estate company simply does not command in the market place.
>
> Nonetheless, I will be the largest shareholder, I will actively advocate for that which I believe will serve me personally best, and that is the success of the stock and any further additional benefits that I will lobby for the stock to have.
>
> Please read the attached redemption notice and its attachments carefully. Please also read the "Additional Q&A Information Schedule," which has additional questions and answers. What is best for me, may not be best for you and vice versa. **<u>The decision is solely yours to make.</u>** I have my own opinions, but they are just that, my opinions based on my goals, you need to make your own decision.

(Emphasis added.)

268) Most notably in this cover letter Feingold expressly told the investors in writing that (i) each investor will get to determine how they would like to exit from the BSG Fund, (ii) Option B is an entirely new venture and is different from anything previously provided in the original documents that the investors signed; and (iii) the decision is solely yours to make.

269) Broadstreet would later claim that it has the sole discretion to determine how the redemptions will be made in direct contraction to the representations Feingold made to the investors in this cover letter. Broadstreet cannot tell the investors that each investor will get to

determine how they would like to be redeemed and then renege on that representation because one of the redemption options, while doable, is inconvenient to Broadstreet.

**b. The Redemption Notice.**

270) Along with this letter Broadstreet sent its investors the Redemption Notice for the investors to Docusign requesting that they identify which redemption option they wanted – cash or stock. The Redemption Notice states, in pertinent part:

> As an Investor in the Broadstreet Global Fund, LLC ("BSG Fund"), you are hereby advised of our full redemption of the entirety of your investment pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"), that each investor executed to become an investor with BSG Fund. **<u>This redemption is binding</u>** upon you whether you make an election or not; therefore, you should carefully read this notice and all information referenced in or attached to this notice.
>
> Some of the Sale Opportunities will generate cash from the sale of individual infrastructure and land projects and another Sale Opportunity will create the payment through common stock of a New York Stock Exchange listed company that is restricted. By "restricted," we mean the stock you would be receiving has substantial restrictions on when it can be sold (restrictions could be for up to forty-two (42) months or less, depending on the price and trading volume of the stock). All restrictions are more specifically discussed in the draft Lock-Up Agreement attached as **Item 3**.
>
> For your redemption, you will be given two choices, and you **<u>must</u>** make a selection. Under one option (Redemption Choice – A), the investor would receive, in cash, an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The second option (Redemption Choice – B) involves providing the investor with the payment of restricted (as defined above) common stock in a company named Soulpower Acquisition Corp. (NYSE symbol: Soul), which is purchasing 21 infrastructure projects from BSG Fund through an entity called SWB Holdings; which will then merge into Soul with those assets from BSG Fund and contain approximately $250 million in cash. You will be paid in stock equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The basis of this valuation of the assets being transferred to SWB Holdings and ultimately Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold at a valuation range of a low of $487 million to a high of multiple billion. The valuation was negotiated at an arm's length basis with the buyer and priced at the high end of the range based

on our agreement to accept stock with the restrictions described above. A copy of one such valuation is attached as **Item 4**.

**There will be no additional returns or consideration paid. No additional payments or preferred returns will be paid to you on or after November 14, 2025.**

**After this redemption, whether you choose choice A or B, you will no longer be an investor in BSG Fund, you will no longer receive preferred returns or other payments from BSG Fund, and there will be no additional amounts or returns paid to you by BSG Fund**.

This redemption process will be conducted exactly as specified in the Operating Agreement document, a copy of which is attached hereto as Item 2 and also available in the BSG Fund data room under the tab Operating Agreement.

**<u>REDEMPTION CHOICE – A</u>**

For the first choice of redemption, known as "Redemption Choice – A," you will simply be redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. Pursuant to the Series Supplement, you will be paid within 180 days of your redemption election. At the conclusion of this transaction, and after your payment has been made, you will no longer be an investor in BSG Fund.

**<u>REDEMPTION CHOICE – B</u>**

For the second choice of redemption, known as "Redemption Choice – B," you will be paid with the payment of restricted common stock in a New York Stock Exchange listed company equal to three times (3x) an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. The basis for this valuation of assets being transferred to SWB Holdings which will ultimately become Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold for public stock at a valuation range of a low of $487 million to a high of multiple billion. The valuation was negotiated on an arm's length basis with the buyer and priced at the high end of the range based on our agreement to accept stock with the restrictions described above. The above-mentioned Operating Agreement will no longer govern any of your rights, or any of the terms or conditions on your investment, because you will no longer be an investor in BSG Fund. You will no longer receive any preferred returns or other payments from BSG Fund, because you will no longer be an investor in BSG Fund. You are also cautioned that the stock you are receiving contains substantial restrictions and conditions on when you can sell the stock, which are set forth in the document entitled Lock-Up Agreement attached as Item 3 and which has also been placed in the BSG Fund data room under the heading of Stock Redemption.

> You should read this document carefully to fully understand the nature of the payment of stock being made for Redemption Choice – B. In addition, you are urged to review the "Additional Q&A Information Schedule" that is attached as **Item 1**; click on the link provided in that schedule, and/or go to the website SEC.GOV, to read all of the public filings on the New York Stock Exchange Company whose stock you will be receiving. At the conclusion of this transaction, and after your stock has been transferred, you will no longer be an investor in BSG Fund.
>
> All prior risk factors in any and all documentation that you received from BSG Fund are incorporated herein by reference and, in addition, you grant Broadstreet, Inc. a power of attorney to execute any and all documents necessary on your behalf in order to accomplish the matters set forth herein.
>
> Neither the United States Securities and Exchange Commission nor any State Securities Administrator has approved or disapproved this redemption notice.
>
> We will no longer be open to any new outside investors. Thus, you will either be completely redeemed for cash as specified in Redemption Choice – A or you will participate in Redemption Choice – B and be completely redeemed for restricted stock as specified in Redemption Choice – B.
>
> **Going forward, you will no longer be a member of BSG Fund, your capital accounts will be a zero and you will not receive any other payments or preferred distributions.**
>
> Investors will have fourteen (14) days to select which redemption they are choosing.

(Emphasis added).

271) Here, all Counter-Plaintiffs elected Redemption Choice – A to receive a cash redemption, and this selection was **<u>binding</u>**.

**c. Item 1 the Additional Q&A Information Schedule.**

272) In lieu of taking questions at the November 13, 2025 Zoom meeting, Broadstreet included as Item 1 in the Redemption Notice Packet an Additional Q&A Information Schedule. Some of the most notable questions and answers contained in that document are as follows:

> <u>Question 3</u>: Is any cash also being paid, and, if so, how much? **No, the PUBCO transaction is an all stock deal.**

> Question 5: If, for example, $150 million in investors choose to redeem, what exactly is the plan to generate the monies needed to fund those redemptions? **We will not know for sure the extent of Broadstreet's redemption obligation until the complete redemption notice process is followed and completed. Nonetheless, we have a number of remaining assets available for sale, even excluding the 21 projects being sold to PUBCO, with indications that those assets are worth more than enough to cover all cash demanded. It would just require a sale of certain assets.**
>
> Question 6: I read that SWB Holdings will have $250 million in cash, but I have not been told if any of those funds are available to the monitorship entities to redeem investors. If so, how much? **The Asset Management Agreement provides us access to the cash which PUBCO will have for our operations. Nonetheless, we think our need to even access such capital is extremely remote based upon negotiations and offers that we have received on our assets that would be available for sale**.
>
> Question 8: Is third-party financing available or lined up to fund redemption obligations? **We have been approached with a $500 million term sheet involving PUBCO stock to secure more funding if need be. At this point, the term sheet is under negotiation but again, we believe the value of our assets alone should suffice to meet any redemption requirement for cash.**
>
> Question 16: If Broadstreet is keeping "70%" of the assets, will David Feingold also continue to have a role with Broadstreet? If so, how does he plan on simultaneously serving Broadstreet and PUBCO? Will Contender still serve as developer for Broadstreet's remaining assets? If so, how will Contender, with finite resources, serve as developer for two entities that are competing in the same market and the same region? I have the similar questions for Joe Baldassarra and Steve Baldassarra, and Broadstreet's other "partners." **Broadstreet plans to sell its remaining assets and make distributions to its partners who have certain levels of ownership in the business. Feingold, the Baldassarras and the other partners will continue to maintain their roles with Broadstreet until such sale of assets is complete. Contender will act as developer for Broadstreet's remaining assets until they are sold. Contender and PUBCO will not be competing as Broadstreet will not be expanding its business. Broadstreet will merely complete its existing business. The Baldassarras and the other existing partners of Broadstreet will be passive shareholders in PUBCO but will not have any other role with PUBCO.**

273) In the answers to questions 5, 6 and 8, Broadstreet represents that it has sufficient means to fulfil the cash redemption obligations.

274) In the answer to question 3, Broadstreet misrepresents that investors who select Option B to receive stock will not receive cash, since Broadstreet has entered into side letter agreements where it has agreed to return some of an investor's cash or transfer a portion of their investment to Innovative (a company in the Broadstreet family) where they can continue to receive cash distribution if they select Option B. See Side Agreement and Text Messages attached as **Exhibit H** and **I**.

275) In the answer to question 16, Broadstreet makes it clear that after already siphoning off 30% (over $300 million) of the money raised for the BSG Fund, the partners at Broadstreet are going to keep for themselves more than 70% (over $500 million) of the assets purchased with Broadstreet investors' money.

276) Notably, in this Complaint Broadstreet claims it can force all Broadstreet investors who selected a cash redemption to accept shares of a speculative, illiquid and restricted stock as an "in-kind" redemption while the partners at Broadstreet get to divvy up over $500 million of assets purchased with Broadstreet investors' funds.

277) This is theft in broad daylight, and nothing in the PPM, Operating Agreement or any of the corporate documents gives Broadstreet the right to do this.

**d. Item 2 the Operating Agreement.**

278) Also, contained in the Redemption Notice Packet at Item 2 was the Amended and Restated Limited Liability Company Agreement of Broad Street Global Funds LLC dated as of September 2023. A few of the provisions of this agreement that are relevant to the Redemption Notice are as follows:

> Section 11.04 Amendments to Company Agreement. This Agreement (including any Series Schedule) may be amended in any manner the Manager deems desirable. The Manager shall promptly give **notice** to Members of any amendment made to this Agreement. **No such amendment shall, except as provided below, become**

> **<u>effective as to any Member without the consent of such Member</u>** or the consent of a Majority-in-Interest of the Members of the Company or the applicable Series, as applicable. Notwithstanding the foregoing, any amendment made by the Manager may be immediately effective if the amendment is made (i) to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision herein, to comply with any applicable requirements of law, or to make any other provision with respect to matters or questions arising under this Agreement that will not be materially inconsistent with the provisions of this Agreement; (ii) to delete or add any provision of this Agreement required to be so deleted or added by any Federal agency or by a state "Securities" or "Corporation" commission, department or administrator, or similar such body, agency or official, which addition or deletion is deemed by such body, agency or official to be for the benefit or protection of the Members; (iii) to admit additional Members; or (iv) to make any change that does not adversely affect the Members in any material respect.

(Emphasis added).

279) The Redemption Notice is an amendment to the Operating Agreement pursuant to Section 11.04 in that it provided all of the Broadstreet investors notice to a change the Operating Agreement, which Feingold describes in the cover letter as different from anything in the documents that the investors previously signed, and it requests the investors signature consenting to the change. Accordingly, the Redemption Notice is an amendment to the Operating Agreement and supersedes any prior representations contained in the Operating Agreement.

> <u>Section 6.02 Withdrawals</u>. Subject to Section 6.05(d) and Section 6.07 and except as may be provided in an applicable Series Schedule, each Member shall have a right to withdraw all or a portion of the balance in its Capital Account maintained in respect of any Series at such times (each, a "Withdrawal Date"), upon such prior written notice to the Manager, as is set forth in the applicable Series Schedule. If a Member has made Capital Contributions to fund more than one Series or Class, different withdrawal provisions may be imposed with respect to each such Series or Class, which provisions may include, without limitation, the introduction of a Series- or Member-level gate or a Lock-Up Period. A Member's notice of withdrawal shall be irrevocable unless waived by the Manager in its sole discretion. The Manager may elect to treat any partial withdrawal from a Series as a request for a complete withdrawal from such Series if the applicable Capital Account balance of such withdrawing Member immediately following such withdrawal would be less than the applicable minimum as set forth in the Series Schedule. **<u>The Manager shall endeavor to make payments of any amounts withdrawn within 60 days after the applicable Withdrawal Date</u>**; provided, however, that if a

> Member elects to withdraw all of its Capital Account(s) in respect of a Series, such Series shall endeavor to pay the Member an amount equal to at least 90% of its estimated withdrawal proceeds (computed on the basis of unaudited data as of the Withdrawal Date) generally within 60 days after the Withdrawal Date.

(Emphasis added).

280) Further proof that the Notice Redemption is an amendment to the Operating Agreement can be found in the fact that it changed the time that Broadstreet has to make the withdrawal payment from 60 to 180 days.

> <u>Section 6.03 Required Withdrawals</u>. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. Unless prohibited under law or regulation, the Manager shall use commercially reasonable efforts to provide each Member prior **<u>written notice</u>** of a termination of all or any portion of such Member's Capital Account. With respect to any Series that permits withdrawals in the ordinary course, the Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal of all or part of its Capital Account(s), as the case may be, under Section 6.02. With respect to any Series that does not permit withdrawals, the Member receiving such notice **<u>shall receive the fair value of its Capital Account</u>** in connection with its withdrawal.

(Emphasis added).

281) Even assuming, *arguendo*, that the Redemption Notice is not an amendment to the Operating Agreement, the highly speculative, illiquid and restrictive stock that Broadstreet wants to force on its investors is not an "in-kind" redemption under the Operating Agreement. Section 6.03 states that in the case of a required withdrawal the members shall receive the **<u>fair value</u>** of their capital account. Because the SPAC shares have no readily ascertainable market value, their forced imposition on Counter-Plaintiffs neither reflects the fair value of their capital accounts nor satisfies the legal requirements of an "in-kind" redemption.

282) Moreover, an "in-kind" redemption represents an investors pro rata share of the entire investment. In particular, Section 80a-2(a)(32) of the U.S Code defines a "redeemable security" as:

> "Redeemable security" means any security, other than short-term paper, under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, ***is entitled*** (whether absolutely or only out of surplus) ***to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof.***

15 U.S.C. § 80a-2(a)(32) (emphasis added).

283) Here, Broadstreet only uses 30% of its infrastructure assets to pay for the SOUL shares that it is distributing to all its investors. Thus, Broadstreet investors are only receiving their pro rata share of 30% of the BSG Fund's infrastructure projects – not their pro rata share of the entire BSG fund. Since the BSG Fund investors' capital account represented their pro rata share of the entire fund, the BSG Fund investors are receiving shares that are worth significantly less than their capital accounts in the BSG Fund.

**e. Item 4 entitled Contender Development, Inc. Calculated Value of Business Enterprise of NewCo.**

284) Further, in the Redemption Notice Broadstreet claims that "The basis of this valuation of the assets being transferred to SWB Holdings and ultimately Soulpower Acquisition Corp. is derived from a number of valuations and calculations that were received placing the assets being sold at a valuation range of a low of $487 million to a high of multiple billion."

285) To support its calculated valuation of the assets being transferred to Soulpower Acquisition Corp., Broadstreet included in the Redemption Notice Packet Item 4 entitled Contender Development, Inc. Calculated Value of Business Enterprise of NewCo. This report was prepared by CohnReznick on October 2, 2025 for David Feingold of Contender Development, Inc.

286) In this report the total appraised value for the BSG Fund's 23 infrastructure projects included in this transaction is listed as $76,675,000 and the total gross revenue adds up to $2,253,806,014.

| Infrastructure Project included in the SOUL Transaction | Total Gross Revenue | Appraised Value | Appraised Value's Percentage of Gross Revenue | Amount Times the Appraised Value to Equal Gross Return |
|---|---|---|---|---|
| Brickyard | $14,700,000.00 | $575,000.00 | 4% | 25.57 |
| Chestnut Crossing | $15,367,998.00 | $1,810,000.00 | 12% | 8.49 |
| Dusty Road | $42,162,815.00 | | | |
| Freedom Florence | $19,668,762.00 | | | |
| Hardscrabble | $24,972,848.00 | $3,520,000.00 | 14% | 7.09 |
| Hawksbill | $212,639,297.00 | | | |
| Highway 357 | $6,463,422.00 | | | |
| Kendrick Creek | $22,577,545.00 | | | |
| Midway | $430,260,895.00 | | | |
| Mountain Drive | $22,033,115.00 | $1,835,000.00 | 8% | 12.01 |
| Oak Hills | $116,019,919.00 | $52,045,000.00 | 45% | 2.23 |
| Oak Hills II | $41,307,276.00 | $1,680,000.00 | 4% | 24.59 |
| Raeford | $20,055,000.00 | | | |
| Ray Road | $22,885,000.00 | | | |
| Rice Creek | $289,880,000.00 | | | |
| Ridge Road | $301,560,180.00 | $11,560,000.00 | 4% | 26.09 |
| Rockgate | $20,750,730.00 | $3,650,000.00 | 18% | 5.69 |
| Ted Farms | $20,400,649.00 | | | |
| Wakefield | $80,100,563.00 | | | |
| Catawba | $154,000,000.00 | | | |
| Mallard | $172,000,000.00 | | | |
| Pearson | $109,000,000.00 | | | |
| MacGregor | $95,000,000.00 | | | |
| | | | | |
| **TOTALS** | **$2,253,806,014.00** | **$76,675,000.00** | | |

287) Admittedly, there is no appraised value for most of the infrastructure projects, which is odd since Broadstreet/Contender Development, Inc. provided CohnReznick with the appraised value numbers. Broadstreet/Contender Development, Inc. should know how much of the BSG Funds were used to acquire each of the infrastructure projects. Even without an updated appraisal, at the very least each infrastructure project should have a value equal to the amount that was spent to acquire the assets. Without this basic information (i.e. the cost of each infrastructure

project), this document cannot be used to support Broadstreet's claim that at a minimum the infrastructure projects are valued at $487 million.

288) From the appraised values that were provided, it is clear that several of the infrastructure projects would have to increase their appraised value by 25 times the "Appraised Value" (basically going from $1 million to $25 million) to reach the "Total Gross Revenue" number that Broadstreet is using to claim that these infrastructure projects are worth billions.

289) Broadstreet has provided no evidence that they have ever been able to accomplish that, and in fact the only infrastructure project that Broadstreet has ever completed Highland Colony Estates (notably with non-Broadstreet investors' money) only had a gross return of 2.5 times the value of the land acquired for that infrastructure project.

290) Accordingly, there is no track record or any other basis that would support Broadstreet's representation the infrastructure projects are worth the combined $2.2 billion total gross revenue numbers contained in this report.

291) Moreover, even assuming, *arguendo*, that the total gross revenue numbers were accurate, they only represent gross revenue, which is the sales revenue before any costs or expenses are deducted.

292) So, while the total gross revenue adds up to $2.2 billion, this number cannot be used to determine the current value of the infrastructure projects involved in the Soulpower Acquisition Corp. transaction without knowing the projected expenses.

293) We do, however, know that Broadstreet intends on transferring over 30% of its infrastructure assets to Soulpower Acquisition Corp. Based on the numbers in Monitor's Third

Status Report, 30% of the infrastructure assets would represent $114,900,000[6] of investors' capital. Thus, assets that were acquired with approximately $114,900,000 of investors' capital is going to Soulpower Acquisition Corp, and **Broadstreet is keeping assets worth <u>$518,100,000</u>**[7] for itself and its partners.

294) In addition to the 70% of infrastructure assets, Broadstreet is keeping its investors investments in Crystal Lagoons, Self-Storage, Car Dealerships, Hotels, Land Banking, Durham, 1031 Exchange, TIC-Land, Annuities, TEFs, Fixed Income and Approximately 35 pre-IPOs. <u>Id</u>. at ¶¶ 29-31. All purchased with funds from Broadstreet investors.

295) As discussed below, the June 2, 2026 Monitor's Seventh Status Report reveals that the BSG Fund was obligated to redeem approximately $2 billion in stock. Thus, it appears that Broadstreet is claiming assets that were purchased with approximately $114.9 million of its investors' funds will be worth $2 billion in 3 ½ years, with no explanation of how that is possible.

296) Broadstreet's projects have absolutely no basis in fact or reality and appear to be entirely made up to hide the fact that Broadstreet is stealing assets acquired with approximately $518 million of the money raised from its investors.

297) And that's in addition to the over $300 million Broadstreet already collected in fees for five years of service that it hasn't and will never provide.

298) All while Counter-Plaintiffs have yet to make a profit on their investments in the BSG Fund, as the shares Broadstreet is trying to force them to accept are speculative, illiquid and could be restricted for the next 3 ½ years.

---

6 Calculated as follows: 0.30 x ($239,000,000 + $144,000,000) = $114,900,000. <u>See</u> Case 1:25-cv-20436-DPG (S.D. Fla.) DE 135 at ¶ 31.

7 Calculated as follows: $633,000,000 - $114,900,000 = $518,100,000. <u>Id</u>.

**XIX. Issues with Soulpower Acquisition Corp. and SPAC's in General.**

299) Soulpower Acquisition Corporation (SOUL) is a publicly traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. It completed its Initial Public Offering (IPO) on April 3, 2025.

300) SOUL is a "family affair" run by two young brothers from Long Island, New York. Justin Lafazan, is the chief executive officer and chairman of the board and his brother Joshua Lafazan is the president.

301) Justin Lafazan (believed to be 29 or 30) has no prior experience in leading a large company; his background appears to be in motivational speaking and co-founding Next Gen HQ which provides a "full ecosystem to help Next Gen-ers across the world reach their goals and dreams[8]."

302) His brother, Joshua Lafazan (believed to be 32), is a former member of the Nassau County Legislature in New York. Joshua Lafazan is perhaps best known for introducing and promoting legislation that would have expanded Nassau County's human rights laws to designate police officers as a "protected class" empowered to sue Black Lives Matter protestors for damages[9].

303) From statements made by CEO Justin Lafazan, SOUL seems to have a decidedly ideological bent. As reported in *The Financial Times*[10] Justin Lafazan stated that

---

8 https://www.nextgenhq.com/our-story (accessed October 23, 2025).
9 https://www.nbcnews.com/news/us-news/n-y-county-exec-vetoes-bill-would-allow-police-sue-n1276568 (accessed August 6, 2026).
10 *You Have $250m. Your mission: overthrow the World Bank. What do you buy?* The Financial Times published April 25, 2025. https://www.ft.com/content/d7d24470-a200-4a1a-bf88-09fd84b55075 (accessed October 23, 2025).

> "[SOUL] has officially filed our permit to start The New World Bank. I believe that the current The World Bank, similar to the United Nations, is an ineffective and morally corrupt organization. I believe that they are largely failing at their mission to boost economic prosperity for people around the world. I believe that the world does not need the 'Charity' of a 'Non-Profit' World Bank."

304) In an effort to accomplish its vision to create "The New World Bank," SOUL seeks to purchase certain unknown assets of Broad Street Global Management, which is in the midst of an SEC enforcement action. Further, SOUL also seeks to purchase assets of Bank of Asia (BVI) Limited, which is in the midst of court-ordered liquidation in the Virgin Islands and has caused a political scandal in the Virgin Islands[11].

305) In addition to the Counter-Plaintiffs' concerns about the youth and inexperience of SOUL's management, its nakedly ideological bent, and the quality of the assets it is acquiring, there are fundamental concerns about the track record and performance of SPACs in general[12].

306) The costs embedded in the SPAC structure are far higher than costs associated with traditional IPOs. Overall, mean and median market-adjusted returns to SPAC shareholders are negative 64% and negative 88% respectively. In SPACs generally there are poor disclosure practices and sponsor incentives that are misaligned with shareholder interests. SPAC targets are more likely to be "pre-revenue" or low-revenue companies. Those companies may have little other than projections with which to communicate their value to investors. And aggressive projections could be one of the reasons SPAC shareholders go along with mergers that leave them with losses. The comprehensive analysis finds that SPAC mergers have resulted in systematically bad deals for shareholders.

---

[11] *Premier faces questions in HOA on failed Bank of Asia*, BVI News published on July 21, 2026. https://bvinews.com/premier-faces-questions-in-hoa-on-failed-bank-of-asia/#:~:text=The%20government's%20deposit%20in%20the,into%20the%20now%2Ddefunct%20bank. (accessed August 6, 2026)

[12] Klausner, Ohlrogge, Ruan, "A Sober Look at SPACs" 39 Yale Journal on Regulation 228 (2022).

## XIX. The December 3, 2025 Hearing in the SEC Enforcement Action.

307) On December 3, 2025, a hearing was held in the SEC's enforcement action on Broadstreet's motion to discharge the monitor. During this hearing, counsel for Broadstreet made the following representations to the Court:

> "As you are also aware, Broad Street has obtained a $3.7 billion buyout and redemption of all of Broad Street's investors. Approximately, **83 percent of the investors have chosen stock**, and **17 percent have chosen cash**. As such, Broad Street no longer has any investors. Additionally, Broad Street had nearly 4,000 investors and never missed a payment to a single one of its investors."

> "Under Docket Entry 178, we have provided notice to the Court of the lawsuit Broad Street intends to file against him, the Monitor, now that redemption is complete and the damages number against him and his firm is set, including **$130 million in cash** and **$450 million in stock** that he forced Broad Street to pay to its investors that was not in any contract with investors, but that the Monitor demanded knowing that investors signed contracts to be paid substantially less."

See Pages 6 and 7 of the Transcript of December 3, 3035 hearing in Case 1:25-cv-20436-DPG (S.D. Fla.) DE 210.

## XX. Broadstreet Misrepresents the Amount of Investors that Chose Stock verses Cash.

308) Broadstreet entered into side letter agreements promising investors cash if they Chose Option B to receive stock. For example, in a side letter dated November 20, 2025 BSG Fund agrees to give an investor $100,000 in cash of their $254,795 investment in the BSG Fund in return for selecting Choice B in the redemption notice. See Special Side Letter Agreement dated November 20, 2025 attached hereto as **Exhibit J**.

309) In addition, Broadstreet offered a side letter agreement to some of the Counter-Plaintiffs with an option to continue receiving distributions through a company called Innovative Development Fund LLC, which they were told is part of the Broadstreet Family, if they choose Option B to receive stock. For example, a side letter agreement received by Counter-Plaintiff Jit Patel from Akhil Morada states:

> "Each of the Investors set forth below, in return for selecting Choice B in the redemption notice provided by BSG as well as executing any other such documents related hereto, shall be given the following investment/redemption opportunity provided all of the below signatories execute this Agreement (a) The Investor's entire Investment was $__________________ and they shall receive back from the Investment due to the redemption process an amount of $_________________ worth of ownership interest in Innovative Development Funds LLC which shall pay a calendar quarterly distribution of fourteen percent annualized return on the amount of value of said ownership and shall receive stock equal to $__________________ worth of stock in NYSE symbol SOUL."

See Innovative Side Letter Agreement attached hereto as **Exhibit H**.

310) Also, on November 25, 2025, Akhil Morada texted Jit Patel the following:

> "Everything in live is going to change when you get a 5x. Remember that. Also if liquidity is a concern we can figure something out. But don't over analyze this. We are all here to make money. We think u well be able to sell starting the first year. But u let me know what exact liquidity u need and we can structure something … We can give ur wife 14% with our family. This way u don't worry about taxes. As once u withdraw. Regardless let me know what u want. I don't want to keep coming to you for this. I'm here … **Family office is same fund land infrastructure. [link to https://innovativepwm.com/employee-bios/] Yes we own this**."

(Emphasis added). See Text Messages between Akhil Morada and Jit Patel attached hereto as **Exhibit** I.

311) In another text message sent on November 20, 2025, Benard Jasmin, a Partner at Broadstreet, Inc., wrote the following to Steven Schulman:

> "If you have any interest in partially or fully maintaining a 14% return (not 14.63%) backed by infrastructure there is a way through a side letter. What would happen is **you would be an infrastructure investor thru Innovative, which is part of the Broadstreet Family Office**. The small amount of infrastructure assets that wont be sold will be able to be invested in thru that fund in what would be a transaction at no cost to you. Funds could be moved over there into investment, also into infrastructure after some docs are signed. Its 14%, existing clients only and it has a 90-day redemption."

(Emphasis added). See Text Messages between Benard Jasmin and Steven Schulman attached hereto as **Exhibit** K.

312) Broadstreet clearly was offering to move its investors across the street to a company called Innovative Development Funds, LLC, which its representatives claim is part of the Broadstreet family office, presumably so that it could claim that Broadstreet no longer has any investors.

313) Broadstreet also appears to be in the process of transferring assets purchased with money from BSG Fund investors to a company called Innovative Development Funds, LLC.

314) Regardless, Broadstreet's representations regarding how many of its investors chose stock over cash is a lie because it has numerous side agreements with the investors who chose option B for stock to funnel cash back to them.

## XXI. Broadstreet's February 2, 2026 Investor Update.

315) On February 2, 2026, Broadstreet issued an Update to Investors on Current Status of Redemption. **Exhibit 2** attached to the Complaint. In it, Broadstreet stated that:

> Collectively, the Stock and Cash payments (collectively referred to as the "Redemption Consideration") to be made to investors has a payment deadline of May 27, 2026, and the Redemption Consideration due is approximately $2.14 billion.
>
> The remaining 6% of the Redemption Consideration is payable as Cash and is reliant on asset sales of projects not sold for Stock, nor projects that have been set aside due to a litigation dispute, and thereby there are substantial assets remaining available through additional sales that are being procured for cash. Those sales are being pursued through negotiations with multiple different counterparties and among them two major multi-billion dollar publicly traded companies (hereinafter referred to as Purchaser #1 and Purchaser #2).
>
> Purchaser #1 offered to pay for certain projects a total of one hundred and eighty-five million dollars ($185,000,000) with a net of approximately one hundred and fifty-five million ($155,000,000) to be achieved and to be paid by December 31, 2025. **Such transaction did not close as anticipated** due to additional circumstances as discussed below (see "Monitor Relationship" below). Purchaser #2 offered to pay for certain projects the sum of four hundred and fifty million dollars ($450,000,000) with negotiations ongoing and continuing to focus on specific projects, the valuations of those projects, the expected delivery status of those projects (such as what phase of construction would be at completion on

> turnover) and such other details as possibly joint venturing future business endeavors, transaction structures and handling of future construction completion, to name a few.
>
> As the Deadline is approximately four months away, achievement of asset sales to satisfy the remaining Redemption Consideration is being pursued by this strategy and individual sales to other potential suitors.

(Emphasis added).

316) In this letter, Broadstreet acknowledges that the $185 million transaction discussed in the Monitor's Fourth Report and that Broadstreet was planning to use to fund the cash redemptions did not happen.

317) But Broadstreet tried to alleviate investors' concerns by claiming that there is another $450 million transaction that they are working on to generate the money necessary to fund the cash redemption.

318) Additionally, in this investor update Broadstreet begins claiming that 94% of its investors chose to receive a stock redemption. However, Broadstreet only gets to this number by artificially inflating the capital accounts of the investors who chose stock by three times (3x) their prior value to make the 18% of investors who selected a cash redemption appear to only be 6%.

319) Further proof of this is the fact that at the December 3, 2025 SEC enforcement hearing Broadstreet's attorney represented to the Court that 18% of Broadstreet investors opted for a cash redemption which amounted to $130 million of the capital accounts.

320) Yet on June 2, 2026, in the Seventh Status Report the Monitor reported that based on the investors' elections, the BSG Fund was obligated to redeem approximately $148 million in cash.

321) How does the percentage of the investors who made the cash election shrink from 18% to 6% when the cash redemption amount owed to those investor grew from $130 million to $148 million?

## XXII. Broadstreet's February 25, 2026 Investor Update.

322) On February 25, 2026, Broadstreet issued an Update to Investors on Current Status of Redemption. **Exhibit 3** attached to the Complaint. In it, Broadstreet states that the remaining 6% of the Redemption Consideration is payable as Cash and is reliant on asset sales of projects not sold for Stock, nor projects that have been set aside due to a litigation dispute, and thereby there are substantial assets remaining available through additional sales that are being procured.

323) Broadstreet goes on to describe two potential asset sales, one for $112 million and another for $65 million, that Broadstreet is pursuing to come up with the money to fund the cash redemptions. Regarding these potential asset sales Broadstreet states:

> Since the last letter, progress has been made as a result of multiple in person and virtual meetings with prospective buyers. Current Progress Update We can now report further progress regarding the cash sales being pursued. We have been currently marketing multiple entitled or near-entitled residential land projects in South Carolina, and a previously referenced purchaser is re-engaging as a prospective bulk buyer of lots across several of these communities. An executive of a previously referenced purchaser just recently visited the development offices to further focus on those projects of interest. Right now, a total sell out of those projects would yield more than $112 million.
>
> In addition, three new development companies/purchasers, two who are located in North Carolina and one who is located in Atlanta have begun negotiations across multiple projects of entitled or near-entitled residential land projects. Most projects are shown as "LDP in Hand," "Entitled Fully Permitting Underway," or annexed/rezoned awaiting plat approval, with detailed per-lot cost bases and targeted per-lot pricing indicating they are being actively positioned for sale of an assumed $65 million dollars of gross sale value for a total sell out.

324) Broadstreet further claimed that "Broadstreet investors are set to receive a multiple of value from their original investment and are set to receive such compensation in a timeline that

is nearly twice as fast as the industry average of just returning the original investment value alone and not taking into account the returning of more than invested value."

325) This was another fraudulent representation to Broadstreet investors, including the Counter-Plaintiffs.

## XXIII. Broadstreet's March 23, 2026 Investor Update.

326) On March 23, 2026, Broadstreet issued an Update to Investors on Current Status of Redemption. **Exhibit 4** attached to the Complaint. In an effort to reassure the investors who chose a cash redemption Broadstreet stated:

> The remaining approximately 6% of the total redemption consideration is expected from cash sales of real estate. We are pleased to report that a number of positive movements have been made with multiple parties. Although no definitive purchase and sale agreement has been executed as of this date, more detailed meetings and draft documents, which are the necessary precursor to such an event are taking place. We continue to be optimistic in achieving our goal even though there is presently a great deal of geo-political and financial market turmoil in the world. We do recognize that the overall markets and economy are matters that are outside of our control but again we comfort ourselves in our belief that we own unique assets. We remain positive and bullish about our abilities accordingly.

## XXIV. Broadstreet's April 28, 2026 Investor Update.

327) On April 28, 2026, Broadstreet issued another update to its investors regarding the current status of the redemptions. **Exhibit 5** attached to the Complaint. In it, Broadstreet states:

> Our primary major deal, that is our present focal point, involves the sale of approximately 26 of our infrastructure projects and the ultimate receipt of $3 Billion of the stock of a public company.
>
> In addition, we also have undertaken a process of selling a number of our other infrastructure projects for cash with the goal being to generate funds to pay those investors that elected to receive a cash redemption (See redemption process discussed below). Presently, we have arranged for the sale of up to 9 projects for a total of $170 million in consideration from one publicly traded homebuilder and arranged the sale of up to another 15 projects in the amount of $120 million to yet another publicly traded homebuilder. The final documentation is being drafted involving those transactions as well as the final payoffs to lenders and third parties in order to determine the net amount of cash that can be received to make cash

> payments to investors. We presently have some arrangements we are finalizing including the assumption of certain debts by third parties to allow us to yield cash proceeds. We also have important tasks such as the securing of title insurance and confirmed payoff amounts, just to name a few open items. We do not expect the document drafting process to take long as we have utilized the land transfer documentation in prior transactions with the buyers and, as such, we think the document drafting process can be achieved in a timely manner provided the aforementioned issues are favorably resolved.
>
> In November 2025, the Fund undertook a full redemption/withdrawal process for all investors. Under the redemption structure approved at that time:
>
> - Approximately 94% of the total redemption consideration, representing roughly $2 billion, was to be satisfied through redemption payment in stock. That stock redemption is currently being implemented and is expected to close before the end of May 2026, as previously referenced to investors.
> - The remaining approximately 6% of the redemption consideration is to be paid in cash through the sale of various Fund real estate assets as mentioned above.

328) Broadstreet spent the remainder of this letter reminding Broadstreet investors about the various provisions in the PPM and Operating Agreement, while ignoring the fact that the Redemption Notice, which is binding and required investor consent, amended and superseded the provision being discussed.

## XXV. Monitor's Sixth Status Report.[13]

329) The Monitor issued his Sixth Status Report on May 5, 2026, most of which has also been redacted by Broadstreet. See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 254. In it the Monitor reported, *inter alia*, that:

> Pursuant to the November 2025 redemption transaction, BSG Fund gave its investors the option of selecting (i) the cash value of their capital account, payable in six months; or (ii) stock in a publicly-traded Cayman entity, valued at three times the value of their capital account, subject to a lock-up period of up to 42 months (or less, depending on the public entity's trading volume and share price).

---

13 The Monitor issued his Fifth Status Report on March 2, 2026, which was almost entirely redacted by Broadstreet.

330) From the Table of Contents, we know that the redacted portions of this report relate to (i) the status of Broadstreet's redemption of all investors, (ii) the redemption notice, and (iii) Broadstreet's Stock Redemption Obligations.

## XXVI. Broadstreet's May 14, 2026 Investor Update.

331) On May 14, 2026, Broadstreet issued another update to its investors regarding the current status of the redemptions. **Exhibit 6** attached to the Complaint. It states in pertinent part that:

> The remaining 6% of the redemption value had elected cash consideration. As of this date, we have encountered two obstacles to completing that portion of the redemption by the last week of May. First, one of the structures that we expected to utilize was the assumption of certain of our debts by a third party. We have already drafted assumption documents accordingly. Such mechanism would allow us to free up cash proceeds from certain asset sales. The success of that now appears uncertain due to ongoing negotiation disagreements that we hope to amicably resolve. Second, one of our purchasers has attempted to negotiate what we deem to be too large a financial concession.
>
> Consequently, we can proceed with our stock transaction for the 94% of the total redemption payments so that the overwhelming majority amount of the redemption is pursued **and then delay or alter the cash representing just the 6% of the total redemption value**, a minority of the total redemption.
>
> Since we have dealt with many counterparties in the homebuilding arena, we do not feel compelled to be forced into the cash component deal and if necessary, we will cancel any or all of the cash sales transactions and then resume discussions with other parties who expressed interest in our assets and who are competitors to the present parties. Although we had hoped to complete asset sales to satisfy the cash component of our redemption transaction in a timely manner, we also recognize that if the sales do not yield appropriate proceeds, then we are under no pressure to accept the changes now served upon us by our counterparties and we can have their competitors acquire what we believe to be very valuable assets

(Emphasis added).

332) This letter makes it sound as if Broadstreet might not be able to come up with the cash redemption in time for the May 27, 2026 due date, but will provide cash to those investors at a later date.

## XXVII. Broadstreet's May 22, 2026 Investor Update.

333) On May 22, 2026, Broadstreet issued another update to its investors regarding the final phase of redemption. **Exhibit 7** attached to the Complaint. This letter is the first time Broadstreet tells its investors who selected a cash redemption that they will be receiving stock instead.

334) Five days later, on May 27, 2026, the Defendants in this case began sending demand letters to Broadstreet demanding the cash redemption they were promised and objecting to receiving shares of stock in SPAC as an "in-kind" redemption. See the Civil Theft Demand Letters attached hereto as **Composite Exhibit ___.** The letter states in pertinent part that:

> Cash Sales – Process Hits Impasse
>
> Now, we can further report that we have reached a stalemate with our purchasers of the assets involving the cash liquidation. Even taking into account those investors who indicated a desire to receive stock instead of cash, that still does not alleviate the amount of sales necessary to fully satisfy the remaining investors who desire to receive cash by next week. **By way of example, we have a project for which we received an appraisal for nearly $24 million, but our purchasers have offered a maximum of $12 million. That is simply unacceptable and has resulted in an impasse preventing a larger transaction**.
>
> Selling at a price the Manager has determined to be roughly half of fair value would disregard that valuation and impose precisely the losses Section 6.07(b)(ii) is designed to avoid.
>
> We also want you to understand the good faith with which we pursued the cash option before reaching this point. Of the total redemption value, approximately 94% of investors elected stock and only approximately 6% elected cash. Satisfy that cash component depended on selling certain assets at a **reasonable price**, and we devoted substantial effort to closing those sales. As described above, that process reached an impasse.
>
> In light of the above, management has elected to complete the Redemption of the small minority of investors remaining who had elected a cash redemption by instead redeeming them in the form of an "in-kind" redemption, with payment being made in stock. The stock payment will be the same class of stock, from the same reverse triangular merger transaction, as that being issued to all other investors. That means

> you are being paid a 3x multiple of your investment, calculated as previously described in the redemption notice.

(Emphasis added).

335) As an initial matter, nowhere in the Redemption Notice does it state that the cash redemption is dependent upon selling certain assets at a **reasonable price**.

336) Instead of honoring the cash redemption election that Counter-Plaintiffs selected in the Redemption Notice that Broadstreet said was binding, Broadstreet is forcing these investors to take shares of the Cayman Island SPAC as an "in-kind" redemption.

337) Notably, Broadstreet did not say that they were providing any additional consideration to the Cayman Island SPAC for taking these additional investors. Thus, presumably Broadstreet is keeping the assets that it valued at $148 million that were going to be used to satisfy the cash redemptions for itself and its partners. This is an additional theft of investor assets.

338) Again, the Broadstreet Global Fund Redemption Notice that Counter-Plaintiffs executed, amended the terms of the Operating Agreement in that it made the Counter-Plaintiffs' selection of a cash redemption verses a stock redemption binding and it changed the time period from when a redemption must be made from 60 days to 180 days. See Section 11.04 of the Operating Agreement entitled Amendments to Company Agreements. Thus, by refusing to honor the terms of the Redemption Notice and provide Counter-Plaintiffs with the binding cash redemption option that they selected, Broadstreet is in breach of this agreement.

339) However, even assuming *arguendo* that the Redemption Notice did not amend the Operating Agreement, the highly speculative, illiquid and restrictive stock that Broadstreet is forcing on the Counter-Plaintiffs is not an "in-kind" redemption under the Operating Agreement. Section 6.03 of the Operating Agreement states that for Required Withdrawals members shall receive the **fair value** of their capital account. (Emphasis added.) Because the SPAC shares that

Broadstreet if forcing on the Counter-Plaintiffs has no readily ascertainable market value, their forced imposition on the Counter-Plaintiffs neither reflects the fair value of their capital accounts nor satisfies the legal requirements of an in-kind redemption.

340) Broadstreet goes on to claim in this letter that the reason why it cannot honor the cash redemptions is because it "would have required liquidating assets at roughly half of their value."

341) Broadstreet relies on Section 6.07(b) to justify its decision not to liquidate based on the language that says *disruption in investment markets make pricing and/or liquidation of some or all Company or Series assets difficult or would result in losses in the Company or a Series attempted such liquidations* (Section 6.07(b)(ii)).

342) To satisfy the $148 million cash redemption request Broadstreet would have had to sell assets Broadstreet determined were valued at $296 million.

343) Ignore the fact that a thing is only worth what someone is willing to pay for it thus rendering Broadstreet's assessed value meaningless, Broadstreet could have sold assets in its possession to satisfy the cash redemption obligations without incurring a loss.

344) Excluding the assets pledged to the Soulpower SPAC transaction, Broadstreet still had assets that were acquired with over $500 million of its investors' capital.

345) Liquidation of what Broadstreet claims would have been $296 million in assets would not have resulted in a loss, because the Company would have gotten rid of all its investors and still would have had a profit of at least $200 million.

346) Accordingly, Broadstreet cannot rely on Section 6.07(b)(ii) to justify not selling assets to satisfy its cash redemption obligations.

347) The real reason Broadstreet chose not to sell those assets is because Broadstreet wanted to keep proceeds from the sale of those assets for itself and its partners.

## XXVIII. Broadstreet's May 28, 2026 Investor Update.

348) On May 28, 2026, Broadstreet issued another update to its investors regarding the final phase of redemption. See **Exhibit L**. In it Broadstreet states in pertinent part:

> Further and previously announced, the results of the Redemption were that approximately 94% of the redemption value of our investors elected to be redeemed in the form of stock payment from a reverse triangular merger transaction. The remaining approximately 6% of the redemption value had elected cash consideration but are also being redeemed for stock as permitted in the Investor Documents signed by each and every investor and thus binding on every investor.
>
> In short, we believe that our deal, which provides for a nearly 3x payment in kind is outstanding and provides the best upside potential based on the information previously discussed.

## XXIX. Monitor's Seventh Status Report.

349) The Monitor issued his Seventh Status Report on June 2, 2026, most of which has also been redacted by Broadstreet.[14] See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 269. In it the Monitor reported, *inter alia*, that:

> As a result of the Redemption Notice, the BSG Fund (i) ceased paying quarterly or monthly dividends to investors; and (ii) was obligated to pay the redemption consideration – cash or stock – by May 27, 2026 (*i.e.*, 180 days from the redemption election date). Id. at ¶ 5. Based on the investors' elections, the BSG Fund was obligated to redeem approximately $2 billion in stock and approximately $148 million in cash. Id.
>
> Since then, the Monitorship Entities represented that approximately 94% of the "Redemption Consideration" or "value of the redemption" selected stock and 6% of the "Redemption Consideration" or "value of the redemption" selected cash. See, e.g., Feb. 25, 2026 Investor Update Letter and May 22, 2026 Investor Update Letter. Id. at ¶ 16.

---

[14] From the Table of Contents we know that the redacted portions of this report relates to the redemption transaction and the Monitor's formal recommendation.

## XXX. Monitor's Eight Status Report.

350) The Monitor issued his Eight Status Report on July 2, 2026, a significant portion has been redacted.[15] See Case 1:25-cv-20436-DPG (S.D. Fla.) DE 299. In it the Monitor reported, *inter alia*, that:

> [O]n the eve of the May 27, 2026 redemption deadline, the Monitorship Entities reversed course and rejected the Monitor's recommendation to include a cash redemption option in connection with the BSG Fund's full-investor redemption transaction. Id. at ¶ 5.
>
> [O]n June 2, 2026, counsel for Defendants Broadstreet, Inc. and Mr. Feingold advised the Monitor that "Defendants and Relief Defendants plan to file a motion with the Court by this Saturday at the latest to address the issues arising from the attached document," but did not advise the Monitor what relief they would be seeking. Id. at ¶ 6.
>
> Subsequent to the filing of the report, counsel for Defendants Broadstreet, Inc. and Mr. Feingold advised the Monitor that, instead of a motion, they would be filing a separate lawsuit seeking a declaratory judgment about the redemption rights and discretion afforded by the BSG Fund's governing documents. Id. at ¶ 7.
>
> On June 6, 2026, Defendant Broad Street Global Management LLC filed [this lawsuit] against five investors, in which it seeks a declaratory judgment confirming its ability to redeem those investors "in kind" with stock in a Cayman company named Soulpower Acquisition Group ("Soul"). Id. at ¶ 8.
>
> Since the filing of the Seventh Status Report, the Monitorship Entities advised that approximately 687 investors had elected cash. Id. at ¶ 12. The Monitorship Entities previously advised that the redemption value of the cash investors was approximately $148 million. Id.
>
> On December 9, 2025, the Monitorship Entities advised that Broadstreet will need approximately $2 billion in stock to redeem the investors who elected to receive stock. Id. at ¶ 15. Given the Monitorship Entities' recent decision also to redeem investors who elected cash with stock, Broadstreet will now need approximately $2.45 billion in stock to redeem all of the investors. Id.

---

[15] From the Table of Contents we know that the redacted portions of this report relate to (i) the Monitor's Recommendation and Broadstreet's recent filings, (ii) the impact on investors, and (iii) the status of the stock component of the redemption.

> The Monitorship Entities have widely reported that SWB, LLC will contribute approximately $3 billion worth of Soul stock in exchange for the selected Broadstreet infrastructure projects. Id. at ¶ 16.

**XXXI. Broadstreet's July 27, 2026 Investor Update.**

350) On July 27, 2026, Broadstreet issued another update to its investors regarding the final phase of redemption. See **Exhibit M**. In this letter Broadstreet states:

> The two exit transactions include: (a) the sale of our technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion based on valuation. Considering that our invested capital was approximately $1.2 billion, that yields a profit of $2.4 billion and a 3x multiple on invested capital based on valuation.

351) Yet, in footnote 2, Broadstreet admits that it is using "Manager discretion in determining value." In other words, Broadstreet is making these numbers up.

352) A thing is only worth what someone is willing to pay for it. Since these shares are restricted, they are essentially worthless.

353) Moreover, the calculated values of the infrastructure projects Broadstreet provided its investors in November 2025 claims that the total gross revenue (before expenses) for these projects adds up to $2.25 billion, not $3 billion. They arrive at these numbers by claiming that some of these infrastructure projects will generate gross revenue more than 25 times the project's appraised value. That is an incredible return, one that is not supported by the historical returns of any of Broadstreet's completed infrastructure projects.

354) Broadstreet's valuation of the assets in Altcoin/Z Squared transactions suffers from the same over valuation concerns.

355) Thus, Broadstreet is falsely claiming that it sold two of its business divisions for stock in publicly traded companies on the NASDAQ and NYSE for a combined value of $3.6 billion.

356) Again, why is Broadstreet inflating the value of these shares, so that it can fraudulently claim that it is entitled to keep the over $500 million in assets acquired with its investors' capital.

357) Accordingly, the update letters Broadstreet keeps sending to its investors are part of the fraud they are committing.

## XXXII. The Counter-Plaintiffs and Representations Broadstreet Employees Made Directly to Them.

Steven Schulman

358) Steven Schulman is a practicing physician. His primary contact at Broadstreet was Benard Jasmin. Mr. Jasmin always reassured him that cashing out was an option with a 6-month time frame, and if there was any degree of urgency, he could receive his money sooner. In April 2024, to make Dr. Schulman feel better about investing in Altcoin Mr. Jasmin wrote you've mentioned your friends' past Madoff type experiences, so for full transparency I am sending you a picture of my personal deposits into the Altcoin Mining Fund from last week. Regarding the November 2025 Redemption Notice Mr. Jasmin told Dr. Schulman if he selected option B for stock, he would get Broadstreet to enter into a side letter with him so that he would be moved over to Innovative where he could still get distributions. Dr. Schulman rejected Mr. Jasmins offer and selected Choice A for a cash redemption. Details of the specific representations Bernard Jasmin made can be found in the Declaration of Steven Schulman attached hereto as **Exhibit N**.

Ankur Anand

359) Ankur Anand is a practicing physician. His primary contact at Broadstreet was Benard Jasmin. Regarding the Daytona Beach hotel project, Bernard Jasmin told Dr. Anand that the investment was expected to produce approximately a three-to-five-times return over about five years. His statements were consistently optimistic, and he presented the projected returns as likely

to occur rather than simply as a remote possibility. Dr. Anand does not recall Bernard discussing significant risks such as construction delays, cost overruns, difficulty selling the property, loss of principal, or the possibility that the projected returns would not be achieved. Bernard said that the infrastructure investment would provide a guaranteed 14.25% annual return, paid quarterly. In the summer of 2025, Dr. Anand told Bernard that he wanted his investment returned in cash and that he wanted to exit as quickly as possible. Bernard responded that the redemption request had been submitted and told Dr. Anand that the cash would be returned within approximately six months. Dr. Anand never received his redemption payment. Details of the specific representations Bernard Jasmin made can be found in the Declaration of Ankur Anand attached hereto as **Exhibit O**.

Gregory Lovallo

360) Gregory Lovallo is a practicing physician. His primary contact at Broadstreet was Todd Sanders. From Dr. Lovallo's communications with Mr. Sanders he understood that the purpose of his investment in Triller was to obtain an ownership interest in Triller before it became publicly traded or otherwise completed a liquidation event. Dr. Lovallo relied on Mr. Sanders' representations when making this investment in February 2021. Since the time of his investment, the Triller investment has not produced the liquidity event, return, or ownership benefit that Dr. Lovallo expected based upon the representations made to him. Mr. Sanders also solicited an investment in the Hilton Element Hotel Opportunity in February 2022. Mr. Sanders told Dr. Lovallo that once the hotel and related operations became functional, he would benefit from his percentage interest in the revenue generated by the project. Despite the property reaching a stage at which it was developed into a Hilton property, Dr. Lovallo has not received the ownership interest or continuing revenue participation that he understood he was purchasing. Dr. Lovallo relied on representation from Mr. Sanders when making this investment. Details of the specific

representations Todd Sanders made can be found in the Declaration of Gregory Lovallo attached hereto as **Exhibit P**.

Nimish Patel

370) Nimish Patel was introduced to Broadstreet through Akhil Morada in December 2022. During their initial discussions, Nimish told Mr. Morada that he did not have cash readily available to invest. Mr. Morada asked me, in substance, whether he had a retirement account. Nimish told him that he did have retirement funds but understood that he could not simply withdraw those funds from his IRA for an investment. Mr. Morada responded, in substance, "Don't worry. I'll show you how to get that money out through Directed IRA." He then explained the Directed IRA process and guided Nimish through transferring retirement funds so they could be invested in Broadstreet opportunities.

371) Before making his first investment in January 2023, Mr. Morada encouraged Nimish to send the investment funds before he received the investment documents to review. When Nimish received the Client Information Sheet the portion related to his finances were already completed. The boxes selected indicated that Nimish's annual income, net worth and liquid assets were significantly more than what they were. During a phone conversation, Nimish asked Mr. Morada why those boxes were checked and informed Mr. Morada that he did not meet those financial qualifications. In response, Mr. Morada instructed Nimish to ignore the checked boxes, to print the form, complete only his personal information by hand and send it back to him. The Subscription Agreement and the Investor Questionnaire also had all the accredited-investor questions prepopulated when Nimish received them. At the time Nimish did not understand that the documents were representing that he personally had selected or verified accredited-investor

criteria that he had never been asked to provide. The same process repeated itself for all Nimish's other investments in the BSG Fund.

372) Mr. Morada said to Nimish that the investments were safer than investing in the stock market. He represented that Nimish's principal would be protected. He represented that Nimish would receive a fixed return. He said that the investments would provide regular fixed-interest distributions. He presented the investments as appropriate for retirement savings because they would avoid the volatility associated with the public stock market. Mr. Morada represented that if Nimish ever need his money he could redeem his investment in three to four days. These representations were particularly important to Nimish because he was investing his retirement funds rather than discretionary money that he could afford to lose. In November 2025, Nimish selected Choice A for a cash redemption, but now Broadstreet is refusing to return his money to him. Details of the specific representations Akhil Morada made can be found in the Declaration of Nimish Patel attached hereto as **Exhibit Q**.

<u>Robert T. Harper</u>

373) Robert T. Harper is 72 years old and completely blind. Mr. Harper invested in the BSG Fund through his broker Brandon Leon of Phoenix Financial. Upon information and belief, Broadstreet has an ownership interest in Phoenix Financial. Mr. Harper told Mr. Leon that he was not interested in a long-term investment. Mr. Harper explained that, because of his age, he was looking for an investment that would provide regular quarterly distributions and reasonable access to his money. Mr. Leon recommended investing in infrastructure projects with Broadstreet. Mr. Leon told Mr. Harper that the infrastructure investment would pay approximately 14.6% interest annually, and that Mr. Harper would have access to his money after approximately six months.

374) Mr. Harper also attended a Zoom presentation on March 12, 2024, where David Feingold and Joseph Baldassarra discussed the infrastructure investment. They also represented, among other things, that the infrastructure investment would have 14.6% annual return, with distributions paid quarterly. Based upon the information provided by Mr. Leon and the representations made during the Zoom meeting, Mr. Harper believed he was investing in a genuine real estate and infrastructure business that would generate regular income. In March and July 2024, Mr. Harper invested in the BSG Funds infrastructure investment.

375) Because Mr. Harper is completely blind, he necessarily depends upon others and upon accurate verbal and written communications when making financial decisions. In November 2025, Mr. Harper selected Option A for a cash redemption, but now Broadstreet is refusing to return his money to him. Details of the specific representations Brandon Leon, David Feingold and Joseph Baldassarra made can be found in the Declaration of Robert T. Harper attached hereto as **Exhibit R**.

<u>Nikhil Patel and Nipuna Patel</u>

376) Nikhil Patel is 64 years old and a retired physician. Nipuna Patel is 65 years old and a retired medical office manager. Nikhil managed the investments for himself and his wife Nipuna. Nikhil told Akhil Morada that preservation of principal, dependable income and access to their funds were important to them. Nikhil also informed Mr. Morada that they were not interested in investments involving substantial speculation, significant market volatility, or an unreasonable risk of losing their principal. Mr. Morada stated that the BSG Fund investments he was recommending were suitable for their investment objectives and risk tolerance. Nikhil relied on Mr. Morada's representations when making his decisions to invest in the BSG Fund.

377) In a text message sent June 27, 2025 Akhil Morada wrote "Judge has officially closed case as SEC is in process of settling this. In a few weeks all this will be behind us."

378) Later, in an attempt to get Nikhil to select Choice B in the November 2025 Redemption Notice, Joseph Baldassarra sent him two side letter agreements. In one of the side letters Broadstreet promised to return some of his investment in cash and some of it in shares of SOUL if Nikhil agreed to select Option B in the Redemption Notice. In the other side letter Broadstreet promised to return some of his investment in the form of an investment in Innovative Development Fund, LLC that would pay quarterly distributions of 14% annually and the rest in shares of SOUL if Nikhil agreed to select Option B in the Redemption Notice. It was up to Nikhil to propose how much of his investment would be returned in cash/Innovative and how much would be returned as shares of SOUL. In investigating Innovative, Nikhil called its office and found out that Innovative and Broadstreet have the same receptionist. Ultimately, Nikhil selected Choice A because he needed his retirement investment returned to him in cash, and Mr. Morada assured him that if he selected Choice A, Broadstreet would return his equity balance in cash within approximately 180 days.

379) In May 2026 when Broadstreet notified investors that they were going to redeem all the BSF investors in cash, Nikhil contacted Joseph Baldassarra. Mr. Baldassarra informed Nikhil that Broadstreet no longer has sufficient cash to satisfy the cash redemption requests and that **<u>Broadstreet no longer had assets</u>** available to satisfy those requests. Details of the specific representations Akhil Morada and Joseph Baldassarra made can be found in the Declaration of Nikhil Patel attached hereto as **Exhibit S**.

<u>Jyoti Patel and Khushbu Patel</u>

380) Jyoti Patel is the mother of Khushbu Patel, and Jyoti manages Khushbu's BSG Fund investments. Jyoti Pate made their investments in the BSG Fund through Akhil Morada. Mr. Morada told her that their BSG Fund investments would provide both attractive returns and significant tax benefits through available write-offs. Jyoti relied on Mr. Morada's representations when making her decisions to invest in the BSG Fund. In November 2025, Jyoti selected Choice A for a cash redemption. Details of the specific representations Akhil Morada made can be found in the Declaration of Jyoti Patel attached hereto as **Exhibit T**.

<u>Dinesh Thakker and Shashikala Thakker</u>

381) Dinesh Thakker manages the investments for himself and his wife Shashikala Thakker. Mr. Thakker was introduced to Broadstreet through Akhil Morada. Akhil told him that the investment in Broadstreet is secured and pays high interest approximately 14% to`16%. Regarding the SEC Enforcement Action, Mr. Morada told him that the allegations lacked merit and represented that Broadstreet had prevailed or that the matter had been closed or dismissed. Regarding the November 2025 Redemption Notice Joseph Baldassarra told Mr. Thakker that Broadstreet had sufficient funds to honor Choice A cash redemptions and investors who selected Choice A would receive the equity value of their investments in cash within 180 days. Mr. Thakker formally elected Choice A Cash Redemption in November 2025. Mr. Thakker made and maintained his investments based in part on representations concerning the stability of the investments, the existence and value of underlying assets, expected returns, the status of the SEC action, and the availability of cash redemption. Details of the specific representations Akhil Morada and Joseph Baldassarra made can be found in the Declaration of Dinesh Thakker attached hereto as **Exhibit U**.

Jit Patel and Karishma Gupta

382) Jit Patel and Karishma Gupta are married and are both physicians. When they first invested in Broadstreet they were newlyweds and still completing their medical residency training. Akhil Morada was their principal point of contact at Broadstreet. At the time, Karishma was not an accredited investor. They raised this concern with Mr. Morada, and he told them not to worry about being accredited and that Broadstreet or his company would "take care of it." Mr. Morada repeatedly told them that they could get their money back when needed. They relied on this and other representations when deciding to invest in the BSG Fund. Regarding the November 2025 Redemption Notice, Jit was told directly by Mr. Morada that Innovative Funds was owned and managed by Broadstreet or people associated with Broadstreet, and if they selected Option B for stock, they could get a portion of their investment returned as cash through Innovative. They ultimately selected Option A for a cash redemption. Details of the specific representations Akhil Morada made can be found in the Declaration of Jit Patel and Karishma Gupta attached hereto as **Exhibit V**.

Mandakini Patel

383) Mandakini Patel is 69 years old and retired. Her husband is 76 years old and retired. They are both in poor health and cannot afford to wait for years for speculative and highly restricted stock to potentially become valuable or liquid. She was introduced to Broadstreet through Akhil Morada. As a retired investor, Mandakini told Mr. Morada she was interested in obtaining a stable and dependable return rather than pursuing speculative or highly volatile investments. Mr. Morada told her that the BSG Fund investments would provide fixed returns. Mandakini relied on Mr. Morada's representations when deciding to invest in the BSG Fund. Regarding the November 2025 Redemption Notice, Mr. Morada told her if she selected Choice A she would get her equity

balance. Mandakini selected Choice A for a cash redemption. Mandakini also attended a meeting with Joseph Baldassare, during which he represented that investors who elected cash redemption would receive the equity value of their investments back in cash. At no time during that discussion was Mandakini informed that Broadstreet could later disregard her cash election and substitute for restricted stock. Details of the specific representations Akhil Morada and Joseph Baldassarra made can be found in the Declaration of Mandakini Patel attached hereto as **Exhibit W**.

<u>James Andrew Ho</u>

384) James Andrew Ho primary contact at Broadstreet was Akhil Morada, and they communicated through WhatApp. Mr. Morada represented to James that Broadstreet makes 30-35% on the MCA Series, that Crypto Mining is Broadstreet's most profitable venture and they have a big cushion with over $100 million in reserves, and that land infrastructure is their primary business, and BSG is a $3 billion fund. Regarding Broadstreet Tennessee, Mr. Morada told James that the upside is his investment will double and worst case is 14.6% annually. Regardless, after a year he will be able to pull his money out immediately. Mr. Morada to James that the Data Center investment is a good income fund. James relied on these representations when deciding to invest in the BSG Fund. Regarding the November 2025 Redemption Notice, Mr. Morada told James "$100k investment gives us $300k in stock @$10. Book value @16 we make around 500% on that number. Selling 5.5% a month - in 4 months u could possibly take ur principal out. + you get 100% write off on the investment for 2025. Try doing $1m." Jon Pecorella from Broadstreet also called him in November of 2025 and told him that the SOUL stock via SPAC would be one of the best investments he could make and that anything David Feingold gets involved with will become successful. James ultimately selected Option A for a cash redemption. Details of the specific

representations Akhil Morada and Jon Pecorella made can be found in the Declaration of James Andrew Ho attached hereto as **Exhibit X**.

Howie Mann

385) Howie Mann's primary contact at Broadstreet was Bernard Jasmin. Mr. Jasmin said to Howie that he would get 14.9% annual interest distributions if he invested in the BSG Fund. Howie relied on these representations when deciding to invest in the BSG Fund. In the November 2025 Redemption Notice he selected Choice A for a cash redemption. Broadstreet asked him for his bank wiring information so they could send him the cash redemption, and he provided it to them. Then in May 2026 Broadstreet informed him that they were not going to give the cash redemption. Details of the specific representations Bernard Jasmin made can be found in the Declaration of Howie Mann attached hereto as **Exhibit Y**.

William Joseph Moroney

386) William Joseph Moroney is a 72-year-old retiree. He unknowingly invested in Broadstreet through Todd Sanders, who had previously sold investment to me in the L3 Funds, another private equity fund that Mr. Sanders previously raised money for. In May 2022, Mr. Sanders sold the Weatherstone investment to Mr. Moroney on the promise that he would make 15% plus on the original investment. But that never happened. Mr. Moroney relied on this representation when deciding to invest in Weatherstone. When Mr. Sanders pitched this investment to Mr. Moroney it was his understanding that this was just another investment in the L3 Funds. Mr. Moroney earned no income from his investment in Weatherstone. All distributions paid to him were used to reduce his original $100,000 investment to an equity balance of $33,905. Since Broadstreet reduced its equity balance with every distribution he received, Broadstreet unilaterally converted his Weatherstone investment into an interest free loan. In the November

2025 Redemption Notice he selected Choice A for a cash redemption. Details of the specific representations Todd Sanders made can be found in the Declaration of William Joseph Moroney attached hereto as **Exhibit Z**.

Theodore "Ted" Chesner

387) Theodore "Ted" Chesner's primary contact at Broadstreet was Bernard Jasmin. In April 2022, Mr. Jasmin told Ted that Broadstreet planned to build what was represented to him as the first high-end AC Marriott hotel in Daytona Beach, Florida. Mr. Jasmin stated that the investment was expected to generate approximately 40% annual returns from revenue produced by the hotel. Ted understood that those returns would begin once the hotel was completed and operational. Mr. Jasmin told Ted that the hotel was expected to be completed by 2025. In reliance on these representations, Ted invested $100,000 in the AC Marriott hotel in Daytona Beach, Florida investment. To this day, construction has not begun on this hotel, and Ted has not received a single distribution from this investment.

388) In November 2025, Ted received the Redemption Notice from Broadstreet offering to give him his $100,000 back in cash if he selected Option A, which would mean that Ted gave Broadstreet an interest free loan for the past four years. Knowing that Ted still selected Option A for a cash redemption. Ted did not want the stock. Ted recently learned that Broadstreet will not honor his decision to make a cash withdrawal of his money that Broadstreet has held interest free for the past four years. Details of the specific representations Bernard Jasmin made can be found in the Declaration of Theodore "Ted" Chesner attached hereto as **Exhibit AA**.

Steven Stiles

389) Steven Stiles is a 78-year-old retired civil engineer. He first invested in the BSG Fund through his investment advisor Tarek Hussain. Mr. Stiles investment decisions were based

largely on representations that Mr. Hussain made that he would receive quarterly dividend distributions based on an approximate 14.6% annual interest payments and that he would have the ability to request a partial or full redemption of his investment at any time, subject to the terms of the Fund's governing documents, not exceeding a 6-month time period.

390) In June 2025, Mr. Stiles sold a property he owned, and he used the proceeds from that sale to make his largest investment in the BSG Fund in July 2025 by purchasing another member's membership interest. A few months later, in October/November 2025, Mr. Stiles was informed that the distributions that he was dependent on from his investments would stop and he would have an option on how he wanted to exit the BSG Fund. Mr. Hussain told Mr. Stiles if he didn't make a selection then he would receive the default option of receiving a cash redemption. Based on this representation, Mr. Stiles didn't make any selection and now Broadstreet is refusing to return his money to him. Details of the specific representations Tarek Hussain made can be found in the Declaration of Steven Stiles attached hereto as **Exhibit AB**.

Kinjalkumar Patel and Bhumika Patel

391) Kinjalkumar Patel and Bhumika Patel are husband and wife. Akhil Morada was their Broadstreet representative. Mr. Morada was fully aware of their financial situation and told them that they could still invest in the BSG Fund even though they technically did not qualify as accredited investors. For their Broadstreet Tennessee investment, Mr. Morada told them that they would double their money in about twelve months, and that if the doubling did not happen there was a minimum return of around 15%. That didn't happen. In two years, there was only one distribution and the investment never doubled. They maintain that they were never given a choice about their crypto investment being converted to shares in Z Squared.

392) On July 5, 2025, Kinjalkumar told Mr. Morada that he is going to need to pull some money out next year around February, and Mr. Morada told him, "Sure we can accommodate." Based on this representation, Kinjalkumar invested another $60,000. To fund the BSG Fund investments they exhausted their savings and liquidated a separate stock portfolio. Now, despite opting for a cash redemption, Broadstreet is refusing to return their money back to them and is no longer paying the distributions that they were dependent on. Details of the specific representations Akhil Morada made can be found in the Declaration of Kinjalkumar Patel attached hereto as **Exhibit AC**.

Yatkin Khanna and Alya Capital LLC

393) Yatkin Khanna is 50 years old doctor who invested a substantial amount of his personal savings in the BSG Fund directly and through his company Alya Capital LLC. Beginning in 2017, Akhil Morada represented to Dr. Khanna that he was an employee of Broadstreet and solicited investment in prelaunch IPOs. As the years passed Mr. Morada solicited investments in infrastructure, crypto, altcoin mining fund and other from Dr. Khanna. Dr. Khanna told Mr. Morada that his purpose in making these investments was to preserve and responsibly grow capital over the long term. Dr. Khanna did not intend to place his money into an investment from which he could not reasonably obtain access to his funds. The security of his principal, the ability to obtain reliable returns, and the availability of his invested funds were important considerations in his decision-making.

394) Regarding the BSG Fund investments that Mr. Morada recommended, he made representations regarding the anticipated returns, their underlying business or assets, and Dr. Khanna's ability to recover or access the money he invested. Of particular importance to Dr. Khanna was his understanding concerning liquidity and the eventual return of his investment. Mr.

Morada never told Dr. Khanna that his capital would be indefinitely inaccessible or that he could be compelled to remain invested without a reasonable means of recovering his principle. Dr. Khanna relied upon the information Mr. Morada communicated to him when deciding whether to entrust his funds with Broadstreet. Details of the specific representations Akhil Morada made can be found in the Declaration of Yatkin Khanna attached hereto as **Exhibit AD**.

<u>Sanjay Gupta and Anita Gupta</u>

395) Sanjay Gupta and Anita Gupta, ages 63 and 57, respectively are a working-class couple employed in Academic Institute who invested a substantial portion of their personal savings and retirement funds with BSG Fund. Akhil Morada presented the real-estate infrastructure and alternative-coin investments as legitimate opportunities with potential financial and tax benefits. Mr. Morada assured them they would be able to access or withdraw their money when needed. Based on these representations and believing that their money would remain accessible when needed, they proceeded with those investments.

396) Given their age, their approaching retirement, and the fact that these funds represented a substantial portion of their financial security, they ultimately chose Option A—the return of their money—in November 2025. Broadstreet has since decided not to give them their cash and now they must worry about ordinary financial obligations, including car payments, tuition expenses for their son, household expenses, and their long-term retirement security. What was supposed to provide financial stability has instead created extraordinary uncertainty and distress. Sanjay recently underwent open-heart surgery, making the continuing financial and emotional stress particularly difficult to manage. Details of the specific representations Akhil Morada made can be found in the Declaration of Sanjay Patel attached hereto as **Exhibit AE**.

## CLAIMS FOR RELIEF

**COUNT I**
**DECLARATORY JUDGMENT**
**Counter-Plaintiffs v. Counter-Defendants**

397) The proponents of this cause of action repeat and reallege paragraphs 1-221 and 248-396.

398) In a May 22, 2026 letter to the BSG Fund investors, Broadstreet informed all BSG Fund investors, including Counter-Plaintiffs, that they would not be honoring the cash redemption payments that they had agreed to pay in the November 2025 Redemption Notice and instead will be providing those investors with an "in-kind" stock redemption consistent with Redemption Choice – B.

399) Broadstreet issued this letter approximately five (5) days before the cash redemption payment was due.

400) Thereafter, Counter-Plaintiffs sent Broadstreet Demand Letters objecting to receiving an "in-kind" redemption and demanding that Broadstreet honor their agreement to pay the cash redemption (Redemption Choice – A) that they selected in the November 2025 Redemption Notice.

401) There is an existing and actual legal controversy that can be effectively resolved by a declaratory judgment regarding whether Broadstreet may choose to redeem BSG Fund investors in kind or is obligated to pay cash to its investors who opted for a cash redemption.

402) Counter-Plaintiffs seek and are entitled to a declaration that (i) Broadstreet is required to honor the cash redemption that Broadstreet agreed to provide to any of its investors who opted for a cash redemption in the November 14, 2025 Redemption Notice; (ii) Broadstreet does not have the right to force an "in-kind" redemption on BSG Fund investors who selected

Redemption Choice – A to be redeemed in cash in the November 14, 2025 Redemption Notice; and (iii) the restricted SOUL shares do not qualify as an "in-kind" redemption.

**COUNT II**
**BREACH OF CONTRACT**
**(The Redemption Notice)**
**Counter-Plaintiffs v. Counter-Defendants**

403) The proponents of this cause of action repeat and reallege paragraphs 1-221 and 248-396.

404) On November 14, 2025, Counter-Defendants sent Counter-Plaintiffs the Broadstreet Global Fund Redemption Notice (the "Redemption Notice") attached hereto as **Exhibit A**. The Redemption Notice states in pertinent parts:

> **PLEASE READ THIS NOTICE CAREFULLY**
>
> **CONSULT YOUR ATTORNEY, INVESTMENT ADVISOR, OR OTHER PROFESSIONAL IF NECESSARY.**
>
> **YOUR RIGHTS AS AN INVESTOR WILL BE SUBSTANTIALLY AFFECTED—WHETHER YOU MAKE AN ELECTION OR NOT.**
>
> **AT THE CONCLUSION OF THE REDEMPTION DISCUSSED HEREIN, YOU WILL NO LONGER BE AN INVESTOR IN THE BROADSTREET GLOBAL FUND, LLC AND YOU WILL NO LONGER RECEIVE ANY RETURNS, DISTRIBUTIONS, OR OTHER FUNDS FROM THE BROADSTREET GLOBAL FUND, LLC.**
>
> **As an Investor in the Broadstreet Global Fund, LLC ("BSG Fund"), you are hereby advised of our full redemption of the entirety of your investment pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"), that each investor executed to become an investor with BSG Fund. This redemption is binding upon you whether you make an election or not; therefore, you should carefully read this notice and all information referenced in or attached to this notice.**
>
> **REDEMPTION OVERVIEW**
>
> For your redemption, you will be given two choices, and you must make a selection. Under one option (Redemption Choice – A), the investor would receive, **in cash**,

> an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.
>
> **After this redemption, whether you choose choice A or B, you will no longer be an investor in BSG Fund, you will no longer receive preferred returns or other payments from BSG Fund, and there will be no additional amounts or returns paid to you by BSG Fund.**
>
> **REDEMPTION PROCESS**
>
> This redemption process will be conducted exactly as specified in the Operating Agreement document, a copy of which is attached hereto as Item 2 and also available in the BSG Fund data room under the tab Operating Agreement.
>
> **REDEMPTION CHOICE – A**
> For the first choice of redemption, known as "Redemption Choice – A," you will simply be redeemed for an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you. Pursuant to the Series Supplement, you will be paid within 180 days of your redemption election. At the conclusion of this transaction, and after your payment has been made, you will no longer be an investor in BSG Fund.
>
> Kindly check the box below to reflect which choice you select.
>
> ( ) Redemption Choice – A – payment in cash in an amount calculated based on your initial capital contribution, plus any additional capital contributions, less any redemption payments made to you.

(Emphasis added).

405) All the Counter-Plaintiffs selected Redemption Choice – A and Docusigned the Redemption Notice.

406) The Redemption Notice states that it is being made pursuant to Article VI of the Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"). A copy of the Operating Agreement is attached to the Redemption Notice as Item 2. Section 11.04 of the Operating Agreement governs amendments, and provides:

> Section 11.04 Amendments to Company Agreement. This Agreement (including any Series Schedule) may be amended in any manner the Manager deems desirable. The Manager shall promptly give **notice** to Members of any amendment made to this Agreement. **No such amendment shall, except as provided below, become**

> **effective as to any Member without the consent of such Member** or the consent of a Majority-in-Interest of the Members of the Company or the applicable Series, as applicable. Notwithstanding the foregoing, any amendment made by the Manager may be immediately effective if the amendment is made (i) to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision herein, to comply with any applicable requirements of law, or to make any other provision with respect to matters or questions arising under this Agreement that will not be materially inconsistent with the provisions of this Agreement; (ii) to delete or add any provision of this Agreement required to be so deleted or added by any Federal agency or by a state "Securities" or "Corporation" commission, department or administrator, or similar such body, agency or official, which addition or deletion is deemed by such body, agency or official to be for the benefit or protection of the Members; (iii) to admit additional Members; or (iv) to make any change that does not adversely affect the Members in any material respect.

(Emphasis added).

407) Pursuant to Section 11.04 the Redemption Notice is an amendment to and supersedes the Operating Agreement. As required by Section 11.04, the Redemption Notice provides members of the BSG Fund, including Counter-Plaintiffs, "**notice**" that their "**rights as an investor will be substantially affected**" by the election they make (or do not make), and it requires the members to **consent** to the change. The Redemption Notice goes on to say that "[t]his redemption is **binding** upon you whether you make an election or not." The Redemption Notice further advises members of the BSG Fund to "**consult your attorney**" before signing this document. The Redemption Notice also informs the members of the BSG Fund that "**at the conclusion of the redemption discussed herein, you will no longer be an investor in the Broadstreet Global Fund, LLC and you will no longer receive any returns, distributions, or other funds from the Broadstreet Global Fund, LLC**," thus materially altering terms of the Operating Agreement and Series Schedule. The Redemption Notice also changes the timing for the redemption/withdrawal payment as stated in Section 6.02 of the Operating Agreement from 60 days to 180 days. The Redemption Notice is the manner in which the Manager of the BSG Fund

chose to amend the Operating Agreement and Series Schedule.

408) Accordingly, the Redemption Notice is an amendment to the Operating Agreement and supersedes any contradictory provisions contained in the Operating Agreement, including provisions that would have permit the Manager of the BSG Fund to determine in its sole discretion how a member would be redeemed.

409) The moment Counter-Plaintiffs signed the Redemption Notice **consenting to the change** it became a binding contract. As consideration in exchange for all the rights previously owed to Counter-Plaintiffs under the Operating Agreement and Series Schedules, the Counter-Plaintiffs agreed to receive a cash redemption of their capital account held at the BSG Fund when they selected Redemption Choice – A. Thus, pursuant to the Redemption Notice, the Counter-Defendants were contractually obligated to provide Counter-Plaintiffs with a cash redemption in accordance with the terms of Redemption Choice – A within 180 days of the Redemption Notice being executed.

410) In a letter to the BSG Fund investors dated May 22, 2026, approximately five (5) days before the cash redemption payment was due, Counter-Defendants informed Counter-Plaintiffs that they would not be honoring the cash redemption payments that they had agreed to in the Redemption Notice and instead will be providing those investors with an "in-kind" stock redemption consistent with Redemption Choice – B.

411) Counter-Defendants' refusal to honor Counter-Plaintiffs' selection to receive a cash redemption is a material breach of the Redemption Agreement.

412) The restricted shares that Counter-Defendants purport to provide Counter-Plaintiffs as an "in-kind" redemption have no known value, accordingly Counter-Plaintiffs have sustained significant damages from not receiving the cash redemption owed to them under the Redemption

Notice.

413) Accordingly, Counter-Defendants are liable to Counter-Plaintiffs for breach of contract, and owe Counter-Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for compensatory damages, rescissionary damages, interest (including missed distribution payments), costs and such other relief as the Court deem appropriate and just.

**COUNT III**
**BREACH OF CONTRACT**
**(The "In-Kind" Redemption)**
**Counter-Plaintiffs v. Counter-Defendants**

414) The proponents of this cause of action repeat and reallege paragraphs 1-221 and 248-396.

415) This Count is pleaded in the alternative to Count II.

416) The highly speculative, illiquid and restrictive stock that Counter-Defendants want to force on Counter-Plaintiffs is not an "in-kind" redemption under the Operating Agreement.

417) Counter-Plaintiffs are all parties to the Operating Agreement for the BSG Fund with Counter-Defendants. Section 6.03 of the Operating Agreement governs situations such as this where the Manager decides on its own to redeem a member's capital account, and provides:

> Section 6.03 Required Withdrawals. The Manager may, in its sole discretion, terminate all or any part of the Capital Account of any Member at any time for any reason or no reason. Unless prohibited under law or regulation, the Manager shall use commercially reasonable efforts to provide each Member prior **written notice of a termination of all or any portion of such Member's Capital Account**. With respect to any Series that permits withdrawals in the ordinary course, the Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal of all or part of its Capital Account(s), as the case may be, under Section 6.02. With respect to any Series that does not permit withdrawals, the Member receiving such notice shall receive the **fair value** of its Capital Account in connection with its withdrawal.

(Emphasis added).

418) In the letter to BSG Fund investors dated May 22, 2026, Counter-Defendants provided Counter-Plaintiffs with **written notice** that they will be terminating all of the Counter-Plaintiffs capital accounts in the BSG Fund by providing them with an "in-kind" stock redemption consistent with Redemption Choice – B in the Redemption Notice. Since Counter-Defendants claim they are exercising their right to force an "in-kind" redemption on Counter-Plaintiffs said "in-kind" redemption would have to be made pursuant to the Required Withdrawals provisions of Section 6.03, which requires that Counter-Plaintiffs must receive the **fair value** of their capital accounts. Because the speculative, illiquid and restricted Cayman Island SPAC shares that Counter-Defendants seek to force on Counter-Plaintiffs as an "in-kind" redemption have no readily ascertainable market value, their forced imposition on Counter-Plaintiffs does not reflects the fair value of Counter-Plaintiffs' capital accounts and thus cannot serve as consideration for a Required Withdrawal.

419) Moreover, an "in-kind" redemption represents an investors pro rata share of the entire investment. In particular, Section 80a-2(a)(32) of the U.S Code defines a "redeemable security" as:

> "Redeemable security" means any security, other than short-term paper, under the terms of which the holder, upon its presentation to the issuer or to a person designated by the issuer, ***is entitled*** (whether absolutely or only out of surplus) ***to receive approximately his proportionate share of the issuer's current net assets, or the cash equivalent thereof.***

15 U.S.C. § 80a-2(a)(32) (emphasis added).

420) Here, Broadstreet only uses 30% of its infrastructure assets to pay for the SOUL shares that it is distributing to all its investors. Thus, Broadstreet investors are only receiving their pro rata share of 30% of the BSG Fund's infrastructure projects – not their pro rata share of the entire BSG fund. Since the BSG Fund investors' capital account represented their pro rata share

of the entire fund, the BSG Fund investors are receiving shares that are worth significantly less than their capital accounts in the BSG Fund.

421) Counter-Defendants have breached the Operating Agreement by forcing Counter-Plaintiffs to accept restricted shares of Soulpower Acquisition Corp. as an "in-kind" redemption that is not equal to the fair value of their capital accounts.

422) Counter-Plaintiffs have been damaged as a result.

423) Accordingly, Counter-Defendants are liable to Counter-Plaintiffs for breach of contract, and owe Counter-Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deem appropriate and just.

**COUNT IV**
**CONVERSION**
**Counter-Plaintiffs v. Counter-Defendants**

424) The proponents of this cause of action repeat and reallege paragraphs 1-396.

425) The Counter-Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over millions of dollars belonging to the Counter-Plaintiffs, which were invested in the BSG Funds with the expectation and promise of a return on the investments.

426) The Counter-Plaintiffs have a superior right of possession of the monies and assets held in these investments.

427) Collectively, Counter-Plaintiffs have invested $13,113,306.00 in the BSG Fund ("**Converted Monies**").

428) Counter-Plaintiffs' investment provided them with ownership interest in the following investment Series of the BSG Fund and all the assets contained within these Series of investments:

a. Daytona Beach AC Retreats
b. Broadstreet Tennessee
c. Crystal Lagoons - 10% Annual Return/ Profit
d. Self-Storage - 10% Annual Return/ Profit
e. Self-Storage - Soft Costs 50% Deduction
f. Weatherstone
g. North Charleston Element
h. BSG15
i. BSG PTT
j. DR Horton/Infrastructure #5
k. IF8 Infrastructure - 14.63% Annual Return
l. IF9 Infrastructure - 16% Annual Return
m. Land Banking
n. Triller
o. Ripple
p. Virgin Hyperloop
q. Data#1 - 19% Annual Return
r. Data#2 - 19% Annual Return
s. Crypto/Altcoin Mining - 28% Annual Return

("**Converted Assets**").

429) Nonetheless, the Counter-Defendants continue to exercise unauthorized dominion over Counter-Plaintiffs' investments to the exclusion and in defiance of the lawful rights of the Counter-Plaintiffs to such investments.

430) Counter-Defendants have actively blocked Counter-Plaintiffs from receiving distributions owed to them from their investments in the BSG Fund.

431) Counter-Defendants have or are actively trying to transfer the Converted Assets and Converted Monies to themselves and/or third parties to permanently deprive Counter-Plaintiffs access to their investments.

432) The Counter-Defendants have acted with felonious intent by intentionally misrepresenting the value of shares of stock that Counter-Defendants are forcing on Counter-Plaintiffs as an alleged "in-kind" redemption, to steal the assets acquired with Counter-Plaintiffs monies.

433) Counter-Plaintiffs requested the return of the Converted Monies from Counter-Defendants in the civil theft demand letters attached as **Exhibit ___** and they have refused to return it.

434) As a result of these illegal distributions, millions of dollars have been stolen from the Counter-Plaintiffs.

435) Notably, many of the Counter-Plaintiffs are retirees who depend on the income from these investments to survive.

436) The Counter-Defendants wrongfully assert dominion over the Converted Assets and Converted Monies in a manner that is inconsistent with the Counter-Plaintiffs' rights to own and possess the Converted Assets and Converted Monies.

437) Counter-Defendants' wrongful assertion of dominion over the Converted Assets and Converted Monies deprives the Counter-Plaintiffs of their right to own and possess the Converted Assets and Converted Monies.

438) The Counter-Plaintiffs have been damaged as a proximate and direct result of Counter-Defendants' conversion of Counter-Plaintiffs contributions to the BSG Fund. The Counter-Plaintiffs have been deprived of the reasonable rates of return that they otherwise would have earned.

**WHEREFORE**, the Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants granting all damages and other available relief under applicable law.

**COUNT V**
**CIVIL THEFT**
**Counter-Plaintiffs v. Counter-Defendants**

439) The proponents of this cause of action repeat and reallege paragraphs 1-396.

440) The Counter-Defendants have exercised unlawful, tortious, and unjustified dominion and/or control over millions of dollars belonging to the Counter-Plaintiffs, which were invested in the BSG Funds with the expectation and promise of a return on the investments.

441) The Counter-Plaintiffs have a superior right of possession of the monies and assets held in these investments.

442) Collectively, Counter-Plaintiffs have invested $13,113,306.00 in the BSG Fund ("**Stolen Monies**").

443) Counter-Plaintiffs' investment provided them with ownership interest in the following investment Series of the BSG Fund and all the assets contained within these Series of investments:

a. Daytona Beach AC Retreats

b. Broadstreet Tennessee

c. Crystal Lagoons - 10% Annual Return/ Profit

d. Self-Storage - 10% Annual Return/ Profit

e. Self-Storage - Soft Costs 50% Deduction

f. Weatherstone

g. North Charleston Element

h. BSG15

i. BSG PTT

j. DR Horton/Infrastructure #5

k. IF8 Infrastructure - 14.63% Annual Return

l. IF9 Infrastructure - 16% Annual Return

m. Land Banking

n. Triller

o. Ripple

p. Virgin Hyperloop

q. Data#1 - 19% Annual Return

r. Data#2 - 19% Annual Return

s. Crypto/Altcoin Mining - 28% Annual Return

(“**Stolen Assets**”).

444) The Counter-Defendants knowingly obtained or used, or endeavored to obtain or use, the Stolen Monies and Stolen Assets.

445) The Counter-Defendants have acted with felonious intent by intentionally misrepresenting the value of shares of stock that Counter-Defendants are forcing on Counter-

Plaintiffs as an alleged "in-kind" redemption, to steal the assets acquired with Counter-Plaintiffs monies.

446) The Counter-Defendants' actions were intended to permanently deprive the Counter-Plaintiffs of their rights to, and the benefits from, the Stolen Assets and Stolen Monies.

447) The Counter-Defendants' actions were intended to appropriate the Stolen Assets and Stolen Monies for the Counter-Defendants' own use.

448) Notably, many of the Counter-Plaintiffs are retirees who depend on the income from these investments to survive.

449) Pursuant to Florida Statute § 772.11, Counter Plaintiffs sent Counter-Defendants letters demanding the return of the Stolen Monies to no avail. See **Composite Exhibit C**.

**WHEREFORE**, the Counter-Plaintiffs demand judgment in their favor and against Counter-Defendants granting all damages including, but not limited to, compensatory damages, treble damages, interest, attorneys' fees and court costs pursuant to Florida Statute § 772.11 and any other available relief under applicable law.

**COUNT VI**
**BREACH OF CONTRACT**
**(Altcoin)**
**Counter-Plaintiffs Steven Schulman, Nikhil R. Patel, Nipuna Patel, Nimish Patel, Jyoti H. Patel, Jit H. Patel, Khusbu Harshad Patel, Sanjay Gupta, Anita Gupta, Kinjalkumar Patel, Bhumika Patel, James Andrew Ho, Alya Capital LLC and Steven Harry Stiles v. Counter-Defendants**

450) The proponents of this cause of action repeat and reallege paragraphs 1-256 and 358-396.

451) Sometime around March 22, 2025, Broadstreet presented the Altcoin investors with a document entitled Altcoin Mining Participant Vote (**Exhibit G**). This document didn't give the

investors an option to vote yes or no. It only had a place for the investors to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

452) The Altcoin Mining Participant Vote presented the following items regarding the investors' Altcoin Series investment being converted to Z Squared stock:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.
>
> 13) I authorize and agree to the above and endorse the above actions by affixing my signature below.

(Emphasis added).

453) Pursuant to Section 11.04 of the Operating Agreement, the Altcoin Mining Participant Vote is an amendment to and supersedes the Operating Agreement. As required by Section 11.04, the Altcoin Mining Participant Vote provides members of the BSG Fund, including Counter-Plaintiffs who were invested in the Altcoin Series, "**notice**" about a change to their rights under the Operating Agreement and Altcoin Series Schedule, and it requires the members to **consent** to the change. The Altcoin Mining Participant Vote is the manner in which the Manager of the BSG Fund chose to amend the Operating Agreement for the Altcoin Series. Accordingly, the Altcoin Mining Participant Vote is an amendment to the Operating Agreement and thus a binding contract between Counter-Plaintiffs and Counter-Defendants.

454) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment (depending on when the investor invested in the Altcoin Series).

455) Of the Broadstreet investors, Akhil Morada, a Partner at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

456) Also, upon information and belief, Broadstreet and its affiliates have paid themselves at least 30% of the money that was supposed to be allocated for the Altcoin Series.

457) Meanwhile, Counter-Plaintiffs who invested in the Altcoin Series, have not been repaid their full investment plus either 100% or 50% of their investment (depending on when the investor invested in the Altcoin Series).

458) The restricted Z Squared shares that Counter-Defendants purport to provide Counter-Plaintiffs as an "in-kind" redemption have no known value.

459) These payments to Akhil Morada, Broadstreet and its affiliates were made in breach of the Altcoin Mining Participation Vote that Broadstreet had Counter-Plaintiffs sign, and thus Counter-Plaintiffs have sustained significant damages from the dilution of any potential value of the Z Squared shares they received as an "in-kind" redemption.

460) Accordingly, Counter-Defendants are liable to Counter-Plaintiffs for breach of contract, and owe Counter-Plaintiffs any and all damages stemming from said breach.

**WHEREFORE**, Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for compensatory damages, rescissionary damages, interest, costs and such other relief as the Court deem appropriate and just.

**COUNT VII**
**<u>FRAUD</u>**
**(Altcoin)**
**Counter-Plaintiffs Steven Schulman, Nikhil R. Patel, Nipuna Patel, Nimish Patel, Jyoti H. Patel, Jit H. Patel, Khusbu Harshad Patel, Sanjay Gupta, Anita Gupta, Kinjalkumar Patel, Bhumika Patel, James Andrew Ho, Alya Capital LLC and Steven Harry Stiles v. Counter-Defendants**

461) The proponents of this cause of action repeat and reallege paragraphs 1-256 and 358-396.

462) The Counter-Defendants have perpetrated numerous frauds on the Counter-Plaintiffs that are continuous and ongoing.

463) Sometime around March 22, 2025, Broadstreet presented investors in the Altcoin Series with a document entitled Altcoin Mining Participant Vote (**Exhibit G**) for them to sign confirming that they agree to allow Broadstreet to do the twelve things identified in the document.

464) The Altcoin Mining Participant Vote presented the following items regarding the investors' Altcoin Series investment being converted to Z Squared stock:

> 4) We have been presented with the opportunity to sell the mining machines to a public company which would allow for payments to investors as described below.
>
> 5) With the new administration adopting a favorable stance toward cryptocurrencies and the establishment of a dedicated cybercurrency task force, we believe this is a strategically opportune moment to enter the public markets. This environment presents a unique opportunity to maximize ownership value while positioning our company at the forefront of a rapidly evolving industry.
>
> 6) We hereby support management negotiating with and entering a deal for the sale of either the machines or the operating alt coin mining business and using its best efforts. ***Presently it appears that investors in the crypto mining from before May of 2024 will receive their investment back plus one hundred percent and investors from after May of 2024 will receive their investment back plus fifty percent.*** All consideration is expected to be paid in kind in the form of stock from a publicly traded company and we hereby support this deal or any other deal negotiated by management.
>
> 7) We understand that there is no guarantee regarding the sale mentioned above and that the investment documents related to alt coin mining had already provided the ***manager discretion*** to do such a transaction. Additional and more specific terms and conditions are located in the data room and it is my responsibility to read those documents as well if I desire more information. ***We recognize that Broadstreet and/or its affiliates are entitled to all remuneration in excess to the expected payments to the investors which are described in this document and/or the data room. We further understand that Broadstreet and/or its affiliates will be paid after the investors have received their entire remuneration.***
>
> 8) In the event the aforementioned transaction is for in kind consideration, that is stock rather than cash, management may negotiate stock lock up periods to protect the stock price of any acquiring entity.
>
> 13) I authorize and agree to the above and endorse the above actions by affixing my signature below.

(Emphasis added).

465) Most notably, Broadstreet represented that it would not pay itself or its affiliates until the investors were repaid their full investment plus either 100% or 50% of their investment depending on when the investor invested in Altcoin.

466) However, at the time that Broadstreet made this statement, it knew that it had already collected in fees 30% of the money raised for Altcoin. Thus, this was a fraudulent statement made to induce investors, including the Counter-Plaintiffs who were invested in this series, to agree to the sale to the public company.

467) Also, Broadstreet's claim that all the Altcoin investors would receive their investment back plus an additional 100% or 50% of their investment back meant that the approximate $174,720,000 (or 42% of the $416 million raised after deducting the 30% fee and a year of 28% distributions) that made it to the Altcoin investment would have to be currently worth somewhere between $624,000,000 and $832,000,000. That is a 360% to 470% return on the Altcoin investment that in 2025 was on pace to generate a 5% annual return.

468) Broadstreet was fully aware of what funds it had allocated to the Altcoin Series and how much the acquired assets were generating. Therefore, Broadstreet knew that they had no basis for representing to the Altcoin investors that they would receive their investment back plus an additional 100% or 50% of their investment in the March 22, 2025 Altcoin Mining Participant Vote. Broadstreet made these fraudulent statements to induce investors in the Altcoin Series to agree to the Altcoin Mining Participant Vote.

469) Broadstreet continued to make fraudulent statements to the Altcoin Series investors even after the Altcoin Mining Participant Vote.

470) Sometime in April 2026, Broadstreet began the process of transferring all its Altcoin investors, including Counter-Plaintiffs, into Z Squared restricted stock. Indeed, as of June 1, 2026, the monthly investor reports reflect that any investor in the Altcoin Series was redeemed on April 27, 2026 via stock in ZSQR.

471) Of the Broadstreet investors, Akhil Morada, a Partner at Broadstreet, Inc., is the largest holder of Z Squared stock with 2,219,691 shares or 4.3% of all outstanding shares. Upon information and belief, Mr. Morada received these shares as part of his compensation from Broadstreet in direct contradiction to the representations made in the Altcoin Mining Participant Vote.

472) Broadstreet has issued several investor updates, including one on July 27, 2026, claiming that the shares that the Altcoin investors received are worth $600 million.

473) However, this was a false statement because on July 27, 2026, Z Squared Inc. (stock ticker "ZSQR") closed at $4.81 per share, which means the 41,521,276 that Broadstreet and its investors received as part of the Altcoin Series conversion would only be worth around $200 million, if they could be trades.

474) But the Z Squared shares aren't even worth that much. Due to the restrictions on the Z Squared shares that the Altcoin investors are supposed to receive, the investors will not know what their shares are worth until the restriction is lifted which may not be until sometime in October 2027.

475) Broadstreet has been misrepresenting the value of the Z Squared shares to the Altcoin investors (i) to get them to agree to receiving the stock, and (ii) to hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the 28% distributions paid to the Altcoin Series investors was their own money being paid back to them in Ponzi-like fashion.

476) The Monitor in the SEC Enforcement Action identified $416,000,000 in investor capital raised for the Altcoin Series.

477) As of March 2025, Broadstreet had approximately 16,000 altcoin machines. Each of these machines cost anywhere between $10,000 and $20,000. Based on this information one can extrapolate how much Broadstreet spent on the Altcoin machines. On the low end $160,000,000 (16,000 machines at $10K) to as much as $320,000,000 (16,000 machines at 20K).

478) Broadstreet paid itself 30% of the capital raised for the Altcoin Series and funded the 28% interest payments for the first year from that capital. That would leave approximately $174,720,000 for Broadstreet to invest in the altcoin machines (possibly a little more if the machines actually generated revenue). This means that Broadstreet's representation that the Altcoin Series/Z Squared shares are now worth $600 million is a gross misrepresentation, since the value of the machines would have had to triple, which is highly unlikely.

479) Thus, Broadstreet made fraudulent misrepresentations in the March 22, 2025 Altcoin Mining Participant Vote regarding Broadstreet and/or its affiliates being paid after the investors receive their entire remuneration, and in that document and other documents since then have made continuous and ongoing misrepresentation regarding the value of the Z Squared shares the investors would receive in order to induce Counter-Plaintiffs and the other Altcoin investors to agree to accepting the Z Squared shares.

480) Counter-Plaintiffs relied on these misrepresentations when signing the March 22, 2025 Altcoin Mining Participant Vote.

481) These misrepresentations warrant rescission of this transaction and Counter-Plaintiffs should be put back in the same position that they were in before these misrepresentations were made.

482) Accordingly, Counter-Defendants are liable to Counter-Plaintiffs for fraud, and Counter-Plaintiffs should have their Altcoin Series investment restored, or receive the monetary

value thereof as damages including all distributions payments they were entitled to receive since March 2025.

**WHEREFORE**, Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for compensatory damages, rescissionary damages, interest (including missed distribution payments), costs and such other relief as the Court deem appropriate and just.

**COUNT VIII**
**FRAUD**
**Counter-Plaintiffs v. Counter-Defendants**

483) The proponents of this cause of action repeat and reallege paragraphs 1-396.

484) Counter-Defendants have perpetrated numerous frauds on Counter-Plaintiffs that are continuous and ongoing.

485) Counter-Defendant Akhil Morada fraudulently represented to Nimish Patel, Kinjalkumar Patel and Bhumika Patel that they could invest in the BSG Fund even though they did not qualify as accredited investors.

486) Broadstreet provided its investors with monthly investor reports that made it appear that the distributions they received came from the investment that the investor selected when that was not the case.

487) These monthly investor reports were also misleading in that Broadstreet made it appear as if all the money the investor allocated to a particular investment Series made it to that investment, when in fact 30% of the funds the investor provided for their selected investment was immediately stripped out as fees.

488) While Broadstreet disclosed that it **could** pay itself as much as 30% of the money raised as fees, Broadstreet never disclosed to Counter-Plaintiffs that it **did** take 30% of the money

received from Counter-Plaintiffs as fees. Instead, Broadstreet provided Counter-Plaintiffs with monthly investor reports that did not reflect any fees being paid.

489) Broadstreet also never provided Counter-Plaintiffs with any financial statements showing that Broadstreet collected 30% of the money raised from them as fees.

490) Through the monthly investor report Broadstreet falsely portrayed distributions as profits when in fact Broadstreet was actual funding these distributions through either a return of the investors own capital or using funds from new investors to pay later investors.

491) Broadstreet provided BSG Fund investors with misleading monthly investor reports to fraudulently induce its investors, including Counter-Plaintiffs, to keep their funds invested in the BSG Fund. Had these investor reports not been misleading, Counter-Plaintiffs would have immediately requested to withdraw their funds.

492) Counter-Defendant David Feingold did not disclose to Counter-Plaintiffs that he was receiving additional compensation out of the money raised from investors for the BSG Fund, above and beyond the 30% Broadstreet was collecting as fees, from side deals he had with some of the companies the BSG Fund was investing in, including, but not limited to Samson Horus, Contender Development and Durham Homes.

493) Broadstreet represented in its Quarterly Reports that it owned assets that it did not actually own, including but not limited to, a Raleigh, NC-TownPlace Suites as one of its hotel projects.

494) In the July 15, 2023 email Broadstreet sent to the BSG Fund investors regarding the Compliance Acknowledgement Update, Broadstreet encouraged its investors to sign it without reading it by claiming they have already seen or certified the information that they would be acknowledging, which was not true.

495) In the November 2025 Redemption Notice in the answer to question 3, of Item 1, Broadstreet misrepresents that investors who select Option B to receive stock will not receive cash, since Broadstreet has entered into side letter agreements where it has agreed to return some of an investor's cash or transfer a portion of their investment to Innovative (a company in the Broadstreet family) where they can continue to receive cash distribution if they select Option B.

496) Broadstreet fraudulently represented to the BSG Fund investors, including Counter-Plaintiffs, in investor update letters that only 6% of the BSG Fund investors selected cash, when in fact at least 18% elected a cash redemption and significantly more if you include the investors that Broadstreet entered into side deals for cash if they select Option B.

497) Broadstreet fraudulently represented to the BSG Fund investors, including Counter-Plaintiffs, that the "in-kind" stock redemption is worth three times each investor's capital account without any basis supporting that representation. Broadstreet made this misrepresentation numerous times to the BSG Fund investors, including in the November 2025 Redemption Notice and investor update letters.

498) Counter-Defendants are fraudulently misrepresenting the value of speculative, illiquid and restricted share of stock in two publicly traded companies (Z Squared Inc. ticker "ZSQR" and Soulpower Acquisition Corporation ticker "SOUL") that it is forcing its investors to accept as an "in-kind' redemption.

499) On July27, 2026, in an investor update letter, Broadstreet fraudulently represented to Counter-Plaintiffs that these two exit transactions: (a) the sale of the technology/crypto endeavor for approximately $600 million value, and (b) the sale of infrastructure assets for approximately $3 billion value, yielding a total sales price of $3.6 billion with absolutely nothing that supports those valuation.

500) Counter-Defendants made these fraudulent misrepresentations regarding the value of these two transactions in order to (i) get the BSG Fund investors to agree to accepting theses shares as a "in-kind" stock redemption, (ii) hide the fact that Broadstreet and its partners had already pocked 30% of the money raised and the distributions paid to the BSG Fund investors was their own money being paid back to them in Ponzi-like fashion, and (iii) keep for themselves the BSG Fund's remaining assets (not involved in these two transactions) that were acquired with over $500 million of investor assets for themselves.

501) Counter-Defendants repeatedly told Counter-Plaintiffs that they could withdraw their investments anytime (barring short holding periods on a few investment). However, Counter-Plaintiffs are learning those representations were a lie since Broadstreet is now attempting to force them into an investment that would have their funds locked up for the next 3 ½ years.

502) Counter-Plaintiffs relied on these misrepresentations when making their investment decision to their detriment and have been damaged as a result.

**WHEREFORE**, Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for compensatory damages, punitive damages, rescissionary damages, injunctive relief to freeze the assets of the BSG Fund, dissolution of the BSG Fund, appointment of a receiver, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT IX**
**BREACH OF FIDUCIARY DUTY**
**Counter-Plaintiffs v. Counter-Defendants**

503) The proponents of this cause of action repeat and reallege paragraphs 1-396.

504) As manager or as the de facto manager of the BSG Fund, Counter-Defendants BSGM, BSI, David Feingold, Steven Baldassarra and Joseph Baldassarra owe members of the

BSG Fund, including Counter-Plaintiffs, the basic fiduciary duties of care and loyalty, which includes good faith, oversight and disclosure.

505) Moreover, Counter-Defendants BSGM, BSI, David Feingold, Steven Baldassarra and Joseph Baldassarra took discretion when making investment decisions for the BSG Fund and in determining how the funds raised for the BSG Fund would be deployed. Often disregarding the investment Series selected by the BSG Fund investor for their investment in the fund. Thus, they acted as investment advisors to the BSG Fund and its members with the highest fiduciary duty to act in the BSG Fund and its members' best interest, which includes a duty to avoid conflicts of interest.

506) Counter-Defendant Akhil Morada also served as the personal investment advisor to several of the Counter-Plaintiffs, and thus he too owed a fiduciary duty of care and loyalty to those Counter-Plaintiffs.

507) In the investment advisory and broker/customer relationship with Counter-Plaintiffs, Counter-Defendants were under a fiduciary duty to:

a. recommend investments only after studying them sufficiently to become informed as to their nature, price and financial prognosis;

b. refrain from self-dealing;

c. inform the customer of the risks involved in purchasing and selling a security;

d. perform orders promptly and in a manner to serve the customer's best interest;

e. transact business only after receiving approval from the customer; and

f. not to misrepresent any material fact to a transaction.

508) Counter-Defendants owed these fiduciary duties to Counter-Plaintiffs, and breached their fiduciary duties as set out above.

509) At all times herein, Counter-Defendants acted in the capacity of agent and fiduciary custodian for Counter-Plaintiff. This fiduciary relationship arose out of Counter-Defendants holding themselves and their agent out as investment advisors and accepting compensation for their services, the Counter-Defendants' superior knowledge and experience regarding securities and investments, and the representations made by Counter-Defendants to Counter-Plaintiffs in regard to the investments.

510) Acting in these capacities, Counter-Defendants owed Counter-Plaintiffs the fiduciary duties of good faith, fair dealing, trust, and integrity in their dealings with Counter-Defendants and in their maintenance of the investments, supervision of the investments, and recommendations regarding the investments. Counter-Defendants also owed the Counter-Plaintiffs the duty not to self-deal and to supervise and prevent self-dealing by their agent. Said duties were breached by Counter-Defendants and their agent by their action and inaction set out herein.

511) For instance, Counter-Defendants recommend, and in some cases forced, the ZSQR and the SOUL shares to the BSG Fund investors even though these investments were unsuitable for the BSG Fund investors, including Counter-Defendants, investment objectives and risk tolerance.

512) Counter-Defendants pushed these investments on the BSG Fund investors, so that Counter-Defendants could keep for themselves assets in the BSG Fund's investments Series acquired with over $500 million of funds from the BSG Fund investors.

513) In doing so, Counter-Defendants breached the fiduciary duty to act in the BSG Fund and its members' best interest, to refrain from self-dealing, to avoid conflicts of interest and to be loyal.

514) Counter-Defendants also misrepresented the value of ZSQR and SOUL shares the BSG Fund investors would be receiving in violation of their duty to not to misrepresent any material fact to a transaction and to inform the customer of the risks involved in purchasing and selling a security.

515) As a direct and proximate result of Counter-Defendants' aforesaid conduct and breaches of fiduciary duties, Counter-Plaintiffs incurred damages in excess of $16 million.

**WHEREFORE**, Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for compensatory damages, punitive damages, rescissionary damages, injunctive relief to freeze the assets of the BSG Fund, dissolution of the BSG Fund, appointment of a receiver, interest, costs and such other relief as the Court deems appropriate and just.

**COUNT X**
**DISGORGEMENT**
**Counter-Plaintiffs v. Counter-Defendants**

516) The proponents of this cause of action repeat and reallege paragraphs 1-396.

517) Every time Counter-Plaintiffs invested in a BSG Fund investment Series, Broadstreet immediately collected 30% of the funds as fees for services it promised to provide over the next five years.

518) Broadstreet did this pursuant to the Compliance Acknowledgement Updates that it had each of the Counter-Plaintiffs signed which states:

> "I have been aware of and continue to consent to the fees and costs associated with my investment and how Broadstreet is paid, including but not limited to **fees of up to six percent per year for five years and all fees can be taken up front** or by splitting profits with investors or other manners of fees and costs as disclosed in the series supplement, the private placement memorandum, the data room and the disclosures in pitch decks."

(Emphasis added).

519) Notably, Broadstreet did not simply say that it is entitled to a 30% up front fee. Instead, Broadstreet said that it could pay itself "fees of up to six percent per year for five years and all fees can be taken up front." By phrasing it this way, if Broadstreet collects five years of fees up front, then Broadstreet is obligated to provide five years of services.

520) Despite collecting five years of fees upfront, Broadstreet is now forcing Counter-Plaintiffs out of the BSG Fund without providing most of them with five years of service.

521) Accordingly, to the extent that Broadstreet overpaid itself for services never rendered, Broadstreet must return any excess fees it collected back to Counter-Plaintiffs.

**WHEREFORE** Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for disgorgement of any excess fees Counter-Defendants collected from Counter-Plaintiffs, interest, costs and such other relief as the Court deem appropriate and just.

**COUNT XI**
**ACCOUNTING**
**Counter-Plaintiffs v. Counter-Defendants**

522) The proponents of this cause of action repeat and reallege paragraphs 1-396.

523) Counter-Plaintiffs have entrusted millions of dollars to Broadstreet, which has imposed upon Broadstreet the burden and duty of accounting for such funds.

524) As manager of the BSG Fund and fiduciary to the Counter-Plaintiffs, the Baldassarras and the remaining Counter-Defendants must produce an accounting.

525) Article IX Section 9.06 of the Operating Agreement entitled "Books and Records" explicitly states that:

> (a) The Manager, together with the Administrator (if any), shall keep books and records pertaining to the Company's and each Series' affairs showing all of its assets and liabilities, receipts and disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series. Such books and records of the Company and its Series shall be kept at the

> Company's office (or at an Administrator's office as directed by the Manager from time to time).
>
> (b) Except as otherwise expressly provided in this Agreement, **each Member shall have the right to obtain any information contained in the books and records of the Company or its Series upon reasonable advance notice, including any information relating to the Company's or its Series' investment activity**.

(Emphasis added.)

526) Counter-Plaintiffs have a contractual right to obtain an accounting of the finances relating to each Series they are or were invested in. Accordingly, the Court should order the Counter-Defendants to provide the Counter-Plaintiffs with an accounting.

**WHEREFORE** Counter-Plaintiffs demand judgment in their favor and against the Counter-Defendants for an accounting providing the books and records pertaining to each Series that Counter-Plaintiffs were invested showing all of its assets and liabilities, receipts and disbursements, gains and losses, Members' Capital Accounts and all transactions entered into by the Company and its Series, and such other relief as the Court deem appropriate and just.

**COUNT XII**
**CONTROL PERSON LIABILITY**
**Counter-Plaintiffs v. Feingold and Baldassarras Brothers**

527) The proponents of this cause of action repeat and reallege paragraphs 1-396.

528) Counter-Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra acted as a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

529) Counter-Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra had the power to control and did control the BSG Fund. Through their control they made decisions to (i) force SOUL shares on the BSG Fund investors even though these investments were unsuitable for the BSG Fund investors, including Counter-Defendants, investment objectives and

risk tolerance, and (ii) misrepresent the value of ZSQR and SOUL shares to the BSG Fund investors.

530) Counter-Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra pushed these investments on the BSG Fund investors, so that they could keep for themselves assets in the BSG Fund's investments Series acquired with over $500 million of funds from the BSG Fund investors.

531) Counter-Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra knew, or were reckless in not knowing, the fraudulent communications Broadstreet agents such as Akhil Morada, Benard Jasmin, Todd Sanders and Tarek Hussain were making to investors in the BSG Fund, including Counter-Plaintiffs, to solicit them to invest in the BSG Fund and remain invested in the BSG Fund.

532) As control persons of the BSG Fund, Counter-Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra are responsible for the actions of Broadstreet's employees including Akhil Morada, Benard Jasmin and Tarek Hussain.

533) As a direct and proximate result of the wrongful conduct alleged in this Count, Counter-Plaintiffs have incurred damages in excess of $16 million.

**WHEREFORE**, Counter-Defendants David Feingold, Steven Baldassarra and Joseph Baldassarra are individually and personally liable to Counter-Plaintiffs as control persons of the BSG Fund for compensatory damages, plus punitive damages, prejudgment interest and costs.

**COUNT XIII**
**CONSTRUCTIVE TRUST, EQUTABLE LIEN,**
**AND/OR SEGREGATION OF SALE PROCEEDS**
**Counter-Plaintiffs v. Counter-Defendants**

534) The proponents of this cause of action repeat and reallege paragraphs 1-396.

535) Counter-Plaintiffs are the proper legal and equitable owners of specific, traceable property, namely their investments in the BSG Fund.

536) Broadstreet intends to sell Counter-Plaintiffs investments in the BSG Fund and make distributions to its partners who have certain levels of ownership in the business.

537) Broadstreet has not provided Counter-Plaintiffs with adequate consideration for their ownership interest in their investments in the BSG Fund.

538) This Court may impose an equitable or constructive trust over specific assets as a provisional or preliminary equitable measure to preserve identifiable property pending final determination of ownership.

539) To whatever extent the Court permits the sale of assets held in Counter-Plaintiffs' investments in the BSG Fund, which it should not, Counter-Plaintiffs should be entitled to a constructive trust over all proceeds until entitlement to the same can be resolved.

**WHEREFORE**, the Counter-Plaintiffs demand that, if the Court permits the sale of assets pertaining to their investments in the BSG Fund to proceed, the Court exercise its authority to impose a preliminary constructive trust over any and all sale proceeds from these assets until such time as proper ownership, control, and other rights to those proceeds can be adjudicated.

## PRAYER FOR RELIEF

Based on the foregoing, Defendants/Counter-Plaintiffs, pray the Court for the following relief:

a. That the Court enter an order declaring that Plaintiff/Counter-Defendants are required to honor the cash redemption that Plaintiff/Counter-Defendants agreed to provide its investors who opted for a cash redemption in the November 14, 2025 Redemption Notice;

b. That the Court enter an order declaring that Plaintiff/Counter-Defendants do not have the right to force an "in-kind" redemption on BSG Fund investors who selected Redemption Choice – A to be redeemed in cash in the November 14, 2025 Redemption Notice;

c. That the Court enter an order declaring that the restricted SOUL shares do not qualify as an "in-kind" redemption;

d. That the Court enter an order finding in Defendants/Counter-Plaintiffs' favor on Counts I through XII;

e. That the Court award Defendants/Counter-Plaintiffs compensatory damages in an amount to be determined at trial but believed to be at least **$16 million**;

f. That the Court award Defendants/Counter-Plaintiffs punitive damages;

g. That the Court award Defendants/Counter-Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c) and Florida Statute § 772.11;

h. That the Court award Defendants/Counter-Plaintiffs rescission and rescissionary damages;

i. That the Court enter an order against Plaintiff/Counter-Defendants for

disgorgement of fees paid by Defendants/Counter-Plaintiffs;

j. That the Court enter an order for injunctive relief preventing Plaintiff/Counter-Defendants from selling or transferring away assets of an investment Series that Defendants/Counter-Plaintiffs have an ownership interest;

k. That the Court enter an order for Plaintiffs/Counter-Defendants to place any proceeds from the sale of any assets from a BSG Fund investment that Defendants/Counter-Plaintiffs have an ownership interest into a constructive trust;

l. That the Court entera an order placing an equitable lien on behalf of Defendants/Counter-Plaintiffs on any asset from a BSG Fund investment that Defendants/Counter-Plaintiffs have an ownership interest in;

m. That the Court enter and order for Plaintiff/Counter-Defendants to provide Defendants/Counter-Plaintiffs with an accounting;

n. That the Court enter an order dissolving the BSG Funds, removing the manager from the BSG Funds, and appointing a Receiver to oversee the liquidation of the BSG Funds;

o. That the Court award Defendants/Counter-Plaintiffs reasonable attorney's fees, costs and expenses pursuant to 18 U.S.C. § 1964(c) and Florida Statute § 772.11;

p. That the Court award Defendants/Counter-Plaintiffs the costs, including experts' fees, and other expenses incurred in the pursuit of this action;

q. That the Court award Defendants/Counter-Plaintiffs pre- and post-judgment interest where appliable, including missing distribution payments owed to Defendants/Counter-Plaintiffs pursuant to their selected investment Series in the BSG Fund;

r. For interest to run until the date that the award is fully paid and satisfied by Plaintiff/Counter-Defendants;

s. That all costs of this action be taxed against Plaintiff/Counter-Defendants; and

t. That the Court award such other and further relief as this Court may deem just and proper.

Defendants/Counter-Plaintiffs reserve the right to amend the Counterclaim and Third Party Complaint.

**JURY TRIAL DEMAND**

Defendants/Counter-Plaintiffs/Third-Party Plaintiffs demand trial by jury on all issues so triable.

Date: August 14, 2026

Respectfully Submitted,

**EPPERSON & GREENIDGE, P.A.**
20 South Olive Street, Suite 304
Media, Pennsylvania 19063
T. 877.445.9261

*/s/ Andrew M. Greenidge*
**ANDREW M. GREENIDGE, ESQ.**
Fla. Bar No. 0016581
andrew@eppersongreenidge.com
service@eppersongreenidge.com

*Counsel for Defendants/Counter-Plaintiffs/Third-Party Plaintiffs*

**CERTIFICATE OF SERVICE**

I CERTIFY that on this 14th day of August 2026, the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that this document is being served on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Andrew M. Greenidge*
Andrew M. Greenidge, Esq.