# EXHIBIT "O"

# DECLARATION OF ANKUR ANAND, M.D.

I, **ANKUR ANAND, M.D.**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and that I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon communications, documents, investor updates, or other information provided to me:

**I. Introduction to Broadstreet**

1. I am a physician.

2. I first learned about Broadstreet Global Fund, which I refer to in this declaration as "Broadstreet" or "BSGF," in approximately March 2022.

3. I learned about Broadstreet through a broker who worked with **Bernard Jasmin** and through two of my anesthesia business partners.

4. One of my anesthesia partners had previously invested with Broadstreet in hotel-related investments.

5. That partner told me that he had been satisfied with his Broadstreet investments up to that point.

6. Another anesthesia business partner approached me about the possibility of investing collectively with Broadstreet.

7. I organized the investment group and formed a limited liability company, or LLC, through which we made the Broadstreet investments.

8. Our investment decisions were based in substantial part upon the information communicated to us concerning the anticipated projects, returns, and investment opportunities.

**II. The 2022 Broadstreet Investments**

9. In or about 2022, our LLC invested in two Broadstreet opportunities.

10. The first investment was approximately [redacted] in a hotel construction project in **Daytona Beach, Florida**.

11. The second investment was approximately [redacted] in a residential construction and development project in **South Carolina**.

12. These investments were made at or around the time I first became involved with Broadstreet.

13. Bernard Jasmin became an important point of contact concerning the investments.

14. Mr. Jasmin communicated with me through telephone calls, text messages, and emails.

**III. Representations Concerning the Daytona Beach Hotel Project**

15. With respect to the Daytona Beach hotel project, Mr. Jasmin represented that the investment was expected to produce approximately a **three-to-five-times return** over a period of about **five years**.

16. He communicated this anticipated return through telephone calls, text messages, and emails.

17. His communications concerning the hotel project were consistently optimistic.

18. Based upon the manner in which the investment was presented to me, I understood that the projected return was considered likely to occur rather than being characterized merely as a remote or highly speculative possibility.

19. I do not specifically recall Mr. Jasmin emphasizing significant risks associated with the hotel project.

20. In particular, I do not recall him meaningfully discussing the possibility of substantial construction delays.

21. I do not recall him meaningfully discussing significant cost overruns.

22. I do not recall him emphasizing the possibility that the completed property could be difficult to sell or refinance.

23. I also do not recall him emphasizing the possibility of a substantial loss of principal.

24. I do not recall him explaining that the projected three-to-five-times return might not be achieved.

25. The optimistic projected return was material to our decision to invest in the Daytona Beach project.

**IV. The South Carolina Residential Project**

26. Our LLC also invested approximately [redacted] in a residential construction and development project in South Carolina called Weatherstone.

27. I do not presently recall the exact return or investment timeline originally represented for that project.

28. I received [redacted] in distributions from the Weatherstone investment, but [redacted] of those distributions was a return of capital that reduced my equity balance to $[redacted].

29. Over time, however, Broadstreet's investor updates indicated that the South Carolina project was not performing as expected.

30. Based upon those updates, I understood that the project was experiencing problems or was otherwise not progressing successfully.

31. Around 2024, Mr. Jasmin proposed that the funds associated with the South Carolina project be transferred into a different Broadstreet investment.

32. The proposed replacement investment was an infrastructure investment.

**V. Transfer Into the Infrastructure Investment**

32. I formally approved the transfer of the approximately [redacted] of the South Carolina investment into the infrastructure investment.

33. I believe that I signed a subscription agreement or similar documentation in connection with that transfer.

34. At approximately the same time, I personally contributed an additional [redacted] through the same LLC.

35. Mr. Jasmin presented the additional [redacted] contribution as an optional opportunity to invest additional money.

36. I did not understand him to be saying that the additional contribution was required in order to protect or recover the existing South Carolina investment.

37. Following the transfer and my additional contribution, approximately [redacted] was associated with the infrastructure investment.

38. That amount consisted of approximately [redacted] transferred from the South Carolina residential project and my additional approximately [redacted] contribution.

**VI. Representations Concerning the Infrastructure Investment**

39. Mr. Jasmin represented that the infrastructure investment would provide a **guaranteed annual return of approximately 14.25%**.

40. He further represented that the return would be paid **quarterly**.

41. Mr. Jasmin communicated these representations through text messages, telephone calls, and emails.

42. I understood the use of the word "guaranteed" to mean that the represented 14.25% annual return was intended to be dependable and not merely a speculative projection.

43. The quarterly payment structure was also important to me.

44. After the infrastructure investment was made, I initially received the represented quarterly payments.

45. The payments were regular rather than sporadic.

46. Those regular payments reinforced my understanding that the infrastructure investment was performing in the manner that had been represented to me.

**VII. My Decision to Exit and Seek Cash Redemption**

47. By the summer of 2025, I wanted our investment returned in cash.

48. I communicated this directly to Mr. Jasmin.

49. I told him that we wanted to exit the investment as quickly as possible.

50. On or about July 14, 2025, I communicated by text message that I wanted a cash liquidation of the account.

51. Attached as **Exhibit _A_** are screenshots of the July 14, 2025 text messages reflecting my request for a cash liquidation.

52. Mr. Jasmin responded that the redemption request had been submitted.

53. He further represented that the cash would be returned within approximately **six months**.

54. I relied upon this representation in expecting that our investment would be returned in cash within that timeframe.

55. I understood the six-month period to be the outside period for completion of the redemption, rather than an indefinite or open-ended estimate.

**VIII. Broadstreet's Formal Redemption Election**

56. Around the same period, Broadstreet formally presented investors with different redemption options.

57. I understood that one option involved receiving stock through a proposed SPAC transaction.

58. I understood that the other option involved a cash redemption.

59. I selected the **cash-redemption option**.

60. My decision was deliberate.

61. I wanted the investment returned in cash.

62. I did not want to substitute a speculative stock investment for the cash redemption I had requested.

63. I understood the cash election to be consistent with my earlier communications to Mr. Jasmin that we wanted to exit the investment as quickly as possible.

64. Around the time Broadstreet presented these redemption options, the quarterly infrastructure payments stopped.

65. The cessation of those payments was significant because those payments had previously been regular.

**IX. Failure to Pay the Cash Redemption**

66. Despite selecting the cash-redemption option and being told that the funds would be returned within approximately six months, I did not receive the redemption payment during that period.

67. The six-month period passed without the return of the investment in cash.

68. I did not receive the funds that I had been told would be returned.

69. Mr. Jasmin did not provide me with a meaningful explanation for why the money had not been returned.

70. He also did not provide me with a definite replacement payment date.

71. I was not given a reliable timeline explaining when the cash redemption would actually be completed.

72. The absence of a clear explanation was concerning because I had expressly requested a cash exit and had been told that the redemption had been submitted.

73. I had also been given a specific approximate timeframe of six months.

**X. Importance of the Representations Made to Me**

74. I relied upon the representations made by Mr. Jasmin when making decisions concerning our Broadstreet investments.

75. With respect to the Daytona Beach hotel project, I relied upon the representation that the investment was expected to produce approximately a three-to-five-times return over approximately five years.

76. I also relied upon the optimistic manner in which that investment was presented.

77. I was not provided with a comparable emphasis on the significant risks that could prevent those projected returns from being achieved.

78. With respect to the infrastructure investment, I relied upon the representation that the investment would provide a guaranteed approximately 14.25% annual return.

79. I relied upon the representation that the return would be paid quarterly.

80. The fact that those quarterly payments initially arrived regularly reinforced my reliance on those representations.

81. I also relied upon Mr. Jasmin's representation that our cash redemption had been submitted.

82. I relied upon his representation that the cash would be returned within approximately six months.

83. Had I understood that Broadstreet might not honor the requested cash redemption within that period, I would have evaluated my investment and exit strategy differently.

**XI. Differences Between What Was Represented and What Occurred**

84. My experience with Broadstreet has differed materially from the expectations created by the representations made to me.

85. The Daytona Beach hotel investment was presented as having the potential for a very substantial return over approximately five years.

86. The South Carolina residential project later experienced problems significant enough that Broadstreet proposed transferring the investment into a different product.

87. The infrastructure investment was represented as providing a guaranteed 14.25% annual return with quarterly payments.

88. Although those quarterly payments initially occurred, they later stopped.

89. When I requested to exit and redeem the investment in cash, I was told that the request had been submitted and that payment would be made within approximately six months.

90. That payment did not occur.

91. I was not provided with a meaningful explanation for the failure to redeem the investment.

92. I was not provided with a definite new payment date.

**XII. My Continuing Cash-Redemption Position**

93. I selected the cash-redemption option because I wanted our investment returned in cash.

94. I did not select the cash option accidentally.

95. My election was consistent with my direct communications to Mr. Jasmin that we wanted to exit the investment.

96. I did not agree that Broadstreet could indefinitely postpone the requested cash redemption.

97. I did not understand that Broadstreet could simply replace a cash redemption with another investment without my agreement.

98. My position remains that the cash-redemption request should be honored.

**XIII. Requested Accounting and Relief**

99. I request that Broadstreet honor the cash-redemption request and election associated with the investment held through our LLC.

100. I request payment of all principal amounts that are due in connection with that redemption.

101. I also request payment of any unpaid quarterly returns, distributions, interest, or other amounts determined to be due.

102. I make this declaration based upon my personal knowledge, my communications with Mr. Jasmin and others concerning Broadstreet, the documents and investor communications I received or reviewed, and my recollection of the events described above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13, 2026, in Suffolk County, State of NY.

____________________________

Ankur Anand, M.D.

As it stands the transaction is moving forward and should be announced by Aug 1, with whatever legal/regulatory things that come to follow..but regardless your groups payments continue until then. The options also give a decent rough estimate of how m as many investable dollars can be swapped from investors who cash in

Ok if we want to liquidate that will be be also aug 1?

You wouldn't just get the cash automatically on that day, If you choose to redeem you go in the queue for regular Redemption

Ok 6 months?

" up to 180 days" as per the perspectus...i couldn't really say how long for certain, you know ?

Ok got it

Monday, Jul 14 • 09:54

Hey man, unfortunately the partners voted to liquidate the funds. Whats the process?

Tuesday, Jul 15 • 11:08

Call you in 5 minutes, but got your message yesterday

hey about liquidation it will pay out the 6 percent as well?

Yes

Wednesday, Aug 13 • 09:45

hey just checking in about redemption any updates how they are going?

and would love to hear about your project as well

Hey Dr. Anand, the request was put in shortly right after we spoke. Its definitely in the queue but I dont have an exact time frame but I assure it will be well within the max 180-day time frame.

thanks hope all is well!

As for the other project, they are getting all the final details ready. It probably wouldn't be appropriate for a big llc group unless they are committed and give you decision making power because its a private/very closely held, friends and family business opportunity & I wouldn't feel comfortable having people involved that I don't have at least a certain relationships with, no less that I have never spoken to

Yes, all is well! , I hope the same for you

ok got it lmk when ur ready to talk about it

Absolutely will

RCS message


Bernard Jasmin
yes reviewing now.
Wednesday, Oct 22 • 16:51
most are inclined for cash redemption unfortunately
Ahh well ok
That's unfortunate
Thursday, Oct 23 • 10:44
hi does the redemption we filed for on July 15th be paid by January 15th?
If thats the exact date it was submitted I'm inclined to say yes by 180 day standards I cant give you an exact date
ok i dont want the clock to
RCS message