# EXHIBIT “Q”

# DECLARATION OF NIMISH PATEL

I, **NIMISH PATEL**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and that I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon documents, communications, or other information I have reviewed:

## I. Introduction to Broadstreet

1. In or about late 2022, I was introduced to **Broad Street**, which I refer to in this declaration as "Broadstreet," "BSG," or "BSGF," through **Akhil Morada**. My first conversation with Akhil was on or about December 30, 2022.

2. Mr. Morada became my primary point of contact concerning Broadstreet's investment opportunities.

3. During our initial discussions, I told Mr. Morada that I did not have cash readily available to invest.

4. Mr. Morada asked me, in substance, whether I had a retirement account.

5. I told him that I did have retirement funds but understood that I could not simply withdraw those funds from my IRA for an investment.

6. Mr. Morada responded, in substance, **"Don't worry. I'll show you how to get that money out through Directed IRA."**

7. He then explained the Directed IRA process and guided me through transferring retirement funds so they could be invested in Broadstreet opportunities.

8. I relied upon Mr. Morada's guidance because I understood him to be knowledgeable about Broadstreet's investments and the procedures necessary to invest retirement funds through a self-directed or directed IRA structure.

## II. My January 2023 Investment

9. On or about January 13, 2023, I invested approximately [redacted] through my Directed IRA.

10. Approximately [redacted] was invested in Broadstreet's **MCA Fund**.

11. Approximately [redacted] was invested in Broadstreet's **Land Fund**.

12. These funds represented a substantial portion of the retirement savings that I had accumulated over many years.

13. Before making this investment, I was not asked whether I qualified as an accredited investor.

14. I was not asked to provide my annual income.

15. I was not asked to provide my net worth.

16. I was not asked to provide the amount of my liquid net worth or investable assets.

17. I was not asked any other questions that I understood to be part of determining whether I satisfied the requirements for accredited-investor status.

18. I did not tell Mr. Morada or Broadstreet that I was an accredited investor.

19. I did not independently represent to Broadstreet that I satisfied any particular accredited-investor qualification.

## III. Wire Transfer Before Receipt of Investment Documents

20. Before I made the January 2023 investment, Mr. Morada repeatedly followed up with me concerning completion of the wire transfer.

21. I was encouraged to send the investment funds before I received the investment documents for review.

22. At the time I wired the funds, I had not yet been provided with the Subscription Agreement.

23. I had not been provided with the Investor Questionnaire.

24. I had not been provided with other investment documents from which I could review and evaluate the specific representations, certifications, or qualifications that Broadstreet intended to attribute to me.

25. Only after I confirmed that the wire transfer had been completed did Mr. Morada send me a **Client Information Sheet**.

26. The sequence was therefore that my money was wired first and the documents containing material investor information were presented to me afterward.

27. That sequence is important to me because I did not have the opportunity to review those documents before transferring my retirement funds.

**IV. Pre-Completed Client Information Sheet**

28. When I received the Client Information Sheet, portions of it were already completed.

29. Specifically, the information concerning accredited-investor qualifications had already been marked before I received the document.

30. The boxes indicating annual income exceeding approximately **$500,000** were already checked.

31. The box indicating net worth exceeding approximately **$1 million** was already checked.

32. The box indicating liquid net worth or investable assets exceeding approximately **$1 million** was already checked.

33. I did not check those boxes myself.

34. I did not instruct anyone to check those boxes on my behalf.

35. To my knowledge, Broadstreet or someone associated with Broadstreet completed those portions before the document was provided to me. The field identified as “REP#/PPM# – For Internal Use Only” was blank when I received the Client Information Sheet.

36. I do not recall being instructed to review, verify, correct, or certify the pre-completed accredited-investor information.

37. The Client Information Sheet did not contain a separate signature or date line through which I personally certified those accredited-investor selections.

38. At no time during this process did I personally select the income, net-worth, or liquid-asset qualifications that had been marked on the document.

39. I questioned Mr. Morada as to why those boxes were already pre-checked because I did not meet those financial qualifications. Mr. Morada understood my financial situation because, before I invested, I had already told him that I did not have any cash available and that my only available funds were in my IRA.

40. During a phone conversation, **Mr. Morada instructed me to ignore them**, print the form, complete only my personal information by hand, and send it back.

## V. January 2023 Subscription Agreement and Investor Questionnaire

41. After the wire transfer, I was sent a Subscription Agreement through DocuSign.

42. I subsequently reviewed the Subscription Instructions contained within the investment documents.

43. Those instructions stated, as I understand them, that only accredited investors were eligible to participate in the Fund.

44. The instructions also stated that each subscriber was required to submit a completed, dated, and executed Investor Questionnaire.

45. The Subscription Agreement further represented that a subscriber was an accredited investor and that the basis for that qualification would be identified in the Investor Questionnaire, identified as Attachment 1.

46. When the Subscription Agreement was presented to me through DocuSign, the accredited-investor qualification boxes in Attachment 1 were already checked.

47. I did not select or check those boxes.

48. I did not enter the accredited-investor criteria myself.

49. I was instructed to sign the DocuSign signature pages.

50. To the best of my recollection, I was not instructed to independently complete the Investor Questionnaire.

51. To the best of my recollection, I did not personally select or certify any of the accredited-investor qualifications appearing in Attachment 1.

52. I relied upon Broadstreet and Mr. Morada to prepare the investment documents accurately.

53. At that time, I did not understand that the documents were representing that I personally had selected or verified accredited-investor criteria that I had never been asked to provide.

**VI. My July 2024 Tennessee Fund Investment**

54. In or about July 2024, I made a second investment through my Directed IRA.

55. I invested approximately [redacted] in Broadstreet's **Tennessee Fund**, which I refer to as the "TN Fund."

56. The same general onboarding sequence occurred with this second investment.

57. Before making the TN Fund investment, Mr. Morada again instructed or encouraged me to complete the wire transfer before I received the final investment documentation.

58. I wired the approximately [redacted] before being provided with the Subscription Agreement for my review and execution.

59. After I confirmed that the funds had been wired, Broadstreet sent me the Subscription Agreement through DocuSign.

60. Before this second investment, no one from Broadstreet asked me whether I qualified as an accredited investor.

61. No one asked me to verify my annual income.

62. No one asked me to verify my net worth.

63. No one asked me to verify my liquid assets or investable assets.

64. To my knowledge, Broadstreet did not conduct a new accredited-investor review or verification with me.

65. When the TN Fund Subscription Agreement was presented to me through DocuSign, the accredited-investor selections were again already checked.

66. I did not select or check those qualifications myself.

67. I did not provide the information that formed the basis for those checked selections.

68. I was again instructed to sign the DocuSign signature pages.

69. To the best of my recollection, I never personally completed, selected, or certified accredited-investor qualifications in connection with the TN Fund investment.

**VII. Consolidation Into Broadstreet Global Fund**

70. Following my investments in the MCA Fund, Land Fund, and TN Fund, Broadstreet later consolidated or transferred those investments into the **Broadstreet Global Fund**.

71. I relied upon Broadstreet to properly account for the investments and maintain accurate records concerning the value and status of my funds.

72. I did not understand that the consolidation would eliminate or materially change the protections, liquidity, returns, or other characteristics that had originally been represented to me.

## VIII. Representations Concerning Safety and Principal Protection

73. In connection with my decision to invest, Mr. Morada made representations concerning the safety of Broadstreet's investments.

74. Mr. Morada represented that the investments were **safer than investing in the stock market**.

75. He represented that my principal would be protected.

76. He represented that I would receive a fixed return.

77. He represented that the investments would provide regular fixed-interest distributions.

78. He presented the investments as appropriate for retirement savings because they would avoid the volatility associated with the public stock market.

79. These representations were particularly important to me because I was investing retirement funds rather than discretionary money that I could afford to lose.

80. I was not seeking a highly speculative investment.

81. I wanted to preserve the retirement savings that I had accumulated over approximately thirty years.

82. I relied upon Mr. Morada's representations concerning safety, preservation of principal, fixed returns, and reduced market volatility when deciding to invest.

**IX. Representations Concerning Liquidity**

83. Liquidity and access to my retirement funds were also important considerations.

84. Mr. Morada represented that if I ever needed my money, I could redeem my investment.

85. He represented that redemption could occur in approximately **three to four days**.

86. I understood from these statements that my retirement funds would remain readily accessible if I needed them.

87. This representation materially influenced my decision to move retirement money into Broadstreet.

88. Had I understood that my funds could become unavailable for years or that a cash redemption could later be replaced with restricted stock, I would have evaluated the investment very differently.

**X. Broadstreet's Redemption Process**

94. Broadstreet later provided investors with redemption options.

95. When given those options, I selected **cash redemption**.

96. My choice was deliberate.

97. I wanted my retirement funds returned to me in cash.

98. I did not want my retirement savings converted into publicly traded or speculative stock.

99. My cash election was consistent with the representations made to me when I originally invested that my funds would not be exposed to stock-market volatility and could be redeemed when needed.

100. Instead of honoring my cash-redemption election, Broadstreet later attempted to substitute restricted public stock in place of the cash I had selected.

101. I did not agree to that substitution.

102. I did not elect restricted stock.

103. I do not consent to restricted stock being treated as full satisfaction of the cash redemption I elected.

**XI. Conflict Between the Original Representations and Proposed Stock**

104. The proposed stock distribution is fundamentally inconsistent with the investment that was originally presented to me.

105. I was told that Broadstreet was safer than the stock market.

106. I was told that my retirement money would not be exposed to the volatility of ordinary stocks.

107. I was told that my principal would be protected.

108. I was told that I would receive fixed returns.

109. I was told I could redeem my funds within approximately three to four days if needed.

110. I was not told that my retirement funds could later be converted into restricted public stock.

111. Restricted stock is not equivalent to cash for my purposes.

112. Restricted stock may be subject to transfer restrictions, holding periods, valuation uncertainty, and market fluctuations.

113. Restricted stock may not be immediately saleable.

114. The price of the stock may decline before an investor is legally or practically able to sell it.

115. These are exactly the types of market and liquidity risks that I understood Broadstreet's investments were intended to avoid.

**XII. WhatsApp Communications With Akhil Morada**

116. I have preserved numerous WhatsApp communications between myself and Mr. Morada.

117. Those communications concern my investments and my efforts to obtain information from Broadstreet.

118. They include repeated requests by me for updates concerning the status of my funds.

119. They also include communications concerning redemption.

120. Mr. Morada provided repeated assurances regarding payment and redemption timing.

121. I have retained those communications and can provide them as supporting documentation.

122. I believe those contemporaneous communications corroborate my recollection that I repeatedly sought access to my funds and was repeatedly given assurances concerning payment.

**XIII. Discovery of the Accredited-Investor Onboarding Issues**

123. At the time I originally invested, I did not appreciate the significance of the accredited-investor information contained in the Client Information Sheet and Investor Questionnaires.

124. I later reviewed my investment documents more carefully.

125. During that review, I became concerned that the accredited-investor qualifications appearing in my records had been completed before those documents were presented to me.

126. I compared the completed Client Information Sheet with a blank version of the form.

127. That comparison reinforced my concern that information relating to accredited-investor status had been pre-populated or pre-selected.

128. I also reviewed the Investor Questionnaire contained within my January 2023 Subscription Agreement.

129. I reviewed the corresponding Investor Questionnaire associated with my July 2024 investment.

130. Based upon that review, I became concerned that Broadstreet's records could create the impression that I personally provided, selected, or certified accredited-investor qualifications that I did not personally provide or select.

131. That concern is particularly significant to me because Broadstreet's own Subscription Instructions state that participation was limited to accredited investors and required a completed Investor Questionnaire.

## XIV. Regulatory and Law-Enforcement Complaints

132. After discovering these issues and becoming concerned about the manner in which my investment documentation had been prepared, I submitted complaints to governmental and regulatory authorities.

133. I submitted a complaint to the **United States Securities and Exchange Commission**.

134. I submitted a complaint to the **Federal Bureau of Investigation Internet Crime Complaint Center, or IC3**.

135. I also submitted a complaint to the **South Carolina Attorney General's Office**.

136. I retained documents concerning those complaints.

137. I made those reports because I believed the circumstances surrounding my onboarding, investment documentation, inability to obtain my money, and attempted substitution of stock warranted regulatory or governmental review.

138. I am not offering a legal conclusion in this declaration regarding whether any particular person violated a criminal or securities law.

139. Rather, I reported the facts and documentation available to me so that the appropriate authorities could evaluate them.

## XV. My Retirement Savings

140. The money I invested with Broadstreet represents essentially my entire retirement savings.

141. I accumulated those savings over approximately **thirty years**.

142. These were not funds I considered disposable or speculative capital.

143. They represented the money I expected to rely upon for retirement.

144. I moved those funds into Broadstreet because I was told the investments were safer than the stock market.

145. I was told that my principal would be protected.

146. I was told that I would receive fixed returns and regular interest distributions.

147. I was told that my funds could be redeemed quickly when needed.

148. Those representations gave me confidence that Broadstreet was appropriate for retirement money.

**XVI. Effect on My Retirement**

149. I am approximately **60 years old**.

150. I expected to have access to the retirement savings I accumulated over my working life.

151. Instead, I have been unable to access those funds.

152. I have received no return of my approximately [redacted] principal.

153. I have received no cash-redemption proceeds.

154. Because I no longer have access to the retirement funds that I expected would support me, I have been forced to continue working.

155. I do not know when or whether Broadstreet will return the money.

156. This has materially changed my retirement planning.

157. It has created significant financial uncertainty and hardship.

**XVII. Emotional and Health Impact**

159. The inability to access essentially my entire retirement savings has caused me substantial emotional distress.

160. I have experienced significant stress and anxiety concerning whether I will recover the money I accumulated over approximately thirty years.

161. The situation has also caused adverse effects on my health and well-being.

162. The uncertainty is particularly difficult because I had specifically attempted to place my retirement savings into what was represented to me as a safer and more predictable alternative to the stock market.

163. Instead, I now face the possibility that Broadstreet will attempt to force me to accept restricted stock whose future value and liquidity are uncertain.

164. This is materially different from the retirement investment I understood I was purchasing.

**XVIII. My Reliance on Akhil Morada and Broadstreet**

165. I relied upon Mr. Morada's representations in deciding whether to move my retirement assets into Broadstreet.

166. I relied upon his guidance concerning the Directed IRA process.

167. I relied upon his representations that Broadstreet's investments were appropriate for retirement savings.

168. I relied upon his representation that my principal would be protected.

169. I relied upon his representations that I would receive fixed returns and regular interest distributions.

170. I relied upon his representation that I could access my money within approximately three to four days if needed.

171. I relied upon Broadstreet and Mr. Morada to prepare my investment documents accurately.

172. I did not know that the accredited-investor criteria would be pre-selected before the relevant documents were presented to me.

173. I did not knowingly provide false accredited-investor information to Broadstreet.

174. I did not personally select the accredited-investor criteria reflected in the documents described above.

175. Had I been required to review and personally provide the relevant accredited-investor information before wiring my funds, the onboarding process would have been materially different from the one I experienced.

176. Had I been told that my retirement savings could become unavailable for an extended period or could be involuntarily converted into restricted stock, I would have made a different investment decision.

177. I make this declaration based upon my personal knowledge, my communications with Mr. Morada and Broadstreet representatives, my review of the Client Information Sheet, Subscription Agreements, Investor Questionnaires, wire records, WhatsApp communications, and other records in my possession.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13 2026, in Guilford County, State of North Carolina

[signature]

Nimish Patel