# EXHIBIT "S"

# DECLARATION OF NIKHIL PATEL

I, **Nikhil Patel**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon information communicated to me or documents or investor communications I received or reviewed. Nikhil Patel has managed and communicated with Broadstreet concerning the investments held for or on behalf of Nipuna Patel and therefore has primary personal knowledge of the communications and events described below.

## I. Background and Investment Objectives

1. I am 64 years old and a retired physician. I am married to Nipuna Patel, and she is 65 years old and a retired medical office manager.

2. I invested a substantial portion of our personal retirement savings with Broad Street Global Fund, which I refer to in this declaration as "Broadstreet" or "BSGF."

3. I was introduced to Broadstreet by **Akhil Morada**.

4. Mr. Morada introduced Broadstreet to me, recommended various Broadstreet investments, communicated with me concerning those investments, and served as my primary point of contact throughout my investment relationship with Broadstreet.

5. Before making my initial investment, I specifically informed Mr. Morada that we were retired and were seeking a stable and dependable source of retirement income.

6. I told him that the money I was considering investing represented our hard-earned retirement savings.

7. I explained that preservation of principal, dependable income, and access to our funds were important to us.

8. I also made clear that we were not interested in investments involving substantial speculation, significant market volatility, or an unreasonable risk of losing our principal.

9. Mr. Morada represented that Broadstreet's investments were appropriate for our stated objectives.

10. He repeatedly reassured me that Broadstreet's investments were designed to provide stable income and were suitable for retired investors who did not want the fluctuations associated with the public stock market.

11. I relied upon these representations in deciding to invest with Broadstreet and, later, in deciding to maintain and expand our investments.

**II. Representations Concerning Infrastructure and Real Estate Investments**

12. Mr. Morada recommended that I invest in Broadstreet's infrastructure and real estate-related investments.

13. He represented that these investments generated annual returns of approximately 14% to 16%.

14. Mr. Morada repeatedly compared Broadstreet's infrastructure investments favorably to publicly traded stocks.

15. He represented that Broadstreet's investments could provide substantial and steady returns without the fluctuations commonly associated with the stock market.

16. He described the investments as being supported by tangible assets, including real estate, land, storage facilities, infrastructure projects, and other income-producing properties.

17. Mr. Morada further represented that Broadstreet had secured long-term contracts with major homebuilders, including D.R. Horton, Lennar, Heritage, and others. He explained that these contracts provided Broadstreet with a stable and predictable source of business and income,

reinforcing his assurances that the investments were safe, asset-backed, and appropriate for someone seeking dependable retirement income rather than speculative investments.

18. Based upon these representations, I made my initial investment in Broadstreet.

19. After I invested, Mr. Morada frequently contacted me and encouraged me to invest additional funds in other Broadstreet offerings.

20. I repeatedly reminded him that I was retired, that my financial resources were limited, and that I could not afford to place additional retirement savings into speculative investments.

21. Despite these statements, he continued sending me information concerning additional Broadstreet investment opportunities and encouraging me to invest additional money.

**Public Storage Investment**

22. One additional investment recommended by Mr. Morada involved public storage properties.

23. Mr. Morada represented that the public storage investment would generate an annual return of approximately 10%.

24. He further represented that investors would receive additional profit participation when the storage properties or buildings were eventually sold.

25. I understood from his representations that the investment would provide both regular income and the possibility of additional appreciation or profit upon sale.

**Land-Banking Investment**

26. Mr. Morada also recommended a land-banking investment.

27. He represented that the land was located near a residential housing development.

28. He stated that the value of the land was expected to increase as the surrounding area was developed.

29. He further represented that investors would receive substantial profits when the land was eventually sold.

**Tennessee Infrastructure Fund**

30. Mr. Morada later recommended the Tennessee Infrastructure Fund.

31. He represented that Broadstreet had acquired valuable properties and infrastructure-related assets in Tennessee.

32. Mr. Morada told me that I would receive a 14.6% annual return from the Tennessee Infrastructure Fund.

33. Mr. Morada further represented that if the properties were not converted into a Real Estate Investment Trust ("REIT") shares within one year, I would receive a guaranteed 14.6% annual return together with the full return of my invested principal. I relied upon these representations when making my investment. I did receive 14.6% annual distributions. More than one year later, however, the properties had not been converted into a REIT as represented, and my principal investment was not returned.

34. In discussing these offerings, Mr. Morada consistently portrayed Broadstreet as owning or controlling valuable real estate and infrastructure assets.

**III. My Attempts to Verify the Underlying Properties and Operations**

34. Throughout my investment relationship with Broadstreet, I repeatedly asked Mr. Morada for information identifying the actual properties, facilities, and business operations underlying the investments he was recommending.

35. I asked questions concerning the location, and operation of the assets, particularly Tennessee Land Fund.

36. When I asked Mr. Morada for addresses, he generally sent me photographs.

37. I had no reliable means of determining whether those photographs actually depicted properties owned, controlled, or operated by Broadstreet.

38. Whenever I raised these concerns, Mr. Morada reassured me that Broadstreet owned substantial and valuable assets and that I should not worry.

39. I repeatedly reminded him that I was retired and was not seeking speculative investments.

40. Each time, he reassured me that Broadstreet's investments were appropriate for someone in my position and were intended to provide dependable retirement income.

## IV. Statements Concerning the SEC Enforcement Action

41. During my investment relationship with Broadstreet, I became aware of an enforcement action by the United States Securities and Exchange Commission involving Broadstreet and related persons or entities.

42. I raised concerns with Mr. Morada concerning the allegations and the possible effect of the SEC action on Broadstreet and my investments.

43. Mr. Morada told me that the SEC’s allegations were false, fraudulent, or otherwise without merit.

44. He represented to me that Broadstreet had effectively defeated or prevailed against the SEC.

45. He further represented that the judge had closed or dismissed the case against Broadstreet.

46. He told me that investors had no reason to worry and that the SEC action did not present a legitimate threat to Broadstreet or its investors.

47. I relied upon these statements when evaluating the safety of my investments and deciding whether to continue trusting Broadstreet.

48. Had I understood that the SEC action remained pending, unresolved, or materially threatening to Broadstreet's operations or financial condition, I would have evaluated my investments differently.

49. Throughout this period, Broadstreet representatives consistently portrayed the company as financially successful and described the SEC as unfairly harassing the business.

50. Those repeated assurances caused me to believe that Broadstreet remained financially strong and capable of honoring its obligations to investors.

## V. Representations Made Before the Redemption Election

51. Prior to the formal redemption election process, **Joe Baldassarra** participated in calls with groups of Broadstreet investors.

52. During those discussions, Mr. Baldassarra represented that investors who elected cash redemption would receive the cash value of their equity balances.

53. He personally assured investors that Broadstreet would make sure they received their money.

54. I understood his statements as an assurance that investors choosing cash would be paid in cash.

55. In or about November 2025, Broadstreet offered investors two redemption options.

56. The first option was identified as "Choice A" and was presented as a cash redemption.

57. The second option was identified as “Choice B” and was presented as stock.

58. I understood Choice A and Choice B to be materially different elections.

59. Choice A was represented as payment of an investor’s equity balance in cash.

60. Choice B was represented as receipt of shares in a proposed public company, including a company referred to as “SOUL,” with the shares described as having a value of approximately three times the investor’s equity balance.

61. I specifically informed Mr. Morada that I wanted Choice A because I needed my retirement investment returned in cash. Mr. Morada urged me instead to select Choice B.

62. I clearly told him that I did not want shares in SOUL or any other stock-based consideration.

63. Mr. Morada assured me that if I selected Choice A, Broadstreet would return my equity balance in cash within approximately 180 days.

64. He told me not to worry and said that my cash redemption would be paid within the promised period.

65. He also explained that investors choosing Choice B would receive stock with a stated or projected value of approximately three times their equity balances.

66. I made clear that I did not want stock, regardless of its projected valuation.

67. I wanted cash because I was retired and required liquidity, certainty, and access to my retirement savings.

68. In reliance upon the representations made by Mr. Morada, Mr. Baldassarra, **David Feingold**, and Broadstreet’s investor communications, I elected **Choice A Cash Redemption in November 2025**.

**VI. Continued Efforts to Encourage Additional Investments**

69. Even after I made clear that I wanted to redeem my investment for cash, Mr. Morada continued encouraging me to invest additional money.

70. He promoted anticipated tax benefits of additional investments, including significant negative K-1 allocations.

71. He also promoted the opportunity to receive stock supposedly worth approximately three times the amount invested.

72. I told him that I was retired, did not have additional income to offset with tax losses, and did not want to invest additional money.

73. I told him that I was satisfied with the steady returns I had expected from my existing investments and did not want to assume additional risk.

74. I declined to make additional investments because I was not interested in speculative investments or uncertain stock-based compensation.

### VII. Alternative Arrangement Proposed by Joe Baldassarra

75. Around the time of the redemption election, Mr. Baldassarra proposed an alternative arrangement to me.

76. He suggested that I could receive part of my investment through a new Innovative Fund or Innovative Family Fund, part in cash, and possibly part in stock.

77. He stated that he would execute a side letter reflecting the terms of the proposed arrangement.

78. However, he also insisted that I would need to formally elect Choice B.

79. Joseph Baldassarra sent me two side letter agreements.

80. In one side letter Broadstreet promised to return some of my investment in cash and some of it in shares of SOUL if I agreed to select Option B in the Redemption Notice.

81. In the other side letter Broadstreet promised to return some of my investment in the form of an investment in Innovative Development Fund, LLC that would pay quarterly distributions of 14% annually and the rest in shares of SOUL if I agreed to select Option B in the Redemption Notice.

82. It was up to me to propose how much of my investment would be returned in cash/Innovative and how much would be returned as shares of SOUL.

83. In investigating Innovative, I called its office and found out that Innovative and Broadstreet have the same receptionist.

84. Mr. Baldassarra also sent me a brochure for Innovative Development Funds, LLC.

85. I did not understand why I would be required to choose the stock option if I was supposedly going to receive a combination of cash and another investment rather than the stock distribution described under Choice B.

86. Ultimately, I decided against entering into a side letter agreement with Broadstreet.

87. I maintained my election of Choice A Cash Redemption.

88. Based upon information communicated to me, I understand that certain other investors may also have been offered individualized arrangements involving combinations of partial cash, partial stock, reinvestment in the Innovative Fund or Innovative Family Fund, or other consideration.

89. I do not have complete independent documentation identifying every investor who received such an offer or the precise terms offered to each investor.

90. Based upon the proposal made directly to me, however, I understood Broadstreet to be encouraging at least some investors who wanted cash to formally select Choice B.

91. In my view, this could have had the effect of reducing the number of investors who appeared in Broadstreet's records as having elected Choice A.

92. It also could have made investors who genuinely wanted cash appear to constitute a smaller group.

93. Broadstreet later relied upon the assertion that relatively few investors selected cash as part of its explanation for refusing to honor the cash elections.

94. Based upon my own experience with the alternative proposal, I believe the reported number of Choice A investors may have been affected by individualized arrangements offered to investors who otherwise wanted cash.

**VIII. Statements Made During Investor Presentations**

95. During a Zoom presentation attended by Broadstreet investors, Mr. Feingold discussed the redemption process and the proposed public-company or SPAC transaction.

96. Mr. Feingold repeatedly represented that investors selecting Choice A would receive cash.

97. He represented that investors selecting Choice B would receive stock valued at approximately three times their balances.

98. He emphasized that investors should consult with their attorneys and certified public accountants before making their elections.

99. His statements reinforced my understanding that Choice A and Choice B were separate and distinct options.

100. I understood that an investor selecting Choice A would receive cash, whereas an investor selecting Choice B would assume the restrictions and market risks associated with stock.

101. During the presentation, Mr. Feingold also discussed the allocation of Broadstreet assets in connection with the proposed transaction.

102. He represented that approximately 30% of Broadstreet's assets, reportedly valued at approximately $250 million, would be contributed to the new SPAC or public company.

103. He further represented that approximately 70% of Broadstreet's remaining assets would remain with Broadstreet or under the control of Broadstreet and its principals.

104. Those remaining assets were described as including land, real estate, infrastructure, and future development projects.

105. Mr. Feingold also stated that he expected to become the largest shareholder of the new public company.

106. I recall that he discussed a very substantial personal shareholding, including approximately 75 million shares attributed to him in information communicated to investors.

107. On another occasion, Mr. Morada told me that, if the transaction proceeded successfully, he expected his personal net worth to exceed approximately $200 million.

108. He stated that he intended to continue working with Mr. Feingold because he wanted to become a billionaire.

109. These statements contributed to my understanding that Broadstreet's principals and representatives expected to receive substantial personal financial benefits from the proposed transaction.

110. At the same time, Broadstreet representatives continued portraying the company as financially strong and minimizing the significance of the SEC enforcement action.

111. In fact, in a text message sent June 27, 2025 Akhil Morada wrote "Judge has officially closed case as SEC is in process of settling this. In a few weeks all this will be behind us."

**IX. My Choice A Election and the Following 180-Day Period**

112. In November 2025, I formally elected Choice A Cash Redemption.

113. I made that election because I needed my investment returned in cash and did not want speculative or restricted stock.

114. I relied upon the repeated representations that Choice A investors would receive their equity balances in cash within approximately 180 days.

115. During the following six months, Broadstreet continued issuing newsletters and investor updates.

116. Those communications stated or suggested that Broadstreet was working on asset sales, liquidations, transactions, and other steps intended to provide value or return money to investors.

117. I relied upon those communications and continued expecting Broadstreet to honor my Choice A election.

118. I understood that the approximately 180-day period would allow Broadstreet sufficient time to liquidate assets or otherwise obtain the funds necessary to pay investors who had elected cash.

119. Broadstreet did not inform me when I made my election that cash might not be available when the 180-day period ended.

120. Broadstreet did not disclose to me that it might later disregard my election and compel me to accept restricted stock.

121. Had I known that Broadstreet did not intend, or might be unable, to honor Choice A, I would have made different decisions concerning my investments and retirement planning.

122. Broadstreet has also failed to pay the expected returns on my infrastructure investments since approximately November 2025.

123. Broadstreet has failed to pay the expected returns on my cryptocurrency investments since approximately February 2025.

124. Those missed payments further reduced the income available to me from investments that had been represented as providing steady retirement income.

**X. Broadstreet's Refusal to Honor My Cash Election**

125. At or near the end of the approximately 180-day period, Broadstreet announced that it would no longer honor the cash-redemption elections made by Choice A investors.

126. Instead, BSGF stated that investors would receive restricted stock as an in-kind distribution.

127. This announcement was inconsistent with the representations made to me before and during the election process.

128. I immediately contacted Mr. Baldassarra and reminded him that Broadstreet had promised to pay my equity balance in cash.

129. Mr. Baldassarra told me that Broadstreet no longer had sufficient cash to satisfy the cash-redemption requests.

130. He also stated, in substance, that Broadstreet no longer had assets available to satisfy those requests.

131. I reminded him that Broadstreet had previously represented that approximately 70% of its assets would remain outside the SPAC or public-company transaction.

132. I asked why those remaining assets could not be sold, refinanced, or otherwise used to satisfy investors who had elected cash.

133. Mr. Baldassarra responded that Broadstreet no longer had those assets available.

134. His response was inconsistent with my understanding of the earlier representations that substantial assets would remain with Broadstreet.

135. I also contacted Mr. Morada and again requested payment of my cash redemption.

136. Mr. Morada did not provide me with a definite payment date, payment plan, or reliable timeline for receiving cash.

137. Instead, he repeatedly encouraged me to accept the stock.

138. He represented that the stock would be worth approximately three times my investment.

139. He also stated that it could eventually increase to four, five, or even ten times the value of my investment.

140. I repeatedly told him that I did not want speculative stock.

141. I explained that projected future stock values did not meet my need for cash, stability, or retirement income.

142. I told him that I wanted the cash redemption Broadstreet had promised and that I had formally elected.

143. I never agreed to substitute restricted stock for my Choice A cash redemption.

144. I have not consented to accept restricted stock as full satisfaction of Broadstreet's obligations to me.

## XI. Broadstreet's Explanation for Distributing Stock Instead of Cash

145. Broadstreet's newsletters and investor communications stated that management did not want to sell valuable real estate or other assets at discounted prices.

146. One example discussed in Broadstreet communications involved land allegedly valued at approximately $240 million that might be sold for approximately $120 million.

147. Broadstreet cited the risk of selling assets below their asserted values as a reason for distributing stock instead of cash.

148. I understand that the market value of real estate and other assets can vary and that selling assets quickly may result in lower sale prices.

149. However, I elected Choice A based upon the representation that Broadstreet would pay my equity balance in cash within approximately 180 days.

150. I was not informed when I made my election that Broadstreet would retain discretion to disregard that election if management later determined that asset prices were unfavorable.

151. If Broadstreet still possessed substantial real estate, land, or infrastructure assets, I believed those assets could be sold over a reasonable period, refinanced, or otherwise used to satisfy investors who elected cash.

152. I did not agree that Broadstreet could protect its principals' preferred valuations or future business opportunities by compelling retired investors to accept restricted stock.

153. In my view, the financial consequences of Broadstreet's decision not to liquidate assets should not be imposed entirely upon investors who specifically elected cash.

**XII. Information Concerning Shares and Allocations**

154. I have reviewed or received information from Broadstreet concerning possible stock allocations to Mr. Feingold and other affiliated persons.

155. Based upon information attributed to Mr. Feingold and reports concerning the proposed transaction, I understand that Mr. Feingold may receive approximately 75 million shares.

156. At a stated value of approximately $10 per share, 75 million shares would have a stated value of approximately $750 million.

157. Broadstreet investor communications further indicated that Mr. Feingold anticipated holding a substantial number of shares and becoming the largest shareholder of the public company.

158. I also received or reviewed information indicating that Mr. Feingold's business partners or affiliated persons may receive stock allocations.

159. Based upon information available to me, I understand that the aggregate stated value of stock or other benefits allocated to Mr. Feingold and related parties could be extremely substantial and potentially approach approximately $1.5 billion.

160. I cannot independently verify that aggregate figure because I do not possess complete, unredacted documentation concerning all allocations.

161. I further understand, based on information provided by Broad Street, that approximately 21 infrastructure projects, carrying debt of up to 80%, were proposed to be transferred to a public company referred to as SOUL.

162. Investors have also been told that the company or stock distributed to investors may have a future valuation ranging from approximately $487 million to $8 billion.

163. I understand that these figures are projections and are not guaranteed or immediately realizable values.

164. A projected company valuation does not establish that an individual investor can sell restricted shares at the projected price.

165. These projected valuations do not provide investors with the same certainty, liquidity, or immediately realizable value as cash.

**XIII. Roles, Compensation, and Continued Asset Management**

166. Based upon information communicated to investors, I understand that Mr. Feingold may receive commissions, fees, shares, or other compensation in connection with transactions involving SOUL or related entities.

167. I also understand from information communicated to investors that Mr. Feingold intended to continue participating in the management of land and infrastructure assets associated with the public company.

168. At the same time, I understood from Broadstreet's representations that approximately 70% of Broadstreet's assets would remain outside the public-company transaction.

169. I understood that those assets could remain under the management or control of Broadstreet, its principals, or related entities.

170. Based upon information available to me, I am not aware of a meaningful noncompetition restriction that would prevent Mr. Feingold from continuing to manage, control, develop, or financially benefit from retained assets.

171. It therefore appeared to me that Mr. Feingold and other Broadstreet principals could potentially receive benefits from both the public-company transaction and assets retained outside that transaction.

172. I understand that Broadstreet principals may receive compensation or economic benefits from multiple sources, including stock allocations, management roles, commissions, fees, and interests in retained assets.

173. Meanwhile, investors such as me who expressly elected cash have been told that we must accept restricted stock instead.

174. In my view, it is fundamentally unfair for Broadstreet's principals and affiliated persons to receive substantial personal or financial benefits while investors are denied the cash redemptions they were promised.

**XIV. Information Concerning Broadstreet's Remaining Assets**

175. I have received or reviewed information suggesting that Broadstreet may continue to control substantial assets.

176. I understand that the stated value of certain remaining assets may possibly be approximately $750 million, although I do not have complete sufficient information to independently verify that figure.

177. I also understand that certain assets may have been assigned, transferred, contributed, or promoted at substantial stated valuations.

178. Based upon information provided or made available to investors, it appears that commissions, fees, stock, or other compensation may have been paid or allocated in connection with some of those transactions.

179. Broadstreet has stated that it does not want to sell assets at reduced prices because doing so would result in a loss, while proposing an in-kind distribution of restricted stock to investors.

180. While Broadstreet has presented that position as a justification for withholding cash from investors, Broadstreet's principals and affiliated persons appear, based upon information communicated to investors, to be receiving substantial benefits associated with assets purchased or developed using investor funds.

181. I believe Broadstreet should provide a full and transparent accounting of the assets it previously owned, the assets transferred into the public-company transaction, the assets retained outside the transaction, the consideration received, and the compensation or stock allocated to its principals and related parties.

**XV. Nature of the Restricted Stock Consideration**

182. Cash and restricted stock are not equivalent.

183. Cash is liquid, immediately usable, and has a readily determinable value.

184. Restricted stock is subject to transfer limitations, holding periods, market risk, valuation uncertainty, and other restrictions.

185. Restricted stock may not be immediately saleable.

186. Even after applicable restrictions expire, there may not be a sufficient trading market to permit an investor to sell the shares at their stated or projected value.

187. The value of the stock may decline substantially before an investor is legally or practically able to sell it.

188. A stated valuation of $10 per share, or a projected multiple of three to ten times an investor's equity, does not guarantee that the shares can actually be sold for that amount.

189. I did not agree to assume those risks.

190. I did not elect to receive restricted stock.

191. I elected **Choice A Cash Redemption**.

192. As a retired investor, restricted stock does not provide the liquidity, dependability, or financial security that I required and communicated to Broadstreet before investing.

**XVI. My Personal and Family Circumstances**

193. Throughout my discussions with Mr. Morada and Mr. Baldassarra, I repeatedly informed them that I am retired and disabled.

194. I explained that my Broadstreet investments represented a substantial portion of my retirement savings.

195. I told them that I depended upon the income and return of principal from those investments for my financial security.

196. I also explained that I assist in caring for my grandson, who has a cancerous tumor and serious medical needs.

197. I informed them that the return of my retirement funds was important to my family's financial security and our ability to address significant family needs.

198. Despite knowing these circumstances, Broadstreet failed to honor my Choice A cash-redemption election.

199. Instead, I was informed that I would have to accept highly speculative, illiquid, restricted stock in place of the cash that had been promised.

200. The proposed stock distribution does not satisfy the retirement and family needs that I specifically communicated to Broadstreet.

**XVII. Reliance, Harm, and Effect on Me**

201. I relied upon repeated representations that Broadstreet's investments were stable, asset-backed, profitable, and appropriate for a retired investor.

202. I relied upon representations that Broadstreet owned or controlled valuable real estate, infrastructure, storage, land, and cryptocurrency-related operations.

203. I relied upon Mr. Morada's statements minimizing the SEC enforcement action and representing that Broadstreet had prevailed or that the case had been dismissed.

204. I relied upon representations made by Mr. Baldassarra, Mr. Morada, Mr. Feingold, and Broadstreet's written communications that Choice A investors would receive cash.

205. I specifically relied upon the representation that my equity balance would be paid in cash within approximately 180 days.

206. I would not have made the same investment decisions had I known that the underlying properties or operations could not be independently verified.

207. I would not have made the same investment decisions had I known that the SEC enforcement action remained unresolved or presented a material risk to Broadstreet.

208. Had I known that Broadstreet would not honor its representations concerning cash redemption, I would have taken different steps to protect my retirement savings and financial security.

209. Broadstreet's failure to pay the expected infrastructure returns since approximately November 2025 has deprived me of income I expected to receive.

210. Broadstreet's failure to pay the expected cryptocurrency returns since approximately February 2025 has also deprived me of income that had been represented as payable.

211. Broadstreet's refusal to honor my cash-redemption election has caused me substantial financial hardship, emotional distress, anxiety, and uncertainty concerning my retirement security.

212. This entire experience has been devastating to me.

213. At my age, after investing my hard-earned retirement savings based upon repeated assurances concerning stability, steady income, asset ownership, and cash-redemption rights, I now face the possibility of losing a substantial portion of my investment.

214. I believe that representations made to me concerning the nature and risk of the investments, the existence and ownership of the underlying assets, the security of my retirement funds, the status of the SEC action, Broadstreet's financial condition, and the availability of cash redemption were inconsistent with what subsequently occurred.

215. I feel deeply betrayed by the promises and assurances that were repeatedly made to me and later abandoned.

**XVIII. Requested Relief**

216. I continue to object to the substitution of restricted stock for my Choice A cash-redemption election.

217. I do not consent to receiving restricted shares or any other stock-based in-kind distribution as full satisfaction of the cash redemption I elected.

218. I request that Broadstreet honor my Choice A election and return my entire equity balance in cash.

219. I also request payment of all unpaid returns, interest, distributions, and other amounts determined to be due in connection with my infrastructure, cryptocurrency, and other Broadstreet investments.

220. If Broadstreet is unable or unwilling to satisfy my redemption in cash, I would be willing to consider an in-kind distribution consisting of actual tangible assets, such as real estate, land, or buildings, provided those assets are fairly valued, marketable, and equivalent in value to the total amount owed to me. My preference remains to receive cash as originally elected, but I would consider an in-kind distribution of actual tangible assets rather than restricted stock.

221. I further request a complete accounting of my investments, unpaid returns, redemption balance, asset allocations, proposed stock allocations, restrictions, fees, commissions, and all other consideration affecting the value of my investment.

222. I make this declaration based upon my personal knowledge, my communications with Broadstreet representatives, and the Broadstreet communications and information that I received or reviewed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2026, in Weakley County, State of Tennessee

Nikhil Ramesh Patel

**Nikhil Patel**