# EXHIBIT "U"

**DECLARATION OF DINESH THAKKER**

I, **DINESH THAKKER**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and that I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon information communicated to me or information I subsequently received or reviewed:

1) Akhil Morada, a representative of Broadstreet, introduced me to Broadstreet, recommended its investments, and served as my primary point of contact. Akhil told me that the investment in Broadstreet is secured and pays high interest approximately 14% to`16%. Initially he approached me to invest in Land infrastructure deal and on asking him how Broadstreet can afford to pay 14% to 16% interest, Akhil explained me that Broadstreet busy land that has not been zoned and get them at a lower price and then they would get it zoned and work with the developers to have homebuilders like D. R. Horton and Lennar, with whom they have already entered in such deals. At that time, it sounded good to me, as I was looking for a passive income model.

2) Based on Mr. Morada's representations, his assurance stating that he himself has invested substantial amount in the same deal, I invested [redacted] in a BSGF land and infrastructure investment.

3) After my initial investment, Mr. Morada continued to discuss additional BSGF opportunities with me, including public storage and other investments. He often described the opportunities as time sensitive. For a public storage investment, he stated that investors could receive approximately a 10% annual return together with additional proceeds when properties were sold. Regarding land-related investments, he stated that property values were expected to increase as surrounding areas were developed. I had other commitments and I communicated to Akhil that I will not be able to invest. Akhil did not stop calling and texted me stating that I am missing

lifetime opportunity. I did not have funds, but Akhil kept calling to convince me to invest and every time he used to say that he has invested substantial amounts in every opportunity, and it will be a missed opportunity if I did not invest.

4) I later became aware of an SEC enforcement action involving Broadstreet and related persons or entities. I asked Mr. Morada about the action and its possible effect on my investments. He stated that the allegations lacked merit and represented that Broadstreet had prevailed or that the matter had been closed or dismissed. Broadstreet's communications also continued to describe the company as financially successful. I considered those statements when deciding to maintain my investments.

5) In November 2025, Broadstreet presented investors with two redemption options. Choice A was presented as a cash redemption, while Choice B was presented as stock in a proposed public company, including SOUL, with a stated or projected value of approximately three times an investor's equity balance.

6) During an investor Zoom meeting, David Feingold stated that investors selecting Choice A would receive cash and that investors selecting Choice B would receive stock. In a separate investor call, I specifically asked Joe Baldassarra whether Broadstreet had sufficient funds to honor Choice A cash redemptions. He indicated that it did and confirmed that investors selecting Choice A would receive the equity value of their investments in cash.

7) I specifically asked whether my [redacted] investment would be returned, and I was told that the cash redemption would be paid within approximately 180 days. Mr. Morada also stated that if I selected Choice A, Broadstreet would return my equity balance in cash within that period which is [redacted]. Although he encouraged me to select Choice B, I made clear that I wanted cash and did not want stock. Based on the representations made by Mr. Morada, Mr.

Baldassarra, Mr. Feingold, and Broadstreet's written communications, I formally elected Choice A Cash Redemption in November 2025.

8) Broadstreet subsequently represented that cash redemptions were expected to be paid by approximately May 27, 2026. That date passed without payment of my [redacted] redemption.

9) Around the time of the election, Mr. Baldassarra also discussed an alternative arrangement involving a combination of cash, investment in an Innovative Fund or Innovative Family Fund, and possibly stock. He stated that the arrangement could be documented through a side letter but that I would need to formally elect Choice B. Because Choice B had been presented as the stock option, I did not accept that proposal and maintained my Choice A election.

10) During investor presentations, Mr. Feingold also stated that approximately 30% of Broadstreet's assets, reportedly valued at approximately $250 million, would be contributed to the proposed public company or SPAC, while approximately 70% would remain with Broadstreet or its principals. Those remaining assets were described as including land, real estate, infrastructure, and future development projects. Mr. Feingold also stated that he expected to become the largest shareholder of the proposed public company, and I recall discussions concerning approximately 75 million shares attributed to him. It was all confusing.

11) Following my Choice A election, Broadstreet continued issuing newsletters and investor updates discussing asset sales, transactions, and efforts to provide value or return funds to investors. I continued to expect payment within the approximately 180-day period. At the time of my election, I was not informed that cash might later become unavailable or that Broadstreet might substitute restricted stock for my cash election.

12) I also stopped receiving expected returns on my infrastructure investments beginning approximately in November 2025.

13) At or near the end of the 180-day period, Broadstreet announced that Choice A investors would not receive cash as originally described and instead would receive restricted stock as an in-kind distribution. I contacted Mr. Baldassarra and asked about payment of my cash redemption. He stated that Broadstreet did not have sufficient cash to satisfy the redemption requests and, in substance, that assets were no longer available for that purpose.

14) Broadstreet later stated in investor communications that management did not want to sell real estate or other assets at discounted prices. One example referred to land described as having a value of approximately $240 million that might sell for approximately $120 million. When I selected Choice A, however, I understood that my equity balance would be paid in cash within approximately 180 days. I was not informed that the redemption could later be changed based on asset valuations or a decision not to liquidate assets.

15) I have also received information concerning possible stock allocations, asset transfers, fees, and compensation involving Mr. Feingold and other affiliated persons. Information attributed to Mr. Feingold referred to approximately 75 million shares, which at a stated value of $10 per share would represent approximately $750 million. I do not have complete documentation sufficient to independently verify all allocations, valuations, compensation arrangements, or asset transfers.

16) Cash and restricted stock are materially different forms of consideration. Cash is liquid and immediately usable. Restricted stock may be subject to transfer limitations, holding periods, market risk, and uncertain future value. A stated or projected share price does not

establish the amount an investor will ultimately be able to realize from restricted shares. I elected Choice A Cash Redemption and did not elect to receive restricted stock.

17) I made and maintained my investments based in part on representations concerning the stability of the investments, the existence and value of underlying assets, expected returns, the status of the SEC action, and the availability of cash redemption. The information available to me now differs from what I understood when making those decisions. I have been unable to independently verify a number of underlying assets, expected infrastructure returns have not been paid since approximately November 2025, and my Choice A cash redemption has not been paid.

18) I continue to request that Broadstreet honor my Choice A election by paying the full [redacted] cash redemption, together with any unpaid investment returns, interest, distributions, or other amounts determined to be due. If Broadstreet is unable to satisfy the redemption in cash, I would consider an in-kind distribution consisting of identifiable tangible assets, such as real estate, land, or buildings, provided they are fairly valued, marketable, and equivalent in value to the amount owed. I also request a complete accounting of my investments, unpaid returns, redemption balance, relevant asset ownership and transfers, stock allocations, restrictions, fees, commissions, compensation, and related consideration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13, 2026, in Warren County, State of Ohio.

[signature]

Dinesh Thakker