# EXHIBIT "V"

# DECLARATION OF JIT PATEL AND KARISHMA GUPTA

We, **Jit Patel** and **Karishma Gupta**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that we are over 18 years of age, and that the matters stated herein are based upon our personal knowledge, except where we expressly state that a matter is based upon communications, documents, investor presentations, or other information provided to us:

## I. Background and Introduction to Broadstreet

1. We are married and are both physicians.

2. When we first learned about Broadstreet Global Fund, which we refer to in this declaration as “Broadstreet,” “BSG,” or “BSGF,” we were newlyweds and were still completing our medical residency training.

3. At that time, we were working extremely demanding schedules, often approximately 80 to 100 hours per week.

4. Our primary focus was completing our medical training and becoming the best physicians we could be.

5. At that point in our lives, our personal investing experience was relatively limited.

6. We had primarily invested in mutual funds and a small number of individual stocks through platforms such as Robinhood and Stash.

7. We learned about Broadstreet through mutual friends and family members who were already investing with the company.

8. Because people we knew and trusted were already involved with Broadstreet, we initially viewed the investment opportunity as credible.

9. We believed Broadstreet might provide an opportunity to diversify our investments and potentially earn better returns than we were receiving through our existing investment accounts.

10. During our four to six years of medical training, we worked very long hours while earning relatively modest resident salaries.

11. We hoped that prudent investing during those years would allow us to begin our married and professional lives on stronger financial footing once our medical training was complete.

12. Although we were happy to be building a life together, financial stress was an ongoing concern during our residency years.

**II. Our Relationship with Akhil Morada**

13. We were formally introduced to **Akhil Morada**, who became our principal point of contact at Broadstreet.

14. We had numerous communications with Mr. Morada by telephone and through WhatsApp.

15. Mr. Morada generally presented himself to us in a polite, confident, and professional manner.

16. One statement in particular stood out to us during the early stages of our relationship.

17. At the time, Karishma was not an accredited investor.

18. Jit may have qualified as an accredited investor, although we were not certain of his precise status at that time.

19. We raised the accreditation issue with Mr. Morada.

20. Mr. Morada told us, in substance, not to worry about being accredited and that Broadstreet or his company would “take care of it.”

21. We relied upon Broadstreet and Mr. Morada to ensure that whatever documentation, qualification, or investment procedures were required would be handled appropriately.

22. Because mutual friends and family members had already invested, and because Mr. Morada appeared to present the investments in an honest and financially sound manner, we decided to invest.

**III. Our Initial Real Estate Investments**

23. Broadstreet’s real estate investment model was particularly persuasive to us.

24. We understood that the investments were associated with tangible real estate assets rather than highly speculative securities.

25. This gave us a sense of security.

26. We also invested through self-directed or directed IRA accounts.

27. The involvement of a directed IRA company made the investment process appear more legitimate and structured to us.

28. We understood that we would retain control over our retirement assets through the directed IRA platform.

29. We therefore focused our initial investments primarily on Broadstreet’s real estate-related funds through those retirement accounts.

30. After investing, we continued working the demanding schedules associated with medical residency.

31. Because our work required so much of our time and attention, we relied upon Broadstreet and its representatives to manage the investments in accordance with the representations made to us.

32. We expected that our money would continue to grow while we focused on our patients and completing our medical training.

**IV. Reinvestment of Returns**

33. For a period of time, we observed returns being credited or generated through our Broadstreet investments.

34. Broadstreet recommended that those returns be reinvested with the company.

35. We agreed to reinvest the returns.

36. At the time, we believed that Mr. Morada and Broadstreet were acting in our financial interests and would appropriately advise us concerning the handling of our investments.

37. We understood the reinvestment recommendation as part of a strategy intended to increase the long-term value of our accounts.

38. The fact that our investments initially appeared to be producing returns increased our confidence in Broadstreet.

39. It also contributed to our willingness to consider additional Broadstreet investments after completing residency.

**V. Additional Investment Opportunities**

40. After we completed our training and became fully practicing physicians, Broadstreet began presenting us with additional investment opportunities.

41. Those opportunities included investments involving **storage units**.

42. They also included investments involving **land ownership or land-related projects**.

43. Broadstreet also offered us an **Alt-Coin or cryptocurrency-related investment**.

44. We invested in several of those additional funds.

45. Throughout this period, we were repeatedly told or given to understand that we could obtain our money back when needed.

46. The represented availability of our principal was important to our decisions.

47. We did not understand that we were committing all of our savings to investments that could later become indefinitely illiquid.

## VI. SEC Investigation and Our Growing Concerns

48. At a later point, we learned of an investigation or enforcement matter involving the United States Securities and Exchange Commission and Broadstreet or related persons or entities.

49. Learning about the SEC matter caused us to become more cautious.

50. We began reducing or stopping additional investments even though Broadstreet representatives continued asking us to invest more money.

51. We became increasingly concerned about the safety and status of our existing investments.

52. Around this same general period, the investment returns that we had previously expected began to stop.

53. From our perspective, the cessation of payments occurred abruptly.

54. In some cases, we did not receive the returns that we understood were required or expected under the investment arrangements.

## VII. Proposed Conversion of Investments Into Stock

55. We were subsequently informed that Broadstreet intended to combine or convert certain investments into stock-based companies that had not yet been created or completed.

56. We understood that the Alt-Coin investment was proposed to be transferred into or acquired by a company referred to as **Z Squared**.

57. We were later informed that many of our other Broadstreet investments would be associated with a company or transaction referred to as **Soul Power**, **SWB**, or a proposed SPAC transaction.

58. We understood that these stock-based companies or transactions were not yet fully formed, approved, or operational at the time they were first described to us.

59. When these stock conversions were initially discussed, we do not recall Broadstreet clearly emphasizing that the stock investors would receive could be severely restricted.

60. We were later informed that restrictions would apply to the stock.

61. Broadstreet representatives also stated that senior Broadstreet partners receiving stock would supposedly be subject to restrictions.

62. We were not provided with documentation that satisfied us that the principals would be subject to the same restrictions, terms, and practical limitations as ordinary investors.

**VIII. Questions Concerning Missing Interest Payments**

63. We repeatedly asked why investment returns or interest payments had stopped when the underlying operations were supposedly continuing.

64. Jit had numerous communications concerning these missed payments.

65. In response to his questions, he was at times told words to the effect of **"it is what it is."**

66. On other occasions, the delay or failure to pay returns was attributed to the SEC or to delays in obtaining approval for the proposed companies or transactions.

67. These explanations did not provide us with clarity concerning why contractual or anticipated payments from the existing investments were no longer being made.

68. We had invested based upon specific investment structures and anticipated returns.

69. We did not understand why the creation or approval of a future stock company should eliminate payments that had been associated with investments that were supposedly still operating.

**IX. Z Squared and the Former Alt-Coin Investment**

70. With respect to the Alt-Coin investment, we were told that it would be converted into stock associated with Z Squared.

71. To date, we have not received the stock that we were told would result from that conversion.

72. We also went for approximately **18 months without receiving interest payments** associated with that investment.

73. During this extended period, we were left without the expected income from the investment and without the replacement stock that had been described.

74. We repeatedly sought information concerning what was happening with the investment.

75. The continuing absence of both payments and stock caused us significant concern about the status and value of the money we had invested.

**X. Soul Power / SWB Redemption Process**

76. Broadstreet subsequently presented a separate process concerning our other investments that were proposed to be associated with Soul Power, SWB, or the SPAC transaction.

77. We were told that investors could choose between receiving their money back or accepting stock at a represented value of approximately three times their investment.

78. We were also informed that the stock would be subject to restrictions affecting when or how it could be sold.

79. Broadstreet provided us with a lengthy written agreement concerning these options.

80. The agreement expressly stated, as we understood it, that once an investor selected cash, the investor could not later select stock.

81. Likewise, once an investor selected stock, the investor could not later select cash.

82. We further understood that the election agreement was intended to be binding and to supersede prior agreements concerning the redemption process.

83. This reinforced our understanding that our choice between cash and stock was a serious and final election.

**XI. Pressure to Select Stock**

84. Despite the written election process, we were heavily encouraged to select the stock option.

85. Broadstreet representatives repeatedly promoted the stock as being substantially more valuable than a cash redemption.

86. We were also presented with an alternative arrangement under which we would formally select stock but receive a combination of different forms of consideration.

87. As that proposal was explained to us, a portion of our investment might be returned in cash.

88. Another portion could be moved into an entity referred to as **Innovative Funds**.

89. Another portion would remain in stock form.

90. Jit was told directly by Mr. Morada that Innovative Funds was owned and managed by Broadstreet or persons associated with Broadstreet.

91. We were confused as to why we would be required to select the stock option if the actual arrangement involved cash, another investment fund, and stock.

92. We did not want to enter into another complicated investment arrangement merely to recover a portion of money we were already requesting back.

## XII. Communications with Jon Pecorella

93. Jit was later contacted by **Jon Pecorella**, whom he understood to be an investment advisor associated with Innovative Funds.

94. Mr. Pecorella strongly encouraged Jit to move our family's money into the stock-related option.

95. The purpose and substance of the call, as Jit understood it, was to persuade us not to take cash.

96. Jit did not accept that recommendation.

97. We remained concerned about liquidity, the restrictions associated with the stock, and the changing structure of the investments.

98. We wanted our money returned rather than converted into another investment structure.

## XIII. Our Choice A Cash-Redemption Election

99. In or about November 2025, we ultimately selected **Option A Cash Redemption**.

100. Our decision was deliberate.

101. We wanted our investment funds returned in cash.

102. We did not select stock.

103. We did not agree to move the funds into Innovative Funds as a substitute for our cash-redemption election.

104. We understood that Broadstreet would have up to approximately **six months** to complete the cash redemption.

105. We relied upon that timeline when making our election and planning our finances.

106. That six-month period has passed.

107. Broadstreet has not returned the cash we elected to receive.

108. We have not been provided with a reliable payment date for the redemption.

**XIV. Our Family Circumstances During the Redemption Period**

109. The timing of these events was particularly significant for our family.

110. By late 2025, we had welcomed our son into the world.

111. When we selected Option A, we intended to use and preserve some of the redeemed funds for our son and our growing family.

112. During the redemption period, we were managing ordinary but significant family obligations, including our mortgage.

113. We also had automobile payments.

114. We had daycare and childcare expenses associated with our new son.

115. These obligations made liquidity and access to our savings particularly important.

116. We had spent many years working demanding medical schedules and trying to build financial stability.

117. We believed that the savings we had accumulated and invested would help provide security for our family.

118. Instead, we found ourselves continually worrying about whether we would recover our investments.

**XV. Emotional and Personal Impact**

119. The situation has been devastating to us.

120. We entrusted a substantial portion of our savings to Broadstreet based upon representations that the investments were legitimate, income-producing, and accessible.

121. We believed that we were making prudent investments that would help us establish financial security after years of demanding medical training.

122. Instead, we have spent substantial time and emotional energy trying to determine what happened to our investments and when we will recover our money.

123. The ongoing financial uncertainty has affected our personal lives.

124. It has created strain and stress concerning our family finances.

125. It has also negatively affected some of our personal relationships.

126. The situation has at times affected the joy and satisfaction we ordinarily receive from practicing medicine because we remain concerned about the possible loss of our savings.

127. We worked extraordinarily hard to build our careers and accumulate these funds.

128. Having to fight for access to money that we believe should already have been returned has taken a substantial emotional toll.

**XVI. Our Concerns Regarding Broadstreet's Conduct**

129. Based upon our experience, we are deeply concerned about the manner in which Broadstreet and its principals handled our investments.

130. We believe the representations made to us concerning investment returns, liquidity, reinvestment, stock conversions, and redemptions were inconsistent with what ultimately occurred.

131. We also question whether Broadstreet placed our interests ahead of the financial interests of its own principals and affiliated persons.

132. We were under the impression that Broadstreet and Mr. Morada were providing financial guidance that took our interests into account.

133. Our experience has caused us to believe that this trust was misplaced.

134. We have also received or reviewed information indicating that Broadstreet principals or affiliated persons may receive substantial fees, compensation, stock, or other economic benefits from the transactions involving investor assets.

135. We do not possess all of the records necessary to independently determine the amount or propriety of such compensation.

136. We therefore request a complete accounting of any compensation, fees, stock, or other benefits paid or allocated to Broadstreet principals in connection with assets funded by investors such as us.

137. We also have concerns regarding statements suggesting that Broadstreet principals may receive compensation calculated over periods that do not correspond to the actual time we invested.

138. We believe those matters should be fully disclosed and independently reviewed.

**XVII. Our Regret and Reliance**

139. We regret that we did not conduct additional independent review through a securities attorney, independent fiduciary advisor, or other qualified investment professional before investing substantial amounts with Broadstreet.

140. At the time, however, several factors gave us confidence.

141. Family members and colleagues were already investing.

142. Broadstreet's real estate model appeared understandable and legitimate.

143. The use of directed IRA custodial arrangements provided additional comfort.

144. Early investment returns appeared to confirm the representations made to us.

145. Mr. Morada repeatedly communicated confidence in the investments and encouraged reinvestment and additional contributions.

146. We relied upon these facts and representations.

147. Had we known that returns could simply stop, that investments could be converted into speculative or restricted stock, or that a formal cash-redemption election might not be honored, we would have made materially different investment decisions.

**XVIII. Effect on Our Son and Family Financial Security**

148. Our financial planning is no longer solely about ourselves.

149. We now have a young son whose future and financial security are extremely important to us.

150. We intended to use a portion of our returned investment funds to strengthen our family's financial security and provide for our son.

151. Broadstreet's refusal or failure to honor our cash-redemption election has interfered with those plans.

152. We feel that money we worked extremely hard to earn and save remains beyond our control.

153. From our perspective, Broadstreet's conduct threatens not only our accumulated savings but also funds that we intended to use for our child's future.

154. That aspect of this experience has been particularly painful to us.

**XIX. Concerns Regarding Potential Misconduct**

155. Based upon what we have experienced, we believe the circumstances warrant serious legal scrutiny.

156. We believe civil legal action is necessary to determine what happened to our money and to recover amounts owed to us.

157. We are also concerned that the conduct of Broadstreet's senior principals may warrant review by appropriate governmental, regulatory, or law-enforcement authorities.

158. We are not offering a legal conclusion regarding whether any particular person committed a crime.

159. Rather, based upon the representations made to us, the cessation of payments, the failure to deliver promised stock, the attempted conversion of our investments, and the failure to honor our cash-redemption election, we believe appropriate authorities should have access to the complete facts and records.

**XX. Reliance and Harm**

160. We relied upon Mr. Morada's representations when deciding to invest and reinvest with Broadstreet.

161. We relied upon representations that Broadstreet's real estate investments were legitimate and supported by real assets.

162. We relied upon the initial returns that Broadstreet paid.

163. We relied upon recommendations that those returns be reinvested.

164. We relied upon representations that our money remained accessible and could be returned when needed.

165. We relied upon Broadstreet's descriptions of the storage, land, Alt-Coin, and other investment opportunities.

166. We relied upon representations that changes or stock conversions would preserve or enhance the value of our investments.

167. We relied upon the written redemption agreement that presented cash and stock as separate and binding elections.

168. We relied upon Broadstreet's representation that our cash redemption would be completed within approximately six months.

169. Had we known that Broadstreet would not honor that election, we would have made different decisions concerning our investments and family finances.

170. Broadstreet's failure to return our investment funds has caused us financial harm, anxiety, stress, and substantial uncertainty.

171. We make this declaration based upon our personal knowledge, our communications with Mr. Morada and other Broadstreet representatives, our investment documents and directed IRA records, WhatsApp and other communications, Broadstreet investor materials, and our recollection of the events described above.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13, 2026, in Jefferson County, State of Alabama.

Jit Patel
_______________________________

**Jit Patel**

Executed on August 13, 2026, in Jefferson County, State of Alabama.

Karishma Gupta

**Karishma Gupta**