# EXHIBIT "W"

# DECLARATION OF MANDAKINI PATEL

I, **MANDAKINI PATEL**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and that I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon information communicated to me or information I subsequently received or reviewed:

## I. Background and Investment

1. I am 69 years old and retired.

2. I was introduced to Broad Street Global Fund, which I refer to in this declaration as "Broadstreet" or "BSGF," through **Akhil Morada**.

3. Based upon representations made to me by Mr. Morada, I invested [redacted] in a Broadstreet land infrastructure investment.

4. The money I invested represented retirement savings that were important to my financial security.

5. As a retired investor, I was interested in obtaining a stable and dependable return rather than pursuing speculative or highly volatile investments.

6. After making my investment, I initially received the regular distributions and returns that had been represented to me.

7. I was satisfied with my investment because it provided the steady return I had expected and wanted as a retired individual.

## II. Repeated Efforts to Encourage Additional Investments

8. After my initial investment, Mr. Morada repeatedly contacted me by telephone, text message, and other communications encouraging me to invest additional money in various Broadstreet investment opportunities.

9. I clearly and repeatedly told Mr. Morada that I was retired, did not have additional funds available to invest, and could not afford to make further investments.

10. Despite my repeated statements that I did not wish to invest additional money, Mr. Morada continued sending me information concerning numerous Broadstreet investment opportunities.

11. Among the investments he promoted were investments that he represented would provide fixed returns while generating negative K-1 tax allocations.

12. I specifically informed Mr. Morada that I had no taxable income that would benefit from negative K-1 losses.

13. I told him that I had no interest in investments designed to generate negative K-1 tax benefits.

14. I also told him that I was completely satisfied with my existing investment and the steady returns I had been receiving.

15. I repeatedly communicated that I did not want to take additional financial risks with my retirement funds.

## III. Broadstreet's Redemption Election Process

16. In or about November 2025, Broadstreet initiated a redemption election process for investors.

17. I understood that Broadstreet was offering investors two materially different choices.

18. "Choice A" was presented to me as a **cash redemption**.

19. "Choice B" was presented as an option through which an investor would receive stock.

20. I informed Mr. Morada that I intended to elect **Choice A Cash Redemption**.

21. Rather than simply accepting my decision, Mr. Morada strongly encouraged me to select Choice B instead.

22. Mr. Morada repeatedly called and texted me urging me to choose the stock option.

23. During the same period, he also continued encouraging me to invest additional money and represented that I could receive additional stock together with negative K-1 tax benefits.

24. I repeatedly told Mr. Morada that I did not want additional investments.

25. I also told him that I did not want additional stock.

26. I again explained that I had no use for negative K-1 tax allocations.

27. I made clear to him that my objective was simple: **I wanted my money returned to me in cash.**

**IV. Representations Concerning Choice A and Choice B**

28. During our discussions concerning the redemption election, Mr. Morada explained the financial difference between Choice A and Choice B.

29. Mr. Morada told me that if I selected Choice A, I would receive my approximately [redacted] **equity balance in cash**.

30. He told me that if I selected Choice B, I would receive approximately [redacted] **worth of stock**.

31. I understood from these representations that Choice B was being promoted as providing stock with a stated or projected value of approximately three times my equity balance.

32. Despite those representations, I declined the stock option.

33. I did not want speculative or illiquid stock.

34. I did not want the uncertainty associated with whether the stock would eventually achieve the value being represented.

35. I wanted the return of my investment in cash.

36. I specifically rejected the opportunity to receive approximately [redacted] in purported stock value because cash and projected stock value did not meet the same financial needs for me.

37. Accordingly, in November 2025, I completed and submitted the required DocuSign redemption documents electing **Choice A Cash Redemption**.

38. I did not elect Choice B.

39. I did not agree to accept restricted stock instead of cash.

## V. Representations Made by Joseph Baldassarra

40. I also attended a meeting with **Joseph Baldassarra** during which Broadstreet's redemption process was discussed.

41. During that meeting, Mr. Baldassarra represented that investors who elected cash redemption would receive the equity value of their investments back in cash.

[redacted].

43. I was told that I would.

44. These representations reinforced my understanding that my Choice A election entitled me to receive my equity balance in cash.

45. At no time during that discussion was I informed that Broadstreet could later disregard my cash election and substitute restricted stock.

46. I relied upon the representations concerning the cash redemption in making and maintaining my Choice A election.

## VI. The Promised Redemption Date

47. Broadstreet subsequently represented that cash redemptions would be paid by approximately **May 27, 2026**.

48. I understood that date to represent when I could expect my Choice A cash redemption to be paid.

49. I therefore expected to receive approximately [redacted] in cash by that time.

50. May 27, 2026 passed without Broadstreet paying my cash redemption.

51. I did not receive the [redacted] that had been represented as payable to me.

52. I also did not receive a reliable replacement payment date for my cash redemption.

## VII. Broadstreet's Statements After Failing to Pay My Redemption

53. After I failed to receive my redemption proceeds, I contacted both Mr. Morada and Mr. Baldassarra.

54. I asked why I had not received the cash redemption that I had validly elected and had been assured I would receive.

55. I was informed that Broadstreet did not have the money available to pay the cash-redemption requests.

56. This was inconsistent with my prior understanding that Broadstreet had sufficient assets and resources to satisfy its obligations to investors.

57. I later received information indicating that Broadstreet intended to retain approximately 70% of its assets while contributing approximately 30% of its assets to a public company or "PUBCO" as part of a restructuring transaction.

58. I do not have complete independent records sufficient to verify the precise allocation or valuation of every Broadstreet asset.

59. However, based upon information communicated to investors, I understood that a substantial portion of Broadstreet's assets would remain outside the public-company transaction.

60. I expected that Broadstreet would use available or retained assets to satisfy valid cash-redemption requests from investors such as me who had elected Choice A.

61. I did not understand why Broadstreet could represent that substantial assets remained while simultaneously stating that it lacked the resources necessary to honor the cash elections that had previously been promised.

## VIII. Continued Pressure to Accept Stock

62. Even after I had clearly elected cash redemption, Mr. Morada continued encouraging me to accept the stock option.

63. He continued emphasizing that I could receive substantially more value through stock.

64. He also continued promoting negative K-1 tax benefits.

65. I again informed him that I wanted neither restricted stock nor negative K-1 allocations.

66. Negative K-1 allocations were not beneficial to me because I did not have taxable income that I needed to offset in the manner he described.

67. I also did not need or want a speculative stock investment.

68. I wanted the cash redemption I had elected.

69. I never changed my election from Choice A to Choice B.

70. I never authorized Broadstreet to replace my cash election with stock.

71. I never consented to receive restricted stock in full satisfaction of Broadstreet's obligation to pay my cash redemption.

## IX. Cash and Restricted Stock Are Not Equivalent to Me

72. Cash and restricted stock are materially different forms of consideration.

73. Cash is liquid and can be immediately used for living expenses, financial obligations, and other needs.

74. Restricted stock can be subject to holding periods, transfer restrictions, market risk, and uncertainty concerning its actual value.

75. Restricted stock may not be immediately saleable.

76. Even after restrictions expire, there is no guarantee that shares can be sold for the stated or projected value.

77. A representation that stock may be worth approximately three times my investment does not mean that I would actually be able to sell those shares for that amount.

78. The value of stock may increase or decrease substantially.

79. Those risks were precisely why I declined Choice B.

80. I am retired and wanted liquidity, certainty, and preservation of the funds I had invested.

81. Restricted stock does not provide me with the same financial security as the approximately [redacted] cash redemption I elected.

82. I did not agree to accept market risk in place of the cash Broadstreet represented it would return to me.

## X. My Personal and Family Circumstances

83. I am currently 69 years old.

84. My husband is currently 76 years old.

85. I suffer from diabetes.

86. My husband suffers from a severe bipolar, or manic-depressive, disorder for which he requires multiple psychiatric medications.

87. Given our age and health circumstances, financial stability and access to our retirement savings are particularly important to us.

88. We cannot reasonably afford to wait for years for speculative and highly restricted stock to potentially become valuable or liquid.

89. I invested my retirement savings with the expectation of receiving stable returns and preserving my financial security.

90. When Broadstreet later offered a cash-redemption process, I elected cash because that option was consistent with my needs as a retired investor.

91. I expected Broadstreet to honor that election.

92. I am grateful that I did not follow Mr. Morada's repeated recommendations that I place additional retirement funds into investments involving stock and negative K-1 allocations.

93. Those proposed negative K-1 allocations provided no meaningful benefit to me because I did not have taxable income that needed to be offset.

94. Had I invested additional retirement funds as repeatedly suggested, my financial exposure to Broadstreet would have been even greater.

## XI. Effect of Broadstreet's Failure to Honor My Election

95. Broadstreet's failure to honor my Choice A cash-redemption election has caused me severe emotional distress.

96. I have experienced substantial stress and anxiety concerning whether my retirement savings will be returned.

97. I have experienced insomnia and nightmares.

98. I have experienced a loss of appetite and weight loss.

99. I have also had difficulty concentrating on normal daily activities.

100. This experience has been extremely traumatic for me.

101. Instead of receiving the cash redemption I elected and was repeatedly assured I would receive, Broadstreet has attempted to substitute speculative, illiquid, and restricted stock in place of cash.

102. I never agreed to that substitution.

103. I never wanted stock.

104. My election has always been, and remains, **Choice A Cash Redemption**.

105. I relied upon Broadstreet's representations when I elected cash and when I expected approximately [redacted] to be returned to me by approximately May 27, 2026.

106. Had I known that Broadstreet would later refuse to honor that election, I would have evaluated my financial and retirement planning differently.

107. Broadstreet's failure to pay has created substantial uncertainty concerning my retirement security and my family's financial circumstances.

**XII. My Continuing Objection and Requested Relief**

108. I believe it is fundamentally unfair that investors who expressly elected cash redemption have not been paid while Broadstreet proposes to distribute restricted stock instead of the cash that was promised.

109. I also believe it is unfair for Broadstreet to state that cash cannot be paid while information communicated to investors suggests that substantial assets may remain with Broadstreet or its affiliated persons or entities.

110. I continue to object to the substitution of restricted stock for my Choice A election.

111. I do not consent to receiving restricted stock as full satisfaction of my approximately [redacted] cash-redemption balance.

111. I do not consent to receiving restricted stock as full satisfaction of my approximately [redacted] cash-redemption balance.

112. I request that Broadstreet honor the Choice A election that I validly submitted in November 2025.

113. I request payment of my entire cash-redemption balance, including the approximately [redacted] **equity balance represented to me as payable**, together with any additional returns, distributions, interest, or other amounts determined to be due to me.

114. I further request a complete and transparent accounting of my Broadstreet investment, including my equity balance, unpaid distributions or returns, redemption amount, the assets available to satisfy redemption requests, and any stock or other consideration Broadstreet proposes to distribute in place of cash.

115. My preference has always been and continues to be the return of my investment in cash.

116. I make this declaration based upon my personal knowledge, my direct communications with Mr. Morada and Mr. Baldassarra, the Broadstreet communications I received, and other information communicated to me concerning my investment and the redemption process.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2026, in Gwinnett County, State of Georgia.

MsPatel

Mandakini Patel