# EXHIBIT "AA"

# DECLARATION OF THEODORE "TED" CHESNER

I, **Theodore "Ted" Chesner**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and that I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon communications, documents, investor presentations, or other information provided to me:

## I. Introduction to Broadstreet and Initial Recommendation

1. I first learned about Broadstreet Global Fund, which I refer to in this declaration as "Broadstreet," "BSG," or "BSGF," through my financial adviser, **Jason Muscari of Empire Asset Management Company**.

2. Mr. Muscari recommended the BSG Fund to me as a high-return investment opportunity.

3. He explained that the investment itself would be made through another firm, Broadstreet Global Fund.

4. Mr. Muscari also told me that his contact at Broadstreet was a good friend of his, **Bernard Jasmin**.

5. Mr. Muscari reassured me that Broadstreet was a legitimate investment firm.

6. He further told me that members of his own family had invested with Broadstreet.

7. Those representations were important to me because Mr. Muscari was my financial adviser and I relied upon him to help identify legitimate investment opportunities.

8. His personal relationship with Mr. Jasmin, together with his statement that members of his own family had invested, gave me additional confidence in the opportunity.

## II. Communications with Bernard Jasmin

9. Within days of my conversation with Mr. Muscari, Mr. Jasmin contacted me directly.

10. On or about April 11, 2022, Mr. Jasmin sent me a text message inviting me to access Broadstreet's data room.

11. I understood that the purpose of the data room was to allow me to review information about the proposed investment and evaluate the opportunity.

12. Over approximately the next two weeks, I reviewed the materials provided by Broadstreet.

13. Those materials included PowerPoint presentations.

14. They also included projected investment returns.

15. I reviewed aerial images of the property associated with the proposed investment.

16. I also reviewed architectural renderings of the proposed hotel.

17. The materials made the project appear organized, well-developed, and legitimate.

## III. Representations Concerning the Daytona Beach Marriott Project

18. During this period, Mr. Jasmin explained that Broadstreet planned to build what was represented to me as the first high-end **AC Marriott hotel in Daytona Beach, Florida**.

19. Mr. Jasmin described the project in highly positive terms.

20. He represented that the investment was expected to generate approximately **40% annual returns** from revenue produced by the hotel.

21. I understood that those returns would begin once the hotel was completed and operational.

22. Mr. Jasmin represented that the hotel was expected to be completed by approximately **2025**.

23. Based upon these representations, I understood that I would begin receiving investment returns once the hotel opened and began generating revenue.

24. I also recall being told that hotel projects of this nature are often sold after approximately eight years.

25. I believe that representation may have been made by Mr. Muscari, Mr. Jasmin, or both.

26. I understood that after approximately eight years, if the hotel were sold in the ordinary course, investors could receive a substantial additional payout.

27. I further understood that the eventual payout upon sale could exceed my original investment amount.

28. The combination of anticipated operating returns and a substantial eventual payout upon sale was material to my decision to invest.

**IV. My [redacted] Investment**

29. Mr. Jasmin continued to describe the hotel project as a very attractive investment opportunity.

30. He consistently expressed confidence in the project and its anticipated performance.

31. Based upon the representations made to me by Mr. Muscari and Mr. Jasmin, and the materials I reviewed in Broadstreet's data room, I decided to invest.

32. Within approximately two weeks, I wire-transferred the minimum investment amount of [redacted]

33. I made that investment with the understanding that my money would be used in connection with the development of the AC Marriott hotel project in Daytona Beach.

34. I expected construction to proceed and the hotel to be completed around 2025.

35. I expected to begin receiving returns after the hotel became operational.

36. I further expected to participate economically in the eventual sale of the hotel.

**V. Failure of Construction to Begin as Expected**

37. More than four years have now passed since I made my investment.

38. To my knowledge, construction of the hotel has not begun.

39. The hotel was not completed by the approximately 2025 date that had been represented to me.

40. I have therefore not received the operating returns that I expected from an operating AC Marriott hotel.

41. Over time, I have received a series of different explanations from Broadstreet concerning why construction has not proceeded.

42. From my perspective, the explanations have shifted over time.

43. The repeated delays and changing explanations caused me increasing concern about the status of my investment.

44. I did not invest with the expectation that my [redacted] would remain tied up for years without construction beginning.

**VI. October 2025 Redemption Offer**

45. In or about October 2025, Mr. Jasmin called me to share the news that the company was selling some of their investments, and I would have the option of getting the 3x stock or the cash redemption that would be about the [redacted] plus interest.

46. However, he said he would strongly recommend taking the stock option.

47. Broadstreet informed investors that it was selling a portion of the company.

48. I understood that the sale included or affected the project in which I had invested.

49. Broadstreet subsequently presented investors with different redemption choices.

50. The terms offered to me changed multiple times.

51. Each change was less favorable to me than the version that preceded it.

## VII. First Redemption Offer

50. Under the first redemption structure, I was offered two choices.

51. **Redemption Choice A** was represented as a cash redemption.

52. Under that option, I understood that I would receive my original [redacted] **investment plus approximately a 6% return** for the time Broadstreet had held my funds.

53. **Redemption Choice B** was represented as receipt of stock.

54. I understood the stock under Choice B to have a stated or projected value of approximately **three times my original investment.**

55. I chose **Choice A Cash Redemption**.

56. My decision was deliberate.

57. I wanted the return of my original investment in cash rather than speculative stock.

## VIII. Second Redemption Offer

58. Broadstreet subsequently revised the redemption terms.

59. Under the revised terms, the previously represented additional approximately 6% return was removed.

60. I was then told that the cash-redemption option would provide only the return of my original [redacted] **principal**.

61. Broadstreet further represented that the cash redemption would be paid within approximately **180 days** after the election.

62. Although this revised offer was less favorable than the original cash-redemption offer, I again selected **Choice A**.

63. My preference remained to receive my original investment back in cash.

64. I did not want stock.

65. I relied upon the representation that Broadstreet would return my [redacted] within approximately 180 days.

**IX. Withdrawal of the Cash-Redemption Option**

66. Broadstreet later changed the redemption terms again.

67. Most recently, Broadstreet withdrew the cash-redemption option altogether.

68. I was then informed that I would instead receive stock valued by Broadstreet at approximately three times my original investment.

69. This was not the option I had selected.

70. I had repeatedly chosen cash.

71. I did not voluntarily change my election to stock.

72. I was also informed that I would need to provide my brokerage-account information by approximately **July 31, 2026** in order to receive the shares.

73. I understand that the proposed shares are subject to significant restrictions.

74. I further understand that the shares reportedly cannot be redeemed or freely sold for approximately **two years**, in addition to other restrictions that may apply.

**X. My Refusal to Provide Brokerage Information**

75. I have not provided my brokerage-account information.

76. I am uncomfortable doing so because the investment I originally purchased was an interest in a proposed Marriott hotel project.

77. I did not originally invest in restricted public-company stock.

78. The nature of what Broadstreet now proposes to give me is materially different from the investment I purchased.

79. I am also concerned because the terms of the proposed redemption have changed repeatedly.

80. I first selected cash plus approximately 6%.

81. I then selected return of my [redacted] principal in cash within approximately 180 days.

82. I am now being told there is no cash option at all.

83. This progression has caused me to lose confidence in the representations being made concerning the stock.

84. I am concerned that the stock may decline substantially in value or become worthless before I am permitted to sell it.

85. A stated value of three times my investment does not guarantee that I will actually be able to sell the stock for that amount.

86. I am not comfortable providing brokerage information merely to facilitate a transaction that I did not elect.

## XI. November 13, 2025 Investor Zoom Meeting

87. On or about November 13, 2025, Broadstreet conducted a Zoom meeting concerning the proposed sale.

88. Mr. Jasmin contacted me by text and encouraged me to attend.

89. **David Feingold** was one of the presenters during the meeting.

90. Mr. Feingold discussed the sale of Broadstreet or portions of its business.

91. He explained that the transaction was being undertaken for business reasons.

92. The transaction was presented as beneficial to investors.

93. I do not recall every statement made during the meeting.

94. I do recall Mr. Feingold discussing restrictions on when investors would be permitted to sell the stock they received.

95. As I understood his explanation, the restrictions were intended to keep investors' funds or shares in the new company for a period of time.

96. I further understood that this was intended to reduce selling pressure and help prevent the stock price from declining.

97. That explanation made clear to me that the shares would not be equivalent to cash.

98. Investors would not simply receive freely tradable stock that they could immediately sell.

## XII. Statements Concerning David Feingold's Personal Stock Position

99. During the same Zoom presentation, Mr. Feingold discussed the substantial stock position he expected to hold personally.

100. I do not recall the precise figure.

101. My recollection is that Mr. Feingold described his personal position as having a value exceeding approximately **$20 million**, although I cannot independently verify that amount.

102. His comments conveyed to me that he expected to maintain a very substantial financial interest in the new company.

103. Overall, the sale transaction and the proposed stock were presented during the meeting as a positive opportunity for investors.

104. Nevertheless, I continued to prefer the cash redemption I had elected.

## XIII. July 27, 2026 Investor Update Letter

105. On or about July 27, 2026, I received an **"Investor Update Letter"** from Broadstreet.

106. The letter discussed two proposed or completed exit transactions.

107. Broadstreet stated that it valued those transactions at a combined approximately **$3.6 billion**.

108. The letter contrasted that stated valuation with approximately **$1.2 billion in invested capital**.

109. Broadstreet characterized the comparison as approximately a **3x multiple on invested capital**.

110. The letter further stated, as I understood it, that the valuation had been determined at the **Manager's discretion**.

111. I understand this to mean that the stated valuation was not necessarily the same thing as a cash market price established through an unrestricted public trading market.

112. The letter also reiterated that investors would be paid or redeemed entirely in stock.

113. It stated that there would be no cash-redemption option.

114. This directly contradicted the cash options previously offered to me and the elections I had made.

## XIV. July 31 Brokerage Deadline and Language Concerning Investors

115. The July 27, 2026 letter also reiterated a deadline of approximately **July 31, 2026** for investors to provide brokerage-account information.

116. The letter further stated that Broadstreet would **"hold steadfast against the minority that seek to avoid their contractual obligations,"** or words to that effect.

117. I understood that language to be directed, at least in part, toward investors such as me who continued to seek the cash redemption previously offered.

118. I found that language concerning because I had not attempted to avoid my obligations.

119. I had simply selected one of the redemption choices Broadstreet itself had offered.

120. I selected cash when cash was expressly presented as an available election.

121. I did not understand that selecting cash would later cause Broadstreet to characterize me as a member of a minority seeking to avoid contractual obligations.

## XV. Material Changes From My Original Investment

122. The investment Broadstreet now proposes is materially different from the investment I made in 2022.

123. I invested [redacted] **in a proposed AC Marriott hotel development in Daytona Beach**.

124. I was told that the hotel was expected to be completed around 2025.

125. I was told that the project was expected to produce approximately 40% annual returns from hotel operations.

126. I understood that there could also be a substantial payout when the hotel was eventually sold.

127. Instead, more than four years later, construction has not begun to my knowledge.

128. I have not received hotel operating returns.

129. I have not received proceeds from a hotel sale.

130. Broadstreet then offered me cash redemption, which I selected.

131. It subsequently changed the terms of that redemption more than once.

132. Broadstreet now proposes to give me restricted stock in place of both the original hotel investment and the cash redemption I selected.

133. I never agreed when I invested that Broadstreet could make that type of unilateral substitution.

**XVI. Cash and Restricted Stock Are Not Equivalent**

134. Cash and restricted stock are materially different.

135. Cash has an immediately ascertainable value and can be used immediately.

136. Restricted stock may be subject to holding periods, transfer limitations, and market risk.

137. Restricted shares may decline in value before an investor is legally or practically able to sell them.

138. The existence of restrictions also prevents me from immediately realizing whatever stated value Broadstreet attributes to the shares.

139. A discretionary valuation of approximately three times my original investment does not guarantee that I can sell the stock for that amount.

140. Even if the company eventually becomes publicly traded, the market may value the stock differently from Broadstreet's current stated valuation.

141. I did not choose to accept those risks.

142. I chose cash.

**XVII. My Reliance on the Representations Made to Me**

143. I relied upon Mr. Muscari's recommendation when deciding to consider Broadstreet.

144. I relied upon his statement that Broadstreet was legitimate.

145. I relied upon his representation that his own family members had invested with the firm.

146. I relied upon his relationship with Mr. Jasmin.

147. I relied upon the documents and materials Broadstreet provided in the data room.

148. I relied upon the aerial images, architectural renderings, financial projections, and other materials depicting the proposed Marriott hotel project.

149. I relied upon the representations concerning approximately 40% annual returns.

150. I relied upon the represented approximately 2025 completion date.

151. I relied upon the representation that I could potentially receive a substantial additional payout when the hotel was eventually sold.

152. I later relied upon Broadstreet's express offer of a cash redemption.

153. I relied upon the revised representation that my [redacted] principal would be returned within approximately 180 days.

154. Had I known in 2022 that construction might not begin for more than four years, I would not have made the investment.

155. Had I known that the hotel project could later be replaced with restricted stock, I would not have made the investment.

156. Had I known that Broadstreet would offer me a cash redemption, accept my election, and later withdraw the option altogether, I would have never invested in the BSG Fund.

**XVIII. Harm and Continuing Concerns**

157. I have been deprived of the use of my [redacted] **principal** for more than four years.

158. I have not received the hotel-related returns that I expected based upon the representations made when I invested.

159. The project has not developed according to the timeline represented to me.

160. The repeated changes in Broadstreet's redemption terms have created substantial uncertainty concerning whether and how I will recover my investment.

161. I remain concerned about accepting restricted stock whose actual future market value is unknown.

162. I am particularly concerned that I could be forced to hold the stock for approximately two years while its value declines.

163. I do not believe a discretionary or projected valuation provides the same protection as receiving my principal in cash.

164. The circumstances have caused me to lose confidence in Broadstreet's handling of my investment.

## XIX. Requested Relief and Accounting

165. I continue to request that Broadstreet honor the cash-redemption election I previously made.

166. At a minimum, I request the return of my original [redacted] **principal in cash**.

167. I also request payment of any additional return, interest, or other amounts determined to be due under the redemption terms or my original investment agreements.

168. I request a complete accounting of my [redacted] investment in the Daytona Beach AC Marriott project.

169. I request documentation identifying how my funds were used from the date of my investment to the present.

170. I request documentation concerning the current status of the Daytona Beach property and proposed hotel.

171. I request documentation showing whether Broadstreet or any related entity currently owns or controls the property.

172. I request documentation concerning all expenditures, development costs, financing, loans, liens, transfers, or other transactions involving the property.

173. I request an explanation concerning why construction did not begin according to the timeline presented to me.

174. I request documentation concerning any proposed sale, contribution, transfer, or conversion of my hotel investment into another company or security.

175. I request a complete accounting of each redemption offer made to me and the basis for Broadstreet's subsequent changes to those offers.

176. I request documentation explaining why the original cash-redemption option included an approximately 6% return and why that additional amount was subsequently removed.

177. I request documentation explaining why the later cash-redemption election, payable within approximately 180 days, was not honored.

178. I request documentation supporting the current asserted three-times valuation of the stock proposed to be distributed to me.

179. I request documentation identifying who determined that valuation, the methodology used, and whether any independent third party provided a valuation or fairness opinion.

180. I request complete disclosure of all restrictions applicable to the proposed stock, including holding periods, lockups, resale limitations, and any other conditions affecting liquidity.

181. I request documentation concerning the interests, stock allocations, compensation, and other economic benefits that Broadstreet's principals, including Mr. Feingold, may receive in connection with the transaction.

182. I do not consent to Broadstreet treating restricted stock as full satisfaction of the cash redemption I elected.

183. I do not believe I should be compelled to provide brokerage information as a condition of receiving a form of consideration I did not choose.

184. My requested resolution remains straightforward: I want Broadstreet to honor the cash-redemption election that it offered and that I selected.

185. I make this declaration based upon my personal knowledge, my communications with Mr. Muscari and Mr. Jasmin, the Broadstreet materials and presentations I received or reviewed, the November 13, 2025 Zoom presentation, the July 27, 2026 Investor Update Letter, and other communications concerning my investment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13, 2026, in Monmouth County, State of NJ.

Theodore Chesner

**Theodore "Ted" Chesner**