# EXHIBIT "AC"

# DECLARATION OF KINJALKUMAR PATEL

I, **Kinjalkumar Patel**, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the foregoing is true and correct, that I am over 18 years of age, and I have personal knowledge of the matters stated herein, except where I expressly state that a matter is based upon information communicated to me or documents or investor communications I received or reviewed. Kinjalkumar Patel has managed and communicated with Broadstreet concerning the investments held for or on behalf of Bhumika Patel and therefore has primary personal knowledge of the communications and events described below.

## I. How we got involved

1) In approximately June 2022, I was introduced to Akhil Morada by a friend, who had himself come to know Mr. Morada through another friend.

2) From that introduction until now, Mr. Morada has been the only person at Broadstreet we have dealt with directly. He acted as our agent or broker. Every investment we made was brought to us by him, and every representation described below was made by him, unless I have specifically attributed it to someone else.

3) In 2022, my wife and I had modest income and assets, and we certainly did not qualify as an accredited investor. Mr. Morada was fully aware of my family's financial situation and told us that we could still invest in the BSG Fund even though we technically did not qualify as accredited investors.

## II. What we were told, by whom, and when

4) **Turtle Creek — June 2022.** Mr. Morada presented a homebuilding project in Turtle Creek. He told me houses would begin selling within about six months; that the whole project would run under twelve months with returns expected in eight to ten

months. I asked him directly, before investing, whether an investor could get out early if needed. He told me that in eight to ten months project will be complete and taking out money would not be a concern. He pressed me that the allocation was filling up and that I needed to decide and wire quickly. I wired [redacted] on June 29, 2022.

5) **Crypto/Altcoin Mining — from May 2023**. Before Turtle Creek had produced any meaningful return, Mr. Morada pitched a crypto altcoin mining fund promising a 28% annual return. I made the first investment of [redacted] on May 15, 2023. Over the following eighteen months he brought me back to this fund repeatedly. We ended up investing eleven separate positions across our two accounts.

6) **Broadstreet Tennessee — July 2024**. Mr. Morada presented an infrastructure deal in Tennessee, which we invested in under my wife's name. The representation was that we would double our money in about twelve months, and that if the doubling did not happen there was a minimum return of around 15%. We wired [redacted] on July 1, 2024.

7) **The consolidation deal — June/July 2025**. Described below at section IV.

8) Across all the Broadstreet investments Mr. Morada recommended, he created urgency and said the same things to me each time. That the opportunity was closing and I had to decide immediately. That it was exclusive. That I should bring in friends and family. And that he invested alongside his clients.

9) On that last point, one instance is worth recording precisely. When I raised doubts specifically about the crypto fund, Mr. Morada told me he was putting $2 million of his own money into it and sent me screenshots of what he represented to be his own account statements. I cannot verify whether those were genuine.

10) I did question him multiple times. I told him more than once that something sounded too good to be true and that I was not comfortable. Each time the answer was reassurance about his own participation and the soundness of the deal, and I relied on it. Over three years I built a personal relationship of trust with him, and that trust is what moved me each time.

## III. What actually happened, in order

11) **Turtle Creek**. The first house did not sell until **July 2023** — more than a year after the eight-to-ten-month representation. Three more followed, in October 2023, February 2024 and July 2024. Of my [redacted], only about [redacted] of capital was ever returned and more then half of it was routed to new crypto fund directly. Total profit on the project was [redacted]

12) **In November 2024**, rather than returning the remaining [redacted] it was moved into a different fund, IF8 Infrastructure. That money has never come back.

13) **The crypto fund**. It did pay for a period, and I want to be accurate about that. But **the final distribution on every one of the eleven positions falls between January and March 2025**. Nothing was paid after that. The conversion into stock in an entity called **ZSQR** began around that time and was not booked until **April 27, 2026** — roughly fourteen months during which our capital was committed and we received nothing. **We were never offered a choice to get our principal back and it was unwillingly converted into publicly traded ZSQR stock.**

14) **Tennessee**. Two years on, there has been exactly one distribution, of [redacted] **— a 14.63% return, not the doubling we were told to expect**. It was reinvested the same day it was declared without our consent, so no money ever reached us.

15) **IF8 Infrastructure**. Paid four quarterly distributions in 2025 and then stopped. The last was **November 15, 2025**. The payments due in February and May 2026 never distributed to us. Capital returned to date: **zero**.

## IV. June–July 2025 — how a further [redacted] was obtained

16) I include this because I have it in writing and it shows how these investments were sold to me.

17) In June 2025 Mr. Morada messaged to say a DocuSign was coming and instructed me: "Select option B and sign." He described a $500m offer for the land infrastructure business, all Broadstreet products consolidating into one fund, a four-year liquidation, and "Should make 3x on our money."

18) I told him I was considering Option A instead — taking my money out. He replied that by the 4.5-year deadline I would have "made 300% or more," that I would receive quarterly payments and should have my principal back within about 2.5 years, and that if I needed capital he could "easily get another client to buy ur share."

19) I said I was not adding funds. I then told him explicitly, on July 5, 2025: "the reason I'm not adding any new funds is that I need money next year around February... I remember you saying that we can withdraw some funds if we wanted later, is that possible?"

20) His reply: "Sure we can accommodate."

21) Five days later: "Let em know what you can add. Closing is Monday." Within hours I had agreed to [redacted]. It was contributed on July 14, 2025.

22) That deal was then scrapped. Every term above was abandoned within months. The [redacted] has produced a single payment of [redacted].

## V. The David Feingold presentation — October 2025

23) Broadstreet held an open house and charity game on October 16–17, 2025 in Greenville, South Carolina. My wife and I attended in person. At an investor breakfast meeting during the event, David Feingold addressed the room.

24) What he told the assembled investors:

a. Broadstreet was **exiting at three times** our money.

b. The company was **selling at a $3 billion valuation**.

c. He anticipated that some investors would not want to continue into the new structure, and said that **those investors would be given a choice — cash out, or stay in and take stock**.

25) I heard this directly. It was delivered from the front of a room to a gathering of Broadstreet investors, so there are many witnesses.

## VI. November 2025 — we chose cash, and were refused six months later

26) The following month, November 2025, the election Mr. Feingold had promised was put to us: take our money in cash, or redeem into stock in the entity going public as SOUL.

27) **We elected cash**.

28) **We were notified in May 2026 that cash would not be paid — six months later, at the point of deadline for returning the money expired**.

29) I want to be clear about what those six months looked like. Having elected to withdraw, our capital stayed with Broadstreet for the entire redemption window. **We received nothing during any of it**. IF8's last distribution was November 15, 2025; the quarterly payments due on February 15 and May 15, 2026 were both missed. So for half a year we had neither our money nor any return on it, waiting on a redemption that was then refused.

30) The reason given was that the sale had not been completed. My understanding is that Broadstreet was unwilling to sell the underlying land in order to fund cash redemptions, and stock was offered in place of the cash we had chosen.

31) **This is the core of my complaint**. It is not that an investment underperformed. A binary choice was put to us, one that a principal of the company had personally committed to in front of a room of investors a month before it was offered. We made our election. Our money was then held for six months, and at the end of that window Broadstreet declined to honor it and planning to give us the publicly traded stock which we had rejected.

**VII. Where this leaves us**

32) Across both accounts we wired approximately [redacted] to Broadstreet between June 2022 and July 2025. To fund it we exhausted our savings and liquidated a separate stock portfolio.

33) Broadstreet's own reports record total contributions of [redacted]. That figure is inflated because money returned from one investment was repeatedly booked as a new contribution to the next — a measure in itself of how much was recycled internally rather than paid to us.

34) As of the July 1, 2026 reports: [redacted] remains as equity in Broadstreet funds, and [redacted] has been converted into ZSQR stock.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13, 2026, in Dallas County, State of Texas.

K Patel

**Kinjalkumar Patel**